## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Jarvis Arrington, individually and on behalf of all others similarly situated, | Civil Action No._____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| Burger King Worldwide, Inc., and Burger King Corporation, | JURY TRIAL DEMANDED |
| Defendants. | |

The allegations contained in this Complaint are based on Plaintiff's personal knowledge as to Plaintiff's own conduct and upon information and belief as to all other matters based on an investigation by Plaintiff's Counsel:

## I.  INTRODUCTION

1.      Plaintiff Jarvis Arrington brings this class action against Defendants Burger King Worldwide, Inc. ("BKW") and Burger King Corporation ("BKC") (together, "Defendants" or "Burger King") for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things, incorporating an employee no-solicitation and no-hiring clause in the standard form franchise agreement all Burger King franchisees are required to sign.  This no-solicitation and no-hiring agreement was an illegal contract, combination and/or conspiracy between and among Defendants and Burger King franchisees.

2.     Pursuant to the standard franchise agreement, BKC and Burger King franchisees agreed not to solicit, poach, or hire workers employed at Burger King restaurants owned by BKC or other Burger King franchisees during their employment and for six months after the termination of their employment.  This "no-poach" agreement is a naked restraint of trade and a *per se* violation of the federal antitrust laws.

3.     Burger King is the world's fifth largest fast-food chain, serving over 11 million customers daily at locations around the world.  In addition to its famous Whopper and other hamburgers, Burger King primarily sells chicken products, french fries, breakfast items, soft drinks, milkshakes, and desserts.

4.     As of 2017, there were 16,767 Burger King restaurants worldwide, with 7,226 restaurants located in the United States.  Only 50 of those restaurants are owned directly by Burger King; the rest are independently owned and operated by franchisees.

5.     Burger King's franchises are significant to its profitability, with franchise and property revenues making up approximately 91-92% of its total revenues in 2015, 2016, and 2017. Franchisees are required to pay Burger King a franchise fee of approximately $50,000, training and other fees, rent where properties are leased from Burger King, and a percentage of monthly gross sales as a royalty to Burger King.  Franchisees are also required to pay for themselves and managers of their Burger King restaurants to attend training programs at Burger King training centers.  The total investment necessary to begin operating a Burger King restaurant is between approximately $323,000 and $3.1 million.

6.     In order to obtain a Burger King franchise, a prospective franchisee is required to sign a standard franchise agreement with BKC.  Beginning in at least 2010 and continuing through at least September 13, 2018, Burger King incorporated a "no-solicitation" and "no-hire" clause

("No-Hire Clause") into its standard franchise agreement.  Specifically, BKC and franchisees agreed to the following:

> Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

7.     Upon information and belief, every franchisee entering into a standard franchise agreement with BKC from at least 2010 through September 13, 2018, signed an agreement containing a substantially identical No-Hire Clause.  Given that the franchise agreement contains standardized terms, franchisees reasonably knew that other franchisees also agreed to the No-Hire Clause.

8.     As the language of the No-Hire Clause makes clear, BKC itself agreed to follow the same no-solicitation and no-hire provisions that it imposed on its franchisees.  Therefore, the No-Hire Clause functioned as an agreement between and among Burger King and its franchisees.

9.     Burger King franchisees also agreed that BKC had the unilateral power to terminate the franchisees' right to operate their Burger King franchises upon the commitment of an act of default, which included failure of the franchisees to comply with the No-Hire Clause.  Burger King franchisees, therefore, ignore the No-Hire Clause at their own peril and to their financial detriment.

10.    The No-Hire Clause is an unreasonable restraint of trade and is *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  As described in the October 2016 Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals*: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se*

illegal under the antitrust laws."[1]  The Guidance further specifies that "firms that compete to hire or retain employees are competitors in the employment marketplace" and "[i]t is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs."[2]

11.     Agreements such as the No-Hire Clause create restrictions on employee mobility and competition in the labor market.  Such agreements give employers power to restrict employee wages, while simultaneously limiting employees' bargaining power to seek increased wages and improved working conditions.  These agreements are particularly harmful in the fast-food industry, where employees are typically paid less than a living wage, and where the skills acquired through employment are only useful at another franchise of the same chain and do not transfer to employment at other fast-food chains or similar businesses.

12.     Moreover, most fast-food employees, including Defendants' employees, do not have the luxury of being unemployed for six months. The No-Hire Clause, therefore, effectively prevented competing Burger King franchisees from competing for experienced employees.

13.     The No-Hire Clause was intended to restrict competition between and among BKC and franchisees and suppress employee wages, and it had such an effect.  Indeed, the No-Hire Clause eliminated any opportunity for franchisees to compete with each other and with BKC for employees, resulting in restricted wages and mobility for employees.  Absent the No-Hire Clause, franchisees could and would have competed with each other and BKC for employees in a free and open marketplace, including on wages and benefits.

---

[1]     *Antitrust Guidance for Human Resource Professionals*, U.S. DEPT. OF JUSTICE (Oct. 2016), https://www.justice.gov/atr/file/903511/download (the "Guidance").

[2]     *Id.*

4

14.     Plaintiff and members of the Class are current and former employees of Burger King restaurants. From at least 2010 forward, Defendants' conduct proximately and foreseeably caused Plaintiff and members of the Class to suffer injuries by suppressing their wages below competitive levels, restricting their benefits, and limiting their ability to seek employment at competing Burger King restaurants.   The No-Hire Clause has deprived Plaintiff and Class members of better wages, benefits, and job growth opportunities.

15.     Given that the No-Hire Clause is contained in the standard franchise agreement and not in employee agreements, Burger King workers are not aware that they are subject to the No-Hire Clause at the time they are hired.   Rather, Defendants fraudulently concealed their unlawful conduct from Plaintiff and members of the Class, and Plaintiff and members of the Class had no way of knowing at the time of their hire that the No-Hire Clause exists in the Burger King franchise agreements or that they would be subject to suppressed wages, restricted benefits, and limited job mobility as a result of the No-Hire Clause.

16.     In January 2018, the Attorney General of the State of Washington (the "Washington Attorney General") began investigating Burger King's inclusion of the No-Hire Clause in its standard franchise agreement. As described herein, the Washington Attorney General deemed the No-Hire Clause a "contract, combination, or conspiracy in restraint of trade" in violation of Washington's antitrust laws.

17.     In response to the investigation, on September 13, 2018, Burger King agreed to remove the No-Hire Clause from its standard franchise agreement for new agreements that are entered into and on renewal of existing agreements.

18.     However, upon information and belief, numerous franchisees continue to operate under previous versions of the Burger King standard franchise agreement, which contain the No-

Hire Clause. Thus, the impact of Defendants' unlawful and anticompetitive conduct is ongoing, continues to this day, and requires injunctive relief to prevent future harm.

19.    Plaintiff and members of the Class seek injunctive relief and damages for their injuries caused by Defendants' collusive, manipulative, and anticompetitive conduct.  Specifically, Plaintiff seeks injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees on behalf of himself and the Class, as defined herein, pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

## II.    JURISDICTION AND VENUE

20.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Section 16 of the Clayton Act, 15 U.S.C. § 26 to award equitable and injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) to award damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

21.    Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d) because Defendants are believed to have resided, transacted business, or were located or had agents located in the District. Additionally, a substantial part of the events giving rise to the claims occurred within this District, and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.  Moreover, Defendants are headquartered in this District.

22.    This Court has personal jurisdiction over Defendants because Defendants have transacted business throughout the United States, including in this District, have substantial contacts with the United States, including in this District, and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States, including in this District.

6

In addition, Defendants' conspiracy was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in the United States, including in this District, and Plaintiff's claims arise out of Defendants' conduct.

23.     Defendants' activities were within the flow of, were intended to and did have a substantial effect on the interstate commerce of the United States.

24.     Burger King restaurants are located in each state in the United States, including within this District.  Burger King conducts substantial business throughout the United States as it operates Burger King restaurants and enters into franchise agreements for franchised Burger King restaurants throughout the United States.

## III.     PARTIES

### A.     <u>Plaintiff</u>

25.     Plaintiff Jarvis Arrington was employed as a line cook at a Burger King restaurant from June through August 2017.  Mr. Arrington was paid $10 an hour for his work as a line cook at the Burger King restaurant located in Dolton, Illinois.  In an effort to increase his pay rate and better his working conditions, Mr. Arrington attempted to transfer to another Burger King restaurant located in Chicago and submitted an application to that restaurant.  Plaintiff was told that his transfer would need to be approved.  When he did not hear back from the restaurant to which he had applied, Mr. Arrington sought employment outside of Burger King.  As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Plaintiff was paid artificially suppressed wages and suffered decreased benefits and job mobility.

### B.     <u>Defendants</u>

26.     Defendant Burger King Worldwide, Inc. is a Delaware corporation headquartered in Miami, Florida.  Burger King Worldwide, Inc. is the parent of Burger King Corporation.

27.     Defendant Burger King Corporation is a Florida corporation headquartered in Miami, Florida.   Burger King Corporation is a wholly-owned subsidiary of Burger King Worldwide, Inc.

**C.      Co-Conspirators and Agents**

28.     Various persons and/or firms not named as defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

29.     Each Defendant and its respective subsidiaries acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

**IV.     FACTUAL ALLEGATIONS**

**A.      Burger King's Business Model**

30.     Since the 2008 recession, fast-food restaurants have generated more jobs than any other sector. Currently, approximately 4.5 million people are employed by quick service restaurants.

31.     Burger King is the world's fifth largest fast-food chain, serving over 11 million customers daily at locations around the world.  Burger King is most well-known for its famous Whopper but also sells other hamburgers, chicken products, french fries, breakfast items, soft drinks, milkshakes, and desserts.

32.     Like numerous other fast-food chains, Burger King franchises the majority of its restaurants.  As of 2017, there were 16,767 Burger King restaurants worldwide, with 7,226

8

restaurants located in the United States. Only 50 of those restaurants are owned directly by Burger King; the rest are independently owned and operated by franchisees.

33.     Defendants, through their direct ownership of certain Burger King restaurants, are competitors of the independently owned and operated franchises, which also compete with each other. Burger King informs franchisees that: (1) "[o]ther BURGER KING Restaurants may compete with your Restaurant"; (2) Burger King franchisees do not receive an exclusive territory; and (3) franchisees "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control." Restaurants owned by Burger King, therefore, compete directly with Burger King franchisees, who in turn also compete with other franchisees to sell their products to customers.

34.     Burger King receives revenue from numerous sources, including rent charged to franchisees for properties Defendants own, royalties based on a percentage of sales by franchisees at their restaurants, fees paid by franchisees, and from operating corporate-owned restaurants. Burger King's franchises are significant to its profitability, with franchise and property revenues making up approximately 91-92% of its total revenues in 2015, 2016, and 2017.

35.     In order to obtain a Burger King franchise, a prospective franchisee must sign a standard franchise agreement with BKC, with a typical term of 20 years. In addition, a franchisee must pay Burger King a franchise fee of approximately $50,000, training and other fees, and a percentage of monthly gross sales as a royalty to Burger King. Franchisees and managers of Burger King restaurants are required to attend training programs at Burger King training centers, with the cost of training borne by the franchisees. The total investment necessary to begin operating a Burger King restaurant is between approximately $323,000 and $3.1 million.

36.     As established by Burger King's standard franchise agreement, Burger King franchises are independently owned and operated by individuals or entities that are intended to be separate legal entities from Defendants. Specifically, the standard agreement states that a Burger King franchisee is an "independent contractor and is not an agent, partner, joint venturer, joint employer or employee of BKC, and no fiduciary relationship between the parties exists."

37.     Other than the bar on soliciting and hiring contained in the No-Hire Clause, Burger King franchisees are "solely responsible for all aspects of the employment relationship with [their] employees, with the sole right to hire, discipline, promote, demote, transfer, discharge, and establish wages, hours, benefits, and employment policies," among other things.

   B.     Employees at Fast-Food Restaurants Face Difficult Economic Conditions

38.     Employees at fast-food restaurants are consistently paid wages that are below the level necessary to be considered a living wage.  According to a report issued by researchers at the University of California, Berkeley, Center for Labor Research and Education and the University of Illinois at Urbana-Champaign Department of Urban & Regional Planning (the "Berkeley Report"), employees at fast-food restaurants received an average of $7 billion of public assistance annually from 2007 to 2011.[3]

39.     The Berkeley Report describes the dire situation faced by fast-food workers in the United States as a result of low wages and lack of benefits: "Low wages paid by employers in the fast-food industry create especially acute problems for the families of workers in this industry. Median pay for core front-line fast-food jobs is $8.69 an hour, with many jobs paying at or near

---

[3]     Sylvia Allegretto, et al., *Fast-food, Poverty Wages: The Public Cost of Low-Wage Jobs in the Fast-Food Industry* (Oct. 15, 2013) U.C. BERKELEY LABOR CENTER, http://laborcenter.berkeley.edu/pdf/2013/fast_food_poverty_wages.pdf.

10

the minimum wage. Benefits are also scarce for front-line fast-food workers; an estimated 87 percent do not receive health benefits through their employer. The combination of low wages and lack of benefits, often coupled with part-time employment, means that many of the families of fast-food workers must rely on taxpayer-funded safety net programs to make ends meet."[4]

40.     Burger King and its franchisees pay entry-level employees in the United States between approximately $7.45 per hour and $12.00 per hour, with approximately $8.00 per hour as the average pay for an entry-level employee.  A full-time employee at this pay level receives $16,640 annually, before taxes and other deductions.  The average pay for a shift manager is approximately $10.00 per hour, or $20,800 annually, and the average pay for an assistant manager is approximately $11.00 per hour, or $22,800 annually.

41.     Although Defendants do not dictate the hourly rate Burger King franchise employees must be paid and instead provide that franchisees are independent decision-makers as to employment issues, including the wages to be paid to employees, the low wages described above are consistent across the Burger King restaurants owned by franchisees and Defendants.

42.     As a result of the No-Hire Clause signed by BKC and all Burger King franchisees, employees at Burger King restaurants nationwide receive consistently low wages and reduced benefits and are subject to limited job mobility.  Because the No-Hire Clause limits workers' mobility and lowers their quit rate, the share of net-returns captured by Defendants are higher.

43.     Employees at fast-food restaurants also face the reality that the training, education, and experience they receive while working at a particular fast-food chain are not transferrable to other restaurants or fast-food chains, because fast-food chains, including Burger King, require

---

[4]     *Id.*

franchisees to use specific brands of communications equipment, computer systems, hardware for back-office and point-of-sale systems, printers and peripherals, backup systems, and proprietary operating procedures.  Training, education, and experience with these systems and procedures is of little value to other restaurants or fast-food chains, who have their own required systems and procedures.  Therefore, an employee of a particular fast-food chain who is forced to leave employment within that chain must essentially start over as an entry-level employee when moving to a different fast-food restaurant chain.

44.     To make matters worse, employees at fast-food restaurants, including Burger King, often suffer wage theft by their employers.  In fact, a study conducted by Anzalone Liszt Grove Research and reported by Fast-Food Forward (the "Fast-Food Forward Report") demonstrated that approximately eighty-four percent of all fast-food employees working in New York City in April 2013 had been paid less by their employers than the wages to which they were legally entitled.[5]

45.     According to the Fast-Food Forward Report, "[a]t McDonald's, Burger King, Domino's, and other chains, workers are experiencing wage theft in a variety of ways—from getting paid less than the legally mandated minimum wage to being required to work off the clock to receiving paychecks with improper deductions or missing hours."[6]

46.     For example, the Fast-Food Forward Report described the working conditions of a "mother of two who earns $7.40 per hour at a Burger King in Brooklyn," who "arrived to work on

---

[5]     *New York's Hidden Crime Wave: Wage Theft and NYC's Fast-food Workers*, FAST-FOOD FORWARD, https://b.3cdn.net/seiumaster/599dede1be985af8ea_xrm6y28qk.pdf (last visited Oct. 1, 2018).

[6]     *Id.*

time for her 12pm shift, but [ ] was told to wait until 1:30pm before she could clock in and start working. She was not paid for the 90 minutes waiting."[7]

47.     The Fast-Food Forward Report detailed the experiences of another Burger King worker who was frequently forced to work through her breaks without pay for that time, in addition to off-the-clock work taking out the trash and putting away boxes in the supply room.[8]   The Burger King employee stated: "It's hard enough for me to pay my rent and bills. I can't afford to work for Burger King for free. Between working through my breaks and doing work after my shift, I'm not getting paid for several hours every week."[9]

48.     The Fast-Food Forward Report further indicated that "almost one-third of cashiers in New York City at fast-food restaurants such as Taco Bell, McDonald's, Wendy's and Burger King report either paying their employer cash out of their own pocket for alleged cash register shortages or having the amount of the shortage deducted from their paychecks, sometimes even if other employees or even managers were using the register."[10]   According to the Fast-Food Forward Report, "McDonald's, Burger King, Domino's and their peers have created a detailed and controlled system of food delivery, which they license to franchisees, yet they largely avoid responsibility for wage theft."[11]

---

[7]     *Id.*

[8]     *Id.*

[9]     *Id.*

[10]     *Id.*

[11]     *Id.*

### C.   <u>Burger King's No-Hire Clause</u>

49.     Burger King franchisees compete with each other and with Defendants, as direct owners of Burger King restaurants, for the business of customers seeking to purchase fast-food. For example, Burger King informs franchisees that it may establish and license other Burger King restaurants in the vicinity of Burger King franchises and that those restaurants "may compete with your Restaurant or may affect customer trading patterns."  Franchisees are further informed that "[b]ecause you will not receive an exclusive territory, you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."

50.     Per the Burger King standard franchise agreement, Burger King franchisees are independent contractors and are not agents, partners, joint venturers, joint employers, or employees of Burger King.  In addition, Burger King franchisees are independent decision-makers as to employment issues, including wages, benefits, and working conditions, and thus, should compete in the labor market.

51.     In a properly functioning labor market, Burger King franchisees would compete with each other and with BKC for the best-performing employees by soliciting and/or hiring workers from other Burger King restaurants.  Increased job mobility and increased information gained from employment solicitation typically increases compensation throughout a labor market.

52.     However, beginning in at least 2010 and continuing through at least September 13, 2018, BKC incorporated the No-Hire Clause into its standard franchise agreement, which all prospective Burger King franchisees are required to execute.  As previously referenced, pursuant to the No-Hire Clause, BKC and Burger King franchisees agree that:

14

> Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

53. The No-Hire Clause contractually prohibits Burger King franchisees from competing with each other and with BKC to obtain the best-performing employees and limits their independent decision-making regarding which employees to hire. Pursuant to the No-Hire Clause, BKC itself agreed to follow the same no-solicitation and no-hire provisions that it imposed on its franchisees with respect to hiring employees for its directly-owned Burger King restaurants.

54. Burger King franchisees also agree that BKC has the unilateral power to terminate the franchisees' right to operate their Burger King franchises upon franchisees' commitment of an act of default, which includes failure of the franchisees to comply with the No-Hire Clause.

55. The standard Burger King employment application available online specifically asks whether an applicant has previously worked for a Burger King restaurant, which helps franchisees and/or BKC identify prospective employees subject to the No-Hire Clause.[12]

56. Burger King informs job applicants that "[t]here are many ways to bring it at Burger King Corporation. Our in-restaurant jobs range from Team Members all the way through to Restaurant General Managers. . . . And of course, we look for experienced professionals to join our above-restaurant functions."[13]

---

[12]    *See* Team Member Application, BURGER KING, https://www.bk.com/careers/in-restaurant-signup?job_role=1354&restaurant_id=331566 (last visited Oct. 1, 2018).

[13]    *See* Job Opportunities, BURGER KING, https://www.bk.com/careers/opportunities (last visited Oct. 1, 2018).

57.     Yet, Burger King fails to inform job applicants about the No-Hire Clause or its anticompetitive effects on their wages, benefits, and job mobility.

**D.      <u>The No-Hire Clause Is Anticompetitive</u>**

58.     Collusive no-poaching agreements like the No-Hire Clause have significant anticompetitive effects.  If Burger King franchisees were not bound by the No-Hire Clause, they would have to compete with each other and with BKC to hire and retain the best employees.  In order to do so, the franchisees and BKC would have to offer higher wages and better benefits to prevent their employees from moving to another Burger King restaurant.  The No-Hire Clause, however, eliminates any incentive for, and in fact prohibits, Burger King franchisees from competing with each other for the best employees.  Because other franchisees and BKC are prohibited from hiring such employees and because such employees cannot readily transfer their training, education, and experience to another restaurant or fast-food chain, Burger King franchisees and BKC are able to artificially restrict the wages and benefits offered to employees and employees are deprived of better job growth opportunities.[14]

59.     In other words, collusive agreements like the No-Hire Clause restrict employee mobility, increase the power of employers like Burger King franchisees and BKC to suppress wages and diminish the power of employees to demand higher wages and better benefits.

60.     The No-Hire Clause is not in the independent best interests of the Burger King franchisees as competitors with each other and BKC, even though it is in the collective interest of the conspirators as a whole when acting together.

---

[14]     *See* Alan B. Krueger and Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, IZA INSTITUTE OF LABOR ECONOMICS (July 2018), http://ftp.iza.org/dp11672.pdf (last visited Oct. 1, 2018).

61.    It is in the independent best interests of the Burger King franchisees to compete for the most talented and experienced employees, since quality employees are critical to the franchisees' financial success.  By adhering to the No-Hire Clause, Burger King franchisees artificially restrict their own ability to hire the best employees, thereby acting in a manner that is inconsistent with their own independent best interests.

62.    By acting in concert, however, the Burger King franchisees and BKC artificially protect themselves from having their own employees poached by other franchises or by BKC.  This allows Burger King franchisees and BKC to retain their best employees while paying restricted wages and offering substandard benefits, working conditions, and promotion opportunities.

63.    The No-Hire Clause does not serve the interest of ensuring that Burger King restaurants produce the best quality product possible.  The No-Hire Clause also does not serve the interests of fast-food customers because it does not incentivize Burger King franchisees or BKC to invest in training workers to improve the Burger King food, customer experience, and service.

64.    The No-Hire Clause does not serve the interests of employees because it does not incentivize Burger King franchisees or BKC to invest in higher wages, better benefits, and/or improved working conditions.  Indeed, the No-Hire Clause commonly impacted all employees at Burger King restaurants by limiting competition, which led to suppressed wages, decreased benefits, and restricted job mobility. The harm not only reached individuals who attempted to obtain employment at a different Burger King restaurant or otherwise would have attempted to gain such employment, but extended to all employees of Burger King restaurants, who were subject to the elimination of competition and the suppression of compensation and benefits.

65.    Consumers can also gain from competition among employers because a more competitive workforce tends to create more or better quality goods and services.  Also, increased

17

competition would lead to higher wages and a decreased need for fast-food workers to rely on public benefits.

66.     In September 2017, *The New York Times* published an article, which noted that "the average fast-food worker takes home just $300 a week before taxes, about a third of what the average private sector worker earns" and detailed how no-poach provisions "keep employees tied to one spot, unable to switch jobs or negotiate higher pay."[15]  According to the article, "[a] lack of worker mobility has long been viewed as contributing to wage stagnation because switching jobs is one of the most reliable ways to get a raise."[16]

67.     The article quoted Alan B. Krueger, an economist at Princeton University and a former chairman of the Council of Economic Advisers who examined agreements for 40 of the nation's largest fast-food companies, who stated that the no-poach clauses "exist mainly to limit both competition and turnover, which can keep labor costs low" and that the clauses "have the potential to restrict competition and significantly influence pay."[17]

68.     According to the DOJ Guidance: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are *per se* illegal under the antitrust laws."[18]  The Guidance further specifies that:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to

---

[15]     Rachel Abrams, *Why Aren't Paychecks Growing? A Burger-Joint Clause Offers a Clue*, N.Y. TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html.

[16]     *Id.*

[17]     *Id.*

[18]     Guidance, *supra* note 1.

expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[19]

69.     In the Spring of 2018, the DOJ issued a Division Update indicating that the "Antitrust Division continues to investigate and prosecute 'no-poach' and wage-fixing agreements."[20]  According to the Update:

> When companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor. The same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services. After all, workers, like consumers, are entitled to the benefits of a competitive market.[21]

The Update further indicated that "[r]obbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[22]

70.     The DOJ reiterated its position on naked no-poach agreements, stating "[n]o-poach agreements are naked if they are not reasonably necessary to any separate, legitimate business collaboration between the employers" and that "[n]aked no-poach and wage-fixing agreements are per se unlawful because they eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers."[23]

---

[19]     *Id.*

[20]     *See No More No-Poach: The Antitrust Division Continues to Investigate and Prosecute 'No-Poach' and Wage-Fixing Agreements*, U.S. DEPT. OF JUSTICE (updated Apr. 10, 2018), https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements (the "Update").

[21]     *Id.*

[22]     *Id.*

[23]     *Id.*

71.     As part of its investigation into unlawful no-poach agreements, in April 2018, the DOJ announced that it had entered into a settlement with several firms in the rail industry, who had entered into anticompetitive no-poaching agreements.[24]

72.     In July 2018, *Reuters* reported that a group of state attorneys general were investigating whether fast-food restaurants, including Burger King, were "using 'no-poach' rules in franchise agreements to hold down wages and limit employee advancement."[25]  The attorneys general stated that "[b]y limiting potential job opportunities, [no-poach] agreements may restrict employees ability to improve their earning potential and the economic security of their families[.]"[26]

73.     As reported by the Labor Department's Bureau of Labor Statistics, restaurant workers make a median of $9.81 per hour and $20,410 annually.[27]  According to *The New York Times*, "the prevalence of [no-poach] provisions has caused concern in some quarters that they may help explain the wage stagnation that has hit fast-food workers especially hard since the recession, even as the nation's unemployment rate has decreased."[28]  *The New York Times* further reported that "no-poach clauses are buried in contracts between the chains and franchisees, which

---

[24]     *See Justice Department Requires Knorr and Wabtec to Terminate Unlawful Agreements Not to Compete for Employees*, U.S. DEPT. OF JUSTICE (Apr. 3, 2018), https://www.justice.gov/opa/pr/justice-department-requires-knorr-and-wabtec-terminate-unlawful-agreements-not-compete.

[25]     Diane Bartz & Alana Wise, *U.S. states probe fast-food franchise deals not to poach workers,* REUTERS (July 9, 2018), https://www.reuters.com/article/us-usa-restaurants-probe/u-s-states-probe-fast-food-franchise-deals-not-to-poach-workers-idUSKBN1JZ2NX.

[26]     *Id.*

[27]     *See id.*

[28]     Rachel Abrams, *'No Poach' Deals for Fast-Food Workers Face Scrutiny by States*, N.Y. TIMES, July 10, 2018, at B3

are not obligated to tell workers about the provisions" and that "[w]orkers may not know they are subject to the restrictions until they try to take another job."[29]

74.     Given this media scrutiny, numerous attorneys general sent letters to various fast-food chains, including Burger King, seeking information about the no-poach provisions included in the chains' franchise agreements.  The letters informed the fast-food chains that no-poach agreements "limit[] potential job opportunities," "restrict employees' ability to improve their earning potential and the economic security of their families[,]" and "deprive other franchisees of the opportunity to benefit from the skills of workers" covered by such agreements.[30]

75.     In July 2018, CNN Money reported that seven fast-food chains, including Arby's, Auntie Anne's, Buffalo Wild Wings, Carl's Jr., Cinnabon, Jimmy John's, and McDonalds, entered into an agreement with the Attorney General of the State of Washington in which they promised to discontinue the use of no-poach agreements in their standard franchise agreements. Massachusetts Attorney General Maura Healy said in a statement that no-poach agreements "unfairly limit the freedom of fast-food and other low-wage workers to seek promotions and earn a better living."[31]

### E.     Burger King Agrees to Remove Its No-Hire Clause

76.     In January 2018, the Washington Attorney General initiated an investigation into no-poach provisions in Burger King's franchise agreements, including the No-Hire Clause.

---

[29]     *Id.*

[30]     Letter from Cynthia Mark, Chief, Fair Labor Div. Mass. Office of the Attorney General, et al.,                     https://www.attorneygeneral.gov/wp-content/uploads/2018/07/2018-07-09-NPNH_Letter_Redacted.pdf (last visited Oct. 1, 2018).

[31]     Jackie Wattles, *7 fast-food chains agree to end 'no-poach' rules*, CNN MONEY (July 12, 2018),   https://money.cnn.com/2018/07/12/news/companies/no-poach-fast-food-industry-wages-attorneys-general/index.html.

77.     On September 13, 2018, the State of Washington filed an Assurance of Discontinuance entered into by BKC (the "AOD") relating to alleged anticompetitive conduct, including entering into and enforcing the No-Hire Clause.[32]   According to the AOD, Attorney General Ferguson asserted that the No-Hire Clause constituted a "contract, combination, or conspiracy in restraint of trade" in violation of Washington antitrust laws.[33]

78.     With regard to the AODs entered into by fast-food chains, including Burger King, Ferguson stated: The "goal is to eliminate no-poach clauses nationwide to benefit workers . . . No-poach provisions create a rigged system where businesses no longer have to compete for workers, putting downward pressure on wages nationwide. That's wrong — and illegal."[34]

79.     As a result of the AOD, Burger King, among others, "must remove any language from existing contracts in Washington within 60 to 120 days" and "[a]t locations outside of Washington state, [Burger King] must remove no-poach clauses as contracts come up for renewal."[35]

80.     The Office of the Washington Attorney General described the anticompetitive effects of no-poach provisions such as the No-Hire Clause, stating "[b]ecause employees cannot move to another location within their corporate brand, their current location has less incentive to

---

[32]     *See* Burger King Corporation Assurance of Discontinuation, *In re: Franchise No Poaching Provisions*, No. 18-2-22877-8SEA (Wash. Super. Ct. Sept. 13, 2018).

[33]     *Id.*

[34]     Press Release, *AG Ferguson secures end to no-poach provisions at eight more restaurant chains nationwide*, WASH. STATE OFFICE OF THE ATTORNEY GENERAL (Sept. 13, 2018), https://www.atg.wa.gov/news/news-releases/ag-ferguson-secures-end-no-poach-provisions-eight-more-restaurant-chains.

[35]     *Id.*

give them raises."[36]   It further stated "economists believe that 'no-poach' clauses reduce opportunities for low-wage workers and stagnate wages."[37]

81.    Although BKC denied committing any antitrust violations, it entered into the AOD and agreed, among other things, to remove the No-Hire Clause from its standard franchise agreement.[38]  BKC also agreed to send a letter, including a proposed amendment to the franchise agreements, to franchisees with restaurants in the State of Washington.[39]   The letter informs Washington franchisees that BKC will no longer include any provisions that restrict the hiring or solicitation of employees in any new U.S. franchise agreement or renewal signed after the date of the AOD.[40]  It further states that BKC "will not enforce any such provisions in any of our franchise agreements in the U.S."[41]

82.    The Amendment to Franchise Agreements (the "Amendment"), which BKC agreed to provide to Washington franchisees, states that BKC "has determined that it is in the best interests of the franchise system to not enforce Section 5.K. of the Franchise Agreement" and that "Section 5.K. is hereby deemed deleted from each Franchise Agreement and is of no further force or effect."[42]   Appendix A to the Amendment provides the text to be deleted from Section 5.K. of the September 1, 2018 franchise disclosure document, i.e., the No-Hire Clause:

---

[36]      *Id.*

[37]      *Id.*

[38]      *See* Burger King Corporation Assurance of Discontinuation, *supra* note 32.

[39]      *See id.*

[40]      *See id.*, Exhibit A.

[41]      *Id.*

[42]      *Id.*, Exhibit B.

K.   Interference with Employment Relations of Others

Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.[43]

## V.   ANTITRUST INJURY

83.   Plaintiff disclaims the need to plead a relevant market for his antitrust claims because the anticompetitive conduct alleged herein constitutes a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

84.   In the alternative, Defendants' anticompetitive conduct constitutes an unreasonable restraint of trade, which resulted in substantial anticompetitive effects in the market in violation of the Sherman Act, 15 U.S.C. § 1, under a "quick look" or "rule of reason" mode of analysis.

85.   Plaintiff and members of the Class are current or former employees of Burger King restaurants.

86.   Burger King franchisees compete with each other and with Burger King restaurants operated by BKC for labor and customers. Burger King franchisees are horizontal competitors with BKC and other Burger King franchisees.

87.   Defendants and their co-conspirators participated as co-conspirators and performed acts in furtherance of the conspiracy alleged herein.

88.   Defendants intended to restrain trade and actually restrained trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by entering into no-poach agreements, including the

---

[43]   *Id.*, Exhibit B, Appendix A.

No-Hire Clause described herein—and their conduct injured competition, Plaintiff, and members of the Class.

89.     Defendants and their co-conspirators shared a conscious commitment to the common scheme designed to achieve the unlawful objective of eliminating competition for labor and suppressing wages, benefits, and employee mobility.

90.     Rather than competing for labor as horizontal competitors typically would, BKC and its franchisees entered into no-poach agreements prohibiting BKC and its franchisees from hiring current and former (for a period of six months) employees from other Burger King restaurants, thereby eliminating competition for labor and suppressing wages, benefits, and employee mobility relative to the but-for world in which franchisees competed with each other and BKC for labor.

91.     Defendants' no-poach agreements included concerted actions and undertakings with its co-conspirators with the purpose and effect of: (a) artificially suppressing the compensation of Plaintiff and Class members at artificially low levels; (b) eliminating competition for labor between BKC and franchisees and among franchisees; and (c) restraining employees' ability to obtain advancement, better working conditions, higher compensation, and more substantial benefits.

92.     Defendants entered into contracts, combinations, and/or conspiracies in restraint of trade in order to lower costs and increase profits for themselves and Burger King franchisees.

93.     Defendants' unlawful conduct has had a substantial effect on interstate commerce and a direct and adverse impact on competition in the United States.

94.     The No-Hire Clause eliminated competition to the detriment of Plaintiff and Class members by depriving them of the chance to bargain for better job opportunities and terms of employment.

95.     The harm not only reached employees who did or otherwise would have moved between Burger King restaurants, but extended to all workers employed at Burger King restaurants.

96.     As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property, in violation of the federal antitrust laws, and have received lower compensation than they would have otherwise.

97.     Absent Defendants' and their co-conspirators' anticompetitive conduct, Plaintiff and Class members would have reaped the benefits of competition.

98.     The injury to Plaintiff and Class members is the type the antitrust laws were designed to prevent and directly flows from Defendants' unlawful anticompetitive conduct.

99.     There is no legitimate business justification for or procompetitive benefits of Defendants' unreasonable restraint of trade.

100.     Defendants are jointly and severally liable for the acts of their co-conspirators.

## VI.     FRAUDULENT CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS

101.     Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the conspiracy and conduct alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived and had no knowledge of Defendants' collusion through the No-Hire Clause and could not reasonably discover the collusion.

102.     The very nature of Defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by Plaintiff and members of the Class, and Plaintiff and members the Class did not have sufficient facts to put them on inquiry notice that there was a conspiracy between and among Defendants and Burger King franchisees.

103.     Plaintiff and members of the Class had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein.  Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy.

104.     As alleged herein, Defendants' collusion was material to Plaintiff and members of the Class at all relevant times.  Within the time period of any applicable statute of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence that Defendants and their co-conspirators were colluding to suppress wages, limit benefits, and/or restrict employee mobility, which Defendants fraudulently concealed.

105.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including but not limited to the No Hire Clause, their collusion to suppress wages, limit benefits, and/or restrict employee mobility for employees of Burger King restaurants.

106.     Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

107.     Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants and their co-conspirators were colluding to suppress wages, limit benefits, and/or restrict employee mobility.

27

108.   For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ACTION ALLEGATIONS

109.   Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and/or (b)(3) on behalf himself and the following nationwide class of those similarly situated:

> All persons in the United States who are current or former employees of a Burger King restaurant operated by Burger King or a franchisee from at least 2010 forward (the "Class").

110.   Excluded from the Class are Defendants and their parents, subsidiaries, and corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators, the court, court staff, Defendants' counsel, and all respective immediate family members of the excluded entities described above. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to add Sub-Classes where appropriate.

111.   The Class is so numerous that individual joinder of all potential members is impracticable. Plaintiff believes that there are at least thousands of proposed members of the Class throughout the United States.

112.   Common questions of law and fact exist to all members of the Class and predominate over any issues solely affecting individual members of the Class.  The common and predominating questions of law and fact include, but are not limited to:

> a)   Whether Defendants entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, or conspiracies, in restraint

of trade or commerce—in the form of the no-poach agreements, including the No-Hire Clause described herein—in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*;

b) Whether Defendants' conduct constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*;

c) Whether Defendants unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*;

d) Whether Defendants entered into contracts, combinations, and/or conspiracies in restraint of trade in order to lower costs and increase profits for themselves and Burger King franchisees;

e) Whether Defendants' unlawful conduct suppressed wages, restricted benefits, and/or restricted job mobility of Plaintiff and Class members;

f) The duration of the conspiracy;

g) Whether Defendants fraudulently concealed their conduct;

h) Whether the conduct of Defendants, as alleged herein, caused injury to the business or property of Plaintiff and members of the Class;

i) Whether Plaintiff and members of the Class are entitled to declaratory and/or injunctive relief and, if so, the nature and extent of such relief; and

j) Whether actual damages, costs, disgorgement, and/or treble damages should be awarded.

113. Plaintiff's claims are typical of the claims of other members of the Class because Plaintiff and all members of the Class share the same injury. As alleged herein, Plaintiff and

members of the Class sustained damages arising out of the same illegal actions and conduct by Defendant.

114.    Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or in conflict with the interests of the other members of the Class.

115.    Plaintiff's interests are co-extensive with and are not antagonistic to those of absent Class members. Plaintiff will undertake to represent and protect the interests of absent Class members and will vigorously prosecute this action.

116.    Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent Class members.

117.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

118.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

119.    The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

120.     The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical. The Class has a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

## VIII.   CLAIM FOR RELIEF

**COUNT ONE**
**VIOLATIONS OF SECTION 1 OF**
**THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1, *ET. SEQ.***

121.     Plaintiff incorporates by reference and re-alleges each preceding paragraph as though fully set forth herein.

122.     Plaintiff brings this claim on behalf of himself and the Class.

123.     As alleged herein, beginning in at least 2010, Defendants entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, or conspiracies, in restraint of trade or commerce—in the form of the no-poach agreements, including the No-Hire Clause described herein—in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

124.     Defendants engaged in anticompetitive behavior by entering into the no-poach agreements, including the No-Hire Clause described herein, and restricting labor competition between and among Defendants and franchisees, which unfairly suppressed wages, restricted benefits, and/or limited employee mobility.

125.     Defendants' contracts, combinations, and/or conspiracies unreasonably restrained trade in violation of the federal antitrust laws.

126.     Defendants' no-poach agreements, including the No-Hire Clause, included concerted actions and undertakings with their co-conspirators with the purpose and effect of: (a) artificially suppressing the compensation of Plaintiff and Class members at artificially low levels; (b) eliminating competition for labor between BKC and franchisees and among franchisees; and

(c) restraining employees' ability to obtain advancement, better working conditions, higher compensation, and more substantial benefits.

127.    Defendants entered into their contracts, combinations, and/or conspiracies in restraint of trade in order to lower costs and increase profits for themselves and Burger King franchisees.

128.    Defendants' unlawful contracts, combinations, or conspiracies, in restraint of trade or commerce are *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

129.    Alternatively, the anticompetitive combination, conspiracy, and/or agreement alleged herein resulted in substantial anticompetitive effects in the market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

130.    In the alternative, Defendants are liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that entering into the no-poach agreements, including the No-Hire Clause described herein, would have an anticompetitive effect on customers, employees, labor, and markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131.    Defendants intended to restrain trade and actually restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants shared a conscious commitment to the common scheme designed to achieve the unlawful objective of suppressing wages, restricting benefits, and/or limiting mobility for employees of Burger King restaurants.

132.    The anticompetitive contracts, combinations, and/or conspiracies alleged herein unreasonably restrained trade, and there is no legitimate business justification for or procompetitive benefits of Defendants' unreasonable restraints of trade. Any alleged

procompetitive benefit or business justification is pretextual and/or could have been achieved through less restrictive means.

133.   The anticompetitive contracts, combinations, and/or conspiracies alleged herein occurred within the flow of and substantially affected interstate commerce.

134.   As a direct and proximate result of Defendants' anticompetitive scheme and concrete acts in furtherance of that scheme, Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

135.   Unless enjoined, Defendants' anticompetitive contracts, combinations, and/or conspiracies will continue.

136.   Plaintiff and members of the Class seek an injunction against Defendants, preventing and restraining the Sherman Act violations alleged herein.  *See* 15 U.S.C. § 26.

137.   Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

138.   Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff and Class members are entitled to treble damages, costs, and attorneys' fees for the violations of the Sherman Act alleged herein.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

A.      Certify this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as representative of the Class and Plaintiff's counsel as counsel for the Class;

B.      Declare Defendants' conduct alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof and all other persons acting or claiming to act on its behalf from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      Find Defendants jointly and severally liable for the acts of their co-conspirators and for the damages incurred by Plaintiff and the Class;

E.      Award actual damages, costs, disgorgement, and/or treble damages under applicable law;

F.      Award Plaintiff and members of the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 (a);

G.      Require Defendants to pay both pre- and post-judgment interest on any amounts awarded;

H.      Award Plaintiff costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

I.      Direct any such further relief that the Court may deem just and proper.

34

## X.     DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 5, 2018

Respectfully submitted,

**PODHURST ORSECK, P.A.**

*/s/ Peter Prieto*
Peter Prieto (FBN 501492)
John Gravante (FBN 617113)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
SunTrust International Center
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
Email: pprieto@podhurst.com
        jgravante@podhurst.com
        mweinshall@podhurst.com
        adelriego@podhurst.com

Joseph H. Meltzer
Kimberly A. Justice
Peter A. Muhic
Melissa L. Troutner
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email: jmeltzer@ktmc.com
        kjustice@ktmc.com
        pmuhic@ktmc.com
        mtroutner@ktmc.com

*Attorneys for Plaintiff Jarvis Arrington and the proposed Class*

35