UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 18-24128-CIV-MARTINEZ-OTAZO-REYES**

JARVIS ARRINGTON, GENEVA
BLANCHARD, and SANDRA MUNSTER,
individually and on behalf of all others similarly
situated,

                    Plaintiffs,

    v.

BURGER KING WORLDWIDE, INC.,
BURGER KING CORPORATION,
RESTAURANT BRANDS INTERNATIONAL,
INC., and RESTAURANT BRANDS
INTERNATIONAL LIMITED PARTNERSHIP,

                    Defendants.

CONSOLIDATED CLASS ACTION
COMPLAINT


JURY TRIAL DEMANDED

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Jarvis Arrington, Geneva Blanchard, and Sandra Munster (together, "Plaintiffs"), on behalf of themselves and all others similarly situated, with knowledge as to their own actions and events and upon information and belief as to other matters, complain and allege against the herein-named defendants as follows:

## NATURE OF THE ACTION

1.      This action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, challenging an employee no-poach and no-hiring agreement orchestrated by Defendants Burger King Worldwide, Inc., Burger King Corporation, Restaurant Brands International, Inc., and Restaurant Brands International Limited Partnership (together, "Defendants" or "Burger King") between and among Defendants and Burger King's nationwide restaurant franchisees, pursuant to which Burger King and the franchisees agreed not to solicit, poach, or hire each other's employees (hereafter the "No-Hire Agreement").

2.      Burger King orchestrated, designed, dispersed, and enforced the No-Hire Agreement among all of its franchisees, at least in part, through explicit contractual agreements (and penalties for violations) in standard franchise documents. The No-Hire Agreement was not reasonably necessary to any legitimate procompetitive benefit. It was nothing more than a market allocation agreement, a category of restraint long held to be *per se* unlawful under antitrust laws.

3.      Plaintiffs and the Class (defined below) are current and former employees of Burger King branded restaurants operated by Burger King or a Burger King franchisee from at least 2010 forward. Plaintiffs and the Class suffered depressed wages and benefits and diminished opportunities as a result of the No-Hire Agreement.

4.      Founded in 1954, Burger King is one of the largest fast food chains in the world, with

over 15,000 restaurants globally. Burger King has stores in all fifty United States states (plus the District of Columbia) and in multiple international markets.

5.      According to Burger King's 2017 Franchise Disclosure Document ("FDD"), more than 99% of its more than 15,000 restaurants worldwide are franchise restaurants. Likewise, as of December 31, 2016, 7,105 of the 7,156 Burger King branded restaurants in the United States (more than 99%) were franchise restaurants. Burger King franchise restaurants are independently owned and operated by franchisees who have executed a standard form franchise agreement with Burger King. Franchisees are separate and distinct legal entities from Burger King.

6.      The FDD expressly warns franchisees that they may face competition from other franchisees or from Burger King's owned and operated restaurants. While this should include competition for both customers and employees, Burger King and the franchises have unreasonably restrained competition for employees.

7.      As part of the system that has made Burger King the fastest-growing fast food restaurant chain in the United States, Burger King franchisees, at the direction of and with the assistance of Burger King itself, have together colluded to depress the wages and employment opportunities of employees who work in Burger King branded restaurants throughout the United States.

8.      Specifically, Burger King and its franchisees have agreed not to solicit or hire each other's employees. In order to obtain a Burger King franchise, a prospective franchisee is required to sign a standard franchise agreement with Burger King Corporation. Since at least 2010 and continuing through at least September 13, 2018, Burger King incorporated the No-Hire Agreement into its standard franchise agreement. Under the heading "Interference with Employment Relations of Others," Burger King and franchisees agreed:

2

> Neither BKC [Burger King Corporation] nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.[1]

Every franchisee signing a Burger King franchise agreement since at least 2010 and before September 2018 executed and agreed to be bound by this No-Hire Agreement.

9.   Repeated breaches of the Burger King franchise agreement may entitle Burger King to terminate the agreement. Franchisees violating the No-Hire Agreement agree that Burger King may terminate the franchise of a franchisee for repeated violations, thus triggering forfeiture of the franchisee's initial franchise fee, potential legal costs and expenses, and imposition of other onerous post-termination restrictions.

10.   The Burger King No-Hire Agreement is an unreasonable restraint of trade. As the Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals* (October 2016) (hereinafter "DOJ/FTC *Guidance*") states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."[2] The DOJ/FTC *Guidance* elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[3]

---

[1] Burger King Corporation 2017 Franchise Agreement (Individual/Owner-Operator) (hereafter "FA"), ¶ 5.K (the No-Hire Agreement).

[2] *Available at* https://www.justice.gov/atr/file/903511/download (last visited Mar. 12, 2019).

[3] *Id.*

3

The No-Hire Agreement between and among Burger King and its franchisees has eliminated employers' incentives and ability to compete for employees, and it has depressed employees' wages and restricted employees' mobility.

11. Consistent with the DOJ/FTC's *Guidance*, the Washington Attorney General concluded in July 2018 that Burger King's No-Hire Agreement constituted an agreement in restraint of trade that "restricts worker mobility and decrease[s] competition for labor by preventing workers from moving among the chain[]'s franchise locations." The Washington AG also determined that this reduction in competition artificially reduced employee compensation during the Class Period by "put[ting] downward pressure on wages." In September 2018, Burger King and the Washington AG entered into a judicial consent order requiring Burger King to eliminate the No-Hire Agreement from future franchise agreements and not to enforce existing agreements. However, the damage had already been done to Burger King employees.

12. Economists have confirmed the Washington AG's findings that no-hire agreements (often referred to as no-poach agreements), like the one implemented among Burger King and its franchisees, depress employee compensation by artificially reducing competition in the labor market. Princeton University economists Alan Krueger and Orley Ashenfelter have studied franchise agreements extensively, and they conclude: (1) that "[a]greements to refrain from recruiting and hiring away employees from other units in a franchise chain are common in franchise contracts;" (2) that those agreements can reduce labor market competition and reduce workers' job opportunities; and (3) that the prevalence of such agreements may help to explain why wage growth has been sluggish despite low unemployment rates.[4]

---

[4] Alan B. Kreuger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, NAT'L BUREAU OF ECON. RES. (July 2018) at 20-1.

13.     The Burger King No-Hire Agreement has and had the effect of restraining competition for hiring employees among Burger King branded restaurants. It is a restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. As a result of the No-Hire Agreement, Plaintiffs and the Class suffered antitrust injury in the form of depressed wages.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15.     The Court has both general and specific personal jurisdiction over Defendants. Defendants Burger King Worldwide, Inc. and Burger King Corporation maintain principal places of business in Miami, Florida and are citizens of this district. Both of these Defendants are subsidiaries of Defendant Restaurant Brands International, Inc., which owns the Burger King brand. Defendant Restaurant Brands International Limited Partnership is a guarantor and has assumed the duties and obligations of Burger King Corporation. Defendants' collusive acts which gave rise to Plaintiffs' claims took place, in substantial part, in this district.

16.     Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. §§ 1391(b)(2), (c)(2).  Burger King transacts or has transacted business in this district. A substantial part of the events that gave rise to this action occurred in this district, including the participation in the conspiracy by and between Burger King and Burger King's franchisees located throughout the United States.

17.     Defendants' acts were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States.  Burger King branded restaurants are in each state in the United States. Burger King engages in substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the

owner of the franchise. Burger King engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## THE PARTIES

*Plaintiffs*

18.    Plaintiff Jarvis Arrington is a citizen and resident of Dolton, Illinois. He was employed as a line cook at a Burger King restaurant from June through August 2017. Mr. Arrington was paid $10 per hour for his work as a line cook at the Burger King restaurant located in Dolton, Illinois. As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Mr. Arrington was paid artificially depressed wages and suffered decreased benefits and job mobility.

19.    Plaintiff Geneva Blanchard is a citizen and resident of New Orleans, Louisiana. She was employed since 2013 by GPS Hospitality Partners IV, LLC, a Burger King franchisee that owned and operated the Burger King store located at 120 Brownswitch Road, Slidell, Louisiana. Ms. Blanchard was employed by GPS Hospitality Partners IV, LLC in job roles including crew member. As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Ms. Blanchard was paid artificially depressed wages and suffered decreased benefits and job mobility.

20.    Plaintiff Sandra Munster is a citizen and resident of Ottawa, Illinois. She was employed by Cave Enterprises, Inc., a Burger King franchisee that owns and operates more than 100 Burger King branded restaurants located in Wisconsin, Michigan, Illinois, Indiana, Minnesota, and South Dakota. Ms. Munster was employed for about fifteen years at the Burger King branded restaurant located at 209 East Norris Drive, Ottawa, Illinois, 61350, starting as a supervisor and eventually rising to the position of general manager. As a result of Defendants' and their co-

conspirators' collusive and anticompetitive conduct, Ms. Munster was paid artificially depressed wages and suffered decreased benefits and job mobility.

***Defendants***

21.     Defendant Burger King Worldwide, Inc. ("BKW") is a Delaware corporation with its principal place of business at 5505 Blue Lagoon Drive, Miami, Florida 33126. BKW is a citizen of Florida. BKW is the parent of Burger King Corporation.

22.     Defendant Burger King Corporation ("BKC") is a Florida corporation with its principal place of business at 5505 Blue Lagoon Drive, Miami, Florida 33126.  BKC is a citizen of Florida.  BKC is the current franchisor of Burger King brand franchise restaurants in the United States and also owns and operates approximately fifty Burger King branded restaurants in the Miami area.  BKC is a wholly-owned indirect subsidiary of BKW.

23.     In 2010, private investment firm 3G Capital acquired BKC and BKW.  In 2014, 3G Capital merged Burger King into Defendant Restaurant Brands International, Inc. ("RBI").

24.     RBI is an Ontario corporation based in Oakville, Ontario, Canada. RBI owns the Burger King brand through its subsidiaries, BKW and BKC.  RBI is a citizen of Canada.

25.     RBI is one of the world's largest quick-service restaurant companies, with approximately $23 billion in system sales and over 18,000 restaurants in 100 countries.  In addition to Burger King, RBI also owns Tim Hortons® brand restaurants and Popeyes® brand restaurants.

26.     Defendant Restaurant Brands International Limited Partnership ("RBI Ltd. Partnership") is an Ontario limited partnership based in Oakville, Ontario, Canada. RBI Ltd. Partnership is a citizen of Canada.

27.     RBI serves as the sole general partner of RBI Ltd. Partnership.

28.     RBI Ltd. Partnership, pursuant to an April 5, 2017 Guarantee filed with the State

of Minnesota, "absolutely and unconditionally guarantees to assume the duties and obligations of Burger King Corporation, located at 5505 Blue Lagoon Drive, Miami, Florida 33126 (the 'Franchisor'), under its franchise registration in each state where the franchise is registered, and under its Franchise Agreements identified in its 2017 Franchise Disclosure Document, as it may be amended, and as those Franchise Agreements may be entered into with franchisees and amended, modified or extended from time to time."

29.     Burger King is in the business of selling food to customers primarily through independently owned and operated franchise restaurants. It has multiple franchise restaurants in every U.S. state and the District of Columbia.

## AGENTS AND CO-CONSPIRATORS

30.     Defendants' agents, including their officers, employees, or other representatives, ordered, authorized, or performed the acts alleged in this Complaint on Defendants' behalf in the normal course of their duties as Defendants' agents engaged to manage and operate Defendants' businesses or affairs.

31.     Various other corporations and persons not named as defendants in this Complaint, including Burger King's franchisees, participated as co-conspirators in the violations alleged and performed acts in furtherance of the conspiracy to depress wages.

32.     Defendants are jointly and severally liable for the acts of their co-conspirators, whether named or not named as defendants in this Complaint.

## FACTUAL ALLEGATIONS

***The Burger King No-Hire Agreement Benefits Burger King and Franchisees at the Expense of Their Employees, Depressing Wage Growth***

33.     In a properly functioning and lawfully competitive labor market, Burger King and its franchisees would compete for labor. A properly functioning market would involve prospective

employers freely communicating with prospective employees—even if the employee does not first express interest—and employees communicating intra-store and at other Burger King branded restaurants about wages and other employment opportunities.

34. For instance, if Franchise A wants to hire a certain employee who works at Franchise B, then Franchise A would be free to contact that employee about an employment opportunity. Conversely, if an employee of Franchise B perceives Franchise A to be a better organization— whether because of increased wages, better benefits, or otherwise—then the employee would be free to communicate with Franchise A about potential employment. Soliciting is a key competitive tool for companies seeking to recruit employees.

35. Burger King's No-Hire Agreement, however, prohibits such lateral hiring of employees because Franchise A cannot solicit or hire Franchise B's current employees or even former employees who worked at Franchise B within the past six months. Franchises also cannot solicit or hire current or former employees of restaurants operated by Burger King under the same terms.

36. No-hire agreements, in general, significantly impact employee compensation. For example, an employee of Franchise B will lack information regarding Franchise A's compensation, benefits, and conditions of employment unless communications are permitted; without such information, the employee lacks leverage when negotiating for a raise or promotion, among other things, with Franchise B. Similarly, unconstrained by a No-Hire Agreement, if an employee of Franchise B receives an offer of higher compensation from Franchise A or a restaurant operated by Burger King, the employee can either accept that offer or attempt to negotiate a pay increase with Franchise B. Either way, the employee's compensation increases. Burger King's No-Hire Agreement eliminated this competition.

37.     The beneficial effects of competition (and beneficial effects on compensation) are not limited to those particular individuals who speak to a rival company about an employment opportunity. The effects also reach all similarly-situated employees because of the effect on information flow and on competition for labor. An employee of Franchise B who receives information regarding potential compensation from a rival employer will also likely inform other Franchise B employees. These Franchise B employees can then use that information to negotiate pay increases or move to another higher-paying franchise employer. Increased mobility combined with increased information and transparency regarding compensation levels tends to increase compensation across all employees. After all, there is pressure amongst rival employers to match or exceed the highest compensation package offered by rivals in order to gain and retain employees.

38.     Because the owners of Franchise A and Franchise B know that they have eliminated labor competition between them through the No-Hire Agreement, each understands that they do not need to compensate their employees as much as they would otherwise to retain them and head off competitive threats.

39.     Agreements to allocate service markets, such as the No-Hire Agreement, are functionally the same as agreements to allocate territories for the sale of products. Both are simply a means to fix prices. "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says business economics and public policy Professor Joseph Harrington of the Wharton School of Business.[5]

---

[5] Knowledge@Wharton, *Silicon Valley's No-poaching Case: The Growing Debate over Employee Mobility*, WHARTON SCH. OF THE UNIV. OF PENN. (Apr. 30, 2014),

40.     According to Professor Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, agreements not to compete for each other's employees are unfair to employees, and such a pact "benefits the companies at the expense of their employees."[6] Mr. Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."[7]

41.     Agreements to allocate service markets can be much more pernicious than agreements to allocate product markets, which are *per se* illegal under the antitrust laws. Every employer exercises market power over its employees in a manner that surpasses the market power of nearly every seller of products over its customers. Employment relationships are much stronger than customer relationships for at least three reasons. First, it is difficult and costly to switch employers: employees must decide to apply to another job, submit an application, be interviewed, and, if offered a job, change a fundamental and regular part of their life. By contrast, a customer of products may freely switch from one brand to another. Second, the value of an employee varies from one potential employer to another. An employee trained and experienced in the Burger King system is more valuable to Burger King branded stores than to other rival fast food brands. The pay that employees can earn varies from one employer to another depending in large part on this varying employer-specific value. A customer, on the other hand, does not pay more for a Whopper if the customer has not purchased a Whopper before. The prices of products are the same across customers, while the pay for work varies across employees. Third, employers regularly discourage

---

http://knowledge.wharton.upenn.edu/article/silicon-valleys-poaching-case-growing-debate-employee-mobility/ (last visited Mar. 12, 2019).

[6] *Id.*

[7] *Id.*

or outright prohibit employees from sharing compensation information with each other.  The reason is that information is power: asymmetrical information allows the employer to pay its employees less. Again, product markets are very different with transparent and advertised prices.

42.      For example, a customer of Burger King may easily decide to buy a hamburger from McDonald's on a particular night, then try Wendy's for lunch the next day, go back to Burger King for dinner that night, and so on, with no switching costs and no reputational injury in the process. An employee of Burger King, on the other hand, has no such freedom with respect to her employment.

43.      Thus, in many ways, employment relationships are much "stickier" and are far harder to change than customer relationships. The strength of the employer/employee relationship provides employers with the power to depress pay, particularly when they act in concert with their direct labor competitors to eliminate competition among them.

44.      In the absence of a No-Hire Agreement, a Burger King store or a franchise owner would face increased pressure to offer periodic pay increases, superior benefits, better working hours, and better work-schedule flexibility to retain employees.

45.      Thus, the No-Hire Agreement raises Burger King's and franchisees' power in the labor market at the expense of employees' bargaining power. This is especially harmful to employees of Burger King branded restaurants, as those employees are frequently paid below a living wage. Further, the marketable skills they acquire through their work at Burger King branded restaurants primarily have value only to other Burger King branded restaurants and do not transfer to other quick-service restaurants. *See* ¶¶ 100–105, *infra*.

46.      If Burger King and franchisees did not bind themselves to the No-Hire Agreement, they would compete with each other to hire and retain employees by offering higher wages and

better benefits, to prevent their employees from moving to another Burger King restaurant. The No-Hire Agreement eliminates any incentive for, and in fact prohibits, Burger King branded restaurants from competing with each other for employees. Thus, employees are deprived of higher wages and better job growth opportunities.[8]

***Employees at Quick-Service Restaurants Face Difficult Economic Conditions***

47.     Although current unemployment figures in the United States are relatively low, wage growth has been slow. A decade removed from the Great Recession, annual wage growth has remained stuck below 3%. A growing number of commentators have identified proliferating employer no-poach agreements—including those used within franchise systems—as significant contributors to this stagnant wage growth.[9]

48.     Approximately 4.5 million people are currently employed by quick-service restaurants.

49.     In 2014, the average hourly wage of fast food employees was $9.09, or less than $19,000 per year for a full-time worker. The poverty level of a family of four in the United States is $23,850.[10]

---

[8] *See* Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, IZA INST. OF LABOR ECONS. (July 2018), http://ftp.iza.org/dp11672.pdf (last visited Mar. 12, 2019).

[9] *See, e.g.*, Rachel Abrams, *Why Aren't Paychecks Growing? A Burger-Joint Clause Offers a Clue*, N.Y. TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html (last visited Oct. 23, 2018); Alan B. Krueger & Eric Posner, *Opinion: Corporate America Is Suppressing Wages For Many Workers*, N.Y. TIMES (Feb. 28, 2018), https://www.nytimes.com/2018/02/28/opinion/corporate-america-suppressing-wages.html (last visited Mar. 12, 2019).

[10] Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack*, CNN BUSINESS (May 20, 2014), http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited Mar. 12, 2019).

50.     Employees at quick-service restaurants are consistently paid wages that are below the level necessary to be considered a living wage. According to a report issued by researchers at the University of California, Berkeley, Center for Labor Research and Education and the University of Illinois at Urbana-Champaign Department of Urban and Regional Planning (the "Berkeley Report"), employees at fast-food restaurants received an average of $7 billion of public assistance annually from 2007 to 2011.[11]

51.     The Berkeley Report describes the dire situation faced by fast-food workers in the United States as a result of low wages and lack of benefits: "Low wages paid by employers in the fast-food industry create especially acute problems for the families of workers in this industry. Benefits are also scarce for front-line fast-food workers; an estimated 87 percent do not receive health benefits through their employer. The combination of low wages and benefits, often coupled with part-time employment, means that many of the families of fast-food workers must rely on taxpayer-funded safety net programs to make ends meet."[12]

52.     According to one estimate, Burger King and its franchisees pay entry-level employees approximately $8.87 to $9.17 per hour. A full-time employee, earning $9.17 per hour, receives about $19,074 annually, before taxes and other deductions. The average pay for a shift manager is approximately $10.57 per hour, or $21,986 annually; and the average pay for an assistant manager is approximately $11.10 per hour, or $23,088 annually.[13]

---

[11] Sylvia Allegretto, et al., *Fast-food, Poverty Wages: The Public Cost of Low-Wage Jobs in the Fast-Food Industry*, at 1 (Oct. 15, 2013) U.C. BERKELEY LABOR CTR., http://laborcenter.berkeley.edu/pdf/2013/fast_food_poverty_wages.pdf (last visited Mar. 12, 2019).

[12] *Id.*

[13] *Burger King Salaries in the United States*, Indeed.com, https://www.indeed.com/cmp/Burger-King/salaries (last visited Mar. 12, 2019).

53.    Although Defendants do not dictate the hourly rate Burger King franchise employees must be paid—and instead provide that franchisees are independent decision-makers as to employment issues, including the wages to be paid to employees—the low wages described above are consistent across the Burger King branded restaurants owned by Defendants and franchisees.

54.    Defendants' No-Hire Agreement artificially depresses wages and decreases benefits and job mobility, thus exacerbating the conditions faced by Burger King fast-food workers. Further, because the No-Hire Agreement limits workers' mobility and lowers their quit rate, the share of net-returns captured by Defendants are higher.

***Responding to Government Action, Burger King Eventually Entered Into an Assurance of Discontinuance of the No-Hire Agreement with One State's Attorney General While Other States' Investigations Continue***

55.    In July 2018, Attorneys General from eleven states announced an investigation into no-poaching hiring practices at a number of fast food franchise chains, including Burger King. According to a release from Illinois Attorney General Lisa Madigan, the state of Illinois is investigating no-poach agreements because those agreements "unfairly stop[] low-income workers from advancing and depress[] their wages."[14] The state AGs demanded documents and information from franchisors about agreements not to compete for employees.

56.    In July 2018, Washington Attorney General Bob Ferguson announced that seven franchisors had reached agreements to discontinue enforcement of no-hire and/or no-poach provisions and to take steps to remove such language from franchise agreements going forward.

---

[14] Hailey Mensik, *Illinois, 10 other states take aim at 'no-poaching' clauses that critics say limit fast food workers' pay*, CHICAGO TRIBUNE (July 9, 2018), https://www.chicagotribune.com/business/ct-biz-fast-food-non-compete-investigation-20180709-story.html (last visited Mar. 12, 2019).

Burger King was not among these franchisors.

57.     In August 2018, Attorney General Ferguson announced that in order to avoid lawsuits, eight additional restaurant chain franchisors had agreed to discontinue enforcement of no-hire and no-poach provisions and to take steps to remove such language from franchise agreements going forward. Burger King was also not among these franchisors.

58.     In September 2018, Burger King finally entered into an Assurance of Discontinuance ("AOD") relating to the No-Hire Agreement evidenced in its then-current franchise agreement.  AG Ferguson announced on September 13, 2018, that among eight additional restaurant chain franchisors, Burger King had agreed to discontinue enforcement of no-poach / no-hire provisions and to take steps to remove such language from some franchise agreements going forward. In particular, Burger King agreed that it would, among other things, (i) no longer include the no-solicit and no-hire provision in any of its new (or renewing) franchise agreements in the United States; (ii) not enforce the no-solicit and no-hire provision in any existing franchise agreements in the United States; (iii) notify all current U.S. franchisees of its agreement with the Washington AG; and (iv) take steps to encourage franchisees that have stores in the state of Washington to remove the provisions immediately and to replace them with a proposed amendment. The AOD specifically notes that Burger King "is under no obligation to offer its franchisees any consideration—monetary or otherwise—in order to induce them to sign the proposed amendment [removing the provisions], or take any adverse action against such franchisees if they refuse to do so."

59.     Defendants, however, made no assurance that they will attempt to remove the provisions from existing franchise agreements with non-Washington franchisees. Nor did any action taken by AG Ferguson or by Burger King resolve any civil liability to franchisee employees

in Washington or anywhere else. For example, the AOD did *not require*: (i) Burger King and franchises to rescind the No-Hire Agreement in current franchise agreements; (ii) Burger King to *inform* franchisees that enforcing the No-Hire Agreement is unlawful and in violation of the AOD; (iii) Burger King or franchisees to inform current and former employees that the No-Hire Agreement existed in the past and will no longer be enforced; or (iv) that any compensation for past wage depression be paid to Burger King current or former employees.

60.    As of January 2019, *fifty* franchisors had entered into legally binding agreements with the Washington AG to remove no-hire / no-poach provisions from their franchise agreements.

61.    On March 12, 2019, Maryland Attorney General Brian E. Frosh (and other state attorneys general) announced that four national fast food franchisors had reached multi-state agreements to discontinue enforcement of no-hire and/or no-poach provisions. "'No-poach agreements limit a worker's job opportunities and earning potential,' stated AG Frosh. 'These settlements mean fairer hiring practices for thousands of workers in Maryland and across the country.'" Burger King was not among the settling franchisors, and investigations into Burger King continue.[15]

## THE BURGER KING SYSTEM

### *The Franchise Model: Burger King Branded Restaurants Compete with One Another, Except for Labor*

62.    Burger King revenues come from three sources: (i) franchise revenues, consisting primarily of royalties based on a percentage of sales reported by franchise restaurants and franchise fees paid by franchisees; (ii) property revenues from properties it leases or subleases to franchisees;

---

[15] *Attorneys General Reach Settlements with Four Fast Food Chains to End Use of No-Poach Agreements*, Maryland Attorney General Press Release (Mar. 12, 2019), *available at* http://www.marylandattorneygeneral.gov/press/2019/031219.pdf (last visited Mar. 13, 2019).

and (iii) sales at restaurants owned by Burger King.[16]

63.     Burger King franchises the majority of its restaurants. As of 2017, there were 16,767 Burger King branded restaurants worldwide, with 7,226 restaurants located in the United States. Approximately fifty of those restaurants are owned directly by Burger King. The rest are independently owned and operated by franchisees.

64.     Burger King's franchises are significant to its profitability, with franchisee and property revenues making up approximately 91-92% of its total revenues in 2015, 2016, and 2017.

65.     As established by Burger King's standard franchise agreement, Burger King franchises are independently owned and operated by individuals or entities that are intended to be separate legal entities from Defendants. The standard agreement states that a Burger King franchisee is an "independent contractor and is not an agent, partner, joint venturer, joint employer or employee of BKC, and no fiduciary relationship between the parties exists."[17] The franchise agreement also states that "[i]n all public records and in FRANCHISEE's relationship with other persons, on stationery, business forms and checks FRANCHISEE shall indicate independent ownership of the Franchised Restaurant. . . ."[18]

66.     Except for the limitations imposed by the No-Hire Agreement, franchisees are responsible for day-to-day operations, including all employment matters. Each franchisee specifically agrees that it is "solely responsible for all aspects of the employment relationship with its employees, with the sole right to hire, discipline, promote, demote, transfer, discharge, and establish wages, hours, benefits, employment policies, and other terms and conditions of employment

---

[16] RBI 2016 Form 10-K Annual Report, at 4.

[17] FA, ¶ 11.B.

[18] *Id.*

for its employees without consultation with or approval by BKC."[19]

67.    Likewise, the hiring section of Burger King's website directs prospective employees to the particular openings available at specific franchise and store locations in the geographic area selected by the prospective employee. Burger King's website asserts that "[j]ob descriptions, compensation, benefits and other employment terms and conditions applicable to positions at independent franchised BURGER KING® Restaurants will vary and are determined solely by the Franchisee."

68.    In order to obtain a Burger King franchise, a prospective franchisee must sign a standard franchise agreement with BKC, with a typical term of twenty years, and pay Burger King a franchise fee of approximately $50,000. The total investment necessary to begin operating a Burger King restaurant is between approximately $323,000 and $3.1 million. Once open for business, franchisees pay Burger King royalties of up to 4.5% of gross sales and an "Advertising Contribution" of 4% of gross sales.

69.    Each franchisee is responsible for locating an appropriate restaurant site, which must be approved by Burger King. The franchise is required to operate the restaurant at the specific site that Burger King approves, and it may not relocate without Burger King's approval.

70.    A Burger King franchisee agrees contractually to identify itself as an independent owner of the franchised restaurant in all public records, stationery, business forms, and checks. It agrees to exhibit in the restaurant "a notification that the Franchised Restaurant is operated by an independent operator and not by BKC."[20]

71.    In executing the Burger King franchise agreement, franchisees agree that the

---

[19] *Id.*

[20] *Id.*

franchise "is for the specified location only and does not in any way grant or imply any area, market, or territorial rights proprietary to Franchisee."

72.     Except for the No-Hire Agreement, restaurants owned by Burger King and franchisees compete with one another.

73.     In the FDD, Burger King tells prospective franchisees that "the quick service restaurant industry in which you will operate is intensely competitive. You compete with other restaurants in the quick service industry and other food service companies." The Burger King franchise is for a single restaurant at a specified location and "does not grant [the franchisee] or imply any type of area or territory, exclusive, protected or otherwise, or protected customer base." The FDD informs franchisees that they "do not have any right to prevent or restrict the development of other restaurants at any other location, at any time."

74.     Burger King notifies franchisees that "[o]ther BURGER KING Restaurants may compete with your Restaurant or may affect customer trading patterns. Because you will not receive an exclusive territory, you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."[21]

**The No-Hire Agreement**

75.     BKC and Burger King franchisees have expressly agreed mot to compete with each other with respect to employee hiring.  This agreement is evidenced by and memorialized in explicit contractual terms contained in franchisees' Burger King franchise agreements.

76.     Since at least 2010, Burger King and each franchisee contractually agreed that they would not:

> attempt, directly or indirectly, to entice or induce or attempt to entice or
> induce any employee of [BKC] or of another Franchisee of BKC to leave

---

[21] *Id.*

such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.[22]

77.     Burger King uses a slightly different form franchise agreement for franchisees that are corporate entities (rather than individuals). Under that form agreement, Burger King and franchisees also agree to not solicit or employ any employee of the other or of another franchisee within six months after his or her termination of employment with such employer, except with prior written consent of the employer. As to those franchisees, the agreement also contemplates that where "such employee is employed by a parent, Affiliate or subsidiary of Franchisee, the period of such employment will not be counted towards the six (6) month period[.]"[23]

78.     The No-Hire Agreement contractually prohibits Burger King franchisees from competing with each other and with BKC to obtain (or retain) employees and limits the stores' independent decision-making regarding which employees to hire.

79.     Franchisees also agreed that BKC or franchisees would be entitled to recover all costs and attorneys' fees and costs (including those incurred on appeal) incurred in legal action brought to enforce the agreement.[24]

80.     Pursuant to the No-Hire Agreement, BKC itself agreed to follow the same no-solicitation and no-hire provisions that it imposed on its franchisees with respect to hiring employees for its directly-owned Burger King branded restaurants.

81.     Burger King franchisees also agreed that BKC has the unilateral power to terminate the franchisees' right to operate their Burger King franchises upon franchisees' commitment of an

---

[22] *Id.* at ¶ 5.K ("No-Hire Agreement").

[23] 2017 Burger King Franchise Agreement (Corporate).

[24] *See* FA, ¶ 21.J. ("Attorney's Fees").

act of default, which includes failure of the franchisees to comply with the No-Hire Agreement.

82.     Repeated breaches of the franchise agreement can amount to "default" of the agreement. In executing the franchise agreement, franchisees agree that if Burger King provides notice of intent to terminate due to repeated breach, it thereafter has the right to terminate the agreement upon notice and without further opportunity to cure. Violations of the No-Hire Agreement thus risk the franchisee's entire investment in the business.

83.     Franchise termination carries additional risks. In executing franchise agreements, Burger King franchisees contractually covenant that they will not operate or have any interests in any hamburger business for a period of one year after termination of the agreement within a two-mile radius.[25]

84.     Where a franchisee is a non-individual business entity, managing owners of the franchisee must also execute notarized personal guarantees pursuant to which they agree to be personally bound by the non-competition covenants contained in the franchise agreement.

85.     The No-Hire Agreement is not in the independent interest of Burger King and franchisees if acting unilaterally. Employees are critical to the success of Burger King franchises and restaurants. A significant component of making the franchise profitable is hiring qualified employees. Therefore, it is in the independent interest of each Burger King franchisee to compete for employees.

86.     The No-Hire Agreement artificially restricts franchisees' ability to hire employees in a manner that would be consistent with their own unilateral economic interests. By acting in concert, however, they also protect themselves from having their own employees poached by other franchisees. This allows Burger King and franchisees to retain employees without having to pay

---

[25] *Id.* at ¶ 19.

competitive wages to these employees or compete over working conditions and promotion opportunities.

87.    Crucially, the No-Hire Agreement does not serve restaurant employees because it does not incentivize Burger King or franchisees to invest in higher wages, benefits, and improved working conditions, *i.e.*, to compete for their labor. It also dis-incentivizes employees from performing their best because franchisees do not have to offer compensation increases or improved benefits to retain employees. Competition among employers helps actual and potential employees through higher wages, better benefits, or other employment terms.

***Burger King Employees Are Not Made Aware of the No-Hire Agreement***

88.    Burger King franchises, like other franchises, are made available on standardized terms. So a franchisee who enters into a Burger King franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

89.    The Burger King FDD includes a list of all Burger King franchisees, organized by state, city, and street address.  Franchisees thus know that the No-Hire Agreement memorialized in the franchise agreement applies to all Burger King branded restaurants.

90.    The standard Burger King employment application available online specifically asks whether an applicant has previously worked for a Burger King restaurant, which helps franchisees and BKC identify prospective employees subject to the No-Hire Agreement.

91.    Burger King informs job applicants that "[t]here are many ways to bring it at Burger King Corporation. Our in-restaurant jobs range from Team Members all the way through to Restaurant General Managers. . . . And of course, we look for experienced professionals to join

our above-restaurant functions."[26]

92.     In the "Careers" section of its website, Burger King tells prospective employees that "if you are looking for a chance to really make something of yourself, that's exactly what you'll find at BKC." Burger King assures prospective employees that ". . . you'll never be short of opportunities to show what you've got[]" and that "there's no limit to how far you could go here."[27]

93.     Yet, Burger King fails to inform prospective employees and actual employees about the No-Hire Agreement or its anticompetitive effects on employee wages, benefits, and job mobility. As far as advancement within the Burger King system, the No-Hire Agreement effectively limits employees to the four walls of a particular Burger King where the worker is employed.

***The No-Hire Agreement Remains in Effect at Thousands of Burger King Stores***

94.     Even though Burger King purportedly removed the no-poach, no-hire language from new franchise agreements on a going-forward basis, beginning in September 2018, there were and are thousands of Burger King franchise restaurants already in existence and operating under older versions of the franchise agreement that contained those provisions.

95.     Franchisees specifically contract for a franchise agreement that can be modified or amended only by a subsequent written document executed by both Burger King and the franchisee.

96.     The No-Hire Agreement is short-sighted and ultimately not in the franchisees' independent interest, even though it is in the interest of the conspirators as a whole when acting together.

97.     In addition to their shared motivation to enforce the No-Hire Agreement and their

---

[26] *See Team Member Application*, BURGER KING, https://www.bk.com/careers/in-restaurant-signup?job_role=1354&restaurant_id=331566 (last visited Mar. 12, 2019).

[27] http://www.bk.com/careers/bring-it-bkc (last visited Mar. 12, 2019).

actual understanding of the No-Hire Agreement, Burger King franchisees also have abundant opportunity to communicate about and coordinate the collusive No-Hire Agreement.

98.     More than 75% of Burger King franchise restaurants in the U.S. and Canada are represented by the National Franchisee Association ("NFA"), which holds annual conferences for franchisee networking and education. Other regional franchisee associations, such as the Great Western Franchisee Association ("GWFA") and the New South Coalition ("NSC"), also provide forums and advocacy for hundreds of Burger King franchise restaurants. The GWFA hosts at least two franchisee meetings each year and both groups foster franchisee communication to advance the cause of working together to enhance the value of franchise investment.

99.     By acting in concert, Burger King and the franchisees artificially protect themselves from having their own employees poached by one another. This allows Burger King franchisees and BKC to retain their employees while paying restricted wages and offering substandard benefits, working conditions, and promotion opportunities.

***Burger King Employees Cannot Easily Leverage Their Skills to Gain Employment Elsewhere and Thus Employment with Non-Burger King Brands Is Not a Reasonable Alternative***

100.     Training, education, and experience within the Burger King system are not transferrable to other restaurant brands for a number of reasons.

101.     Burger King franchises are required to utilize Burger King's own operations systems, including its Manual of Operating Data or "MOD Manual," which is considered confidential and proprietary information that each franchisee must agree not to disclose. The MOD Manual is comprised of the Burger King operations manual, the restaurant equipment manual, approved brands and distributors list, approved equipment list, and the brand standards guide, among other documents. The purpose of the MOD Manual is to protect Burger King's standards, the Burger King system, and the Burger King trademarks. Experience and training with these systems is of little

value to other restaurants.

102.     Burger King reserves for itself the right to specify or require certain brands or models of communications equipment, computer systems, hardware for back-office and point-of-sale systems, printers and peripherals, backup systems, and the like. Experience with these systems is of little value to other brand restaurants.

103.     Franchisees use approved or mandatory suppliers and vendors affiliated with Burger King. Experience with these vendors is of little value to other restaurants.

104.     Moreover, franchisees must use the computers, point-of-sale equipment, and systems specified by Burger King and must also collect, process, and store customer data specified by Burger King. Franchisees are required to generate reports and records required by Burger King and allow access to all such records and reports.  In addition, Burger King requires that all franchisees transmit point-of-sale data to Burger King through data reporting systems approved by Burger King. Training or skill in the operation of these systems is of little use to non-Burger King branded restaurants.

105.     In sum: The No-Hire Agreement resulted in greater profits for Defendants and franchisees, and it has resulted in, and continues to result in, depressed wages and reduced employment opportunities for Plaintiffs and Class members.

**REPRESENTATIVE PLAINTIFFS' ALLEGATIONS AND ANTITRUST INJURY**

*Plaintiff Jarvis Arrington*

106.     Plaintiff Jarvis Arrington was employed as a line cook at a Burger King restaurant from June through August 2017.  Mr. Arrington was paid $10 an hour for his work as a line cook at the Burger King restaurant located in Dolton, Illinois.  In an effort to increase his pay rate and better his working conditions, Mr. Arrington attempted to transfer to another Burger King

restaurant located in Chicago and submitted an application to that restaurant.  Plaintiff was told that his transfer would need to be approved. When he did not hear back from the restaurant to which he had applied, Mr. Arrington sought employment outside of Burger King.

107.    As a result of Defendants' No-Hire Agreement, Mr. Arrington was paid artificially depressed wages and suffered decreased benefits and job mobility.

**Plaintiff Geneva Blanchard**

108.    Plaintiff Blanchard was employed as a "crew member" since 2013 at a Burger King store located at 120 Brownswitch Road, Slidell, Louisiana, a Burger King franchise store owned and operated by GPS Hospitality Partners IV, LLC. Ms. Blanchard earned $7.35 per hour when she started at the store, requiring her to take a second job at a hotel just to survive.

109.    In 2016, Ms. Blanchard's pay was reduced to $7.25 per hour, and she began to lose shifts from five days per week, to four, to three, to two, and eventually, Ms. Blanchard stopped receiving any shifts at all.  Plaintiff has never quit working for Burger King even though she has not received any hours since late 2016.

110.    As a result of Defendants' No-Hire Agreement, Ms. Blanchard was paid artificially depressed wages and suffered decreased benefits and job mobility.

**Plaintiff Sandra Munster**

111.    Plaintiff Sandra Munster began working at the Burger King restaurant in Ottawa, Illinois on February 2, 2002. At all relevant times, Ms. Munster was an at-will employee.

112.    Ms. Munster was initially hired as a supervisor, with an hourly wage of $4.25. Over the years, her excellent work earned her promotions to various roles, including acting assistant manager (hourly wage of approximately $7.50) and assistant manager (hourly wage of approximately $9.50). In or around September 2015, Ms. Munster became the general manager of

the Ottawa restaurant, with an annual salary of approximately $28,000. She earned subsequent pay increases that raised her annual salary to approximately $31,000.

113.     After leaving the Ottawa store on April 1, 2017, Ms. Munster applied for a job as general manager of the Burger King restaurant in Marseilles, Illinois, which had a vacancy at that location and which is only a few miles from where Munster lives in Ottawa; the position would have been an excellent fit for her.

114.     Ms. Munster interviewed with the district manager, who told her that she would need a release from the Ottawa franchise before she could be allowed to be hired at the Marseilles store. The Ottawa franchise owner refused to grant her a release, so Ms. Munster was not able to take the new job.

115.     Because Burger King's No-Hire Agreement prevented Ms. Munster from obtaining work at a competing Burger King restaurant, her only options were to wait six months (during which the General Manager position at the Marseilles franchise would almost certainly be filled) or to start over at an entry-level job with an entry-level wage in another setting.

116.     As a result of Defendants' No-Hire Agreement, Ms. Munster was paid artificially depressed wages and suffered decreased benefits and job mobility.

## ANTITRUST INJURY

117.     But for the No-Hire Agreement, Burger King branded restaurants (whether corporate-owned or franchisee-owned) would compete with each other for employees.

118.     Plaintiffs and the Class are current or former employees of Burger King branded restaurants. They supply or supplied labor to Burger King branded restaurants (whether corporate-owned or franchisee-owned).

119.     By agreeing to and enforcing the No-Hire Agreement, Burger King and its

franchisees unlawfully restrained competition for the supply of employees between all Burger King branded restaurants. They did so to artificially depress wages and benefits and reduce worker mobility.

120.     The proximate and foreseeable results of the No-Hire Agreement was to deprive Plaintiffs and the Class of higher wages, better benefits and working conditions, and greater job choice and mobility that free and open competition promotes.

121.     Depressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flow from that which makes the No-Hire Agreement unlawful.

122.     Burger King's anticompetitive actions had no legitimate business justifications and did not have any pro-competitive benefits.

123.     Burger King is jointly and severally liable for the acts of non-Defendant co-conspirator franchisees.

124.     Burger King therefore caused antitrust injury to Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

125.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and/or (b)(3), on behalf of themselves and the following nationwide class of those similarly situated:

> All persons in the United States who are current or former employees of a Burger King restaurant operated by Burger King or a franchisee from at least 2010 to the present (the "Class").

126.     Excluded from the Class are Defendants and their parents, subsidiaries, and corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators, the court, court staff, Defendants' counsel, and all respective immediate family members of the

excluded entities described above. Plaintiffs reserve the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to add Sub-Classes where appropriate.

127.    Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are thousands of Burger King branded restaurants in the United States. While the exact number and identities of the individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that thousands of Class members are the subjects of the Class.

128.    Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, whether:

(a)    Defendants orchestrated and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

(b)    Defendants violated the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*;

(c)    Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

(d)    Plaintiffs and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

(e)    The amount and nature of such relief to be awarded to Plaintiffs and the Class.

129.    Typicality: All of Plaintiffs' claims are typical of the claims of the Class inasmuch as Plaintiffs were Burger King franchisee restaurant employees and each member of the Class either

was or is a Burger King franchisee restaurant employee subject to the same agreements and rules as Plaintiffs. Further, Plaintiffs and all the members of the Class sustained the same monetary and economic injuries of being subjected to artificial depression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiffs seek relief against Defendants for themselves and all Class members.

130.   Adequacy: Plaintiffs are adequate representatives because Plaintiffs' interests do not conflict with the interests of the Class that Plaintiffs seek to represent, Plaintiffs have retained counsel competent and highly experienced in complex class action litigation, and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

131.   Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' employment records and franchisees' records.

132.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## **FRAUDULENT CONCEALMENT**

133.    Plaintiffs and Class members had neither actual nor constructive knowledge of the unlawful no-poach and no-hiring conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiffs or the Class have put them on notice of the conspiracy. Any statute of limitations is therefore tolled by Defendants' intentional concealment of their no-poach and no-hire agreement. Plaintiffs and Class members were deceived regarding Defendants' collusion to depress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

134.    Neither Defendants nor franchisees disclosed the existence of the No-Hire Agreement or the no-poach and no-hire conspiracy to Plaintiffs or Class members.

135.    Burger King's public statements conceal the fact that it orchestrated and engaged in a no-poach and no-hire conspiracy among franchisees.

136.    On its website, Burger King lauds its "Commitment to People." It claims to be "dedicated to supporting and investing in our people—employees, franchisees, suppliers and restaurant guests—because they are the cornerstones of our business. We do all that we can to serve employees and guests alike."[28] The plaudits go on: "We continue to distinguish ourselves from our competitors by being an exceptional employer" that "vest[s] individuals with the power and control to achieve their goals whether that person is our colleague, our franchisee, our supplier or our restaurant guest."[29]

---

[28] *See* https://www.bk.com/corp-respon (last visited Mar. 12, 2019).

[29] *Id.*

137.    Burger King also touts its "Commitment to Corporate Governance" on its website:

> Our codes and company policies encompass not only our core ethical principles, but also specific issues that our employees and business partners face on a day-to-day basis. Our goal is to continuously reinforce our policies and procedures to ensure compliance with the law as well as openness and accountability.
>
> The core ethical and governance principles of BKC begin at the top.  The board sets the tone by promoting an ethical culture that respects and values all employees and stakeholders and encourages compliance with all laws and company policies.[30]

138.    Burger King's website goes on to reference its "Code of Business Ethics and Conduct for Vendors" and to tout its recognition as a "good corporate citizen."[31] The Code of Business Ethics asserts that "[o]ur philosophy is simple: integrity, honesty and compliance with the law are not optional."[32] These statements conceal the fact that Burger King and its franchisees have, in fact, conspired to depress the wages and employment mobility of the very employees they purport to value.

139.    Burger King similarly tells employees and prospective employees that "[w]e're a business that's 100% built on the energy and hunger of its people. Whether you join us in a restaurant or in a corporate role, you'll never be short of opportunities to show what you've got. And if we like what we see, there's no limit to how far you could go here."[33]

140.    Burger King refers to itself as a "meritocratic" business and tells prospective

---

[30] *Id.*

[31] *Id.*

[32] *See* Restaurant Brands International Code of Business Ethics and Conduct for Vendors, RESTAURANT BRANDS INT'L, http://www.rbi.com/Cache/1500094810.PDF?O=PDF&T=&Y=&D=&FID=1500094810&iid=4591 210 (last visited Mar. 12, 2019).

[33] *See* https://www.bk.com/careers/bring-it-bkc (last visited Mar. 12, 2019).

employees that "we expect a lot of our people.  You'll need extraordinary levels of ownership, drive, and accountability to join the team here.  Demonstrate all that, though, and you'll quickly discover that this is an environment where great results and great rewards go hand in hand.  It's not a regular job for sure. But if you're looking for the chance to really make something of yourself, that's exactly what you'll find at BKC."[34] These statements conceal the fact that Burger King and its franchisees have in fact colluded to depress the wages of franchise store personnel.

141.    As noted, the "Job Opportunities" section of Burger King's website directs prospective employees to the particular openings available at specific franchise and store locations in the geographic area selected by the prospective employee. It informs visitors that "[j]ob descriptions, compensation, benefits and other employment terms and conditions applicable to positions at independent franchised BURGER KING® Restaurants will vary and are determined solely by the Franchisee."[35] These statements highlight the supposed hiring independence of franchisee-employers and conceal the existence of the collusive No-Hire Agreement.

142.    Plaintiffs and the Class would thus have no reason to know of the No-Hire Agreement and the collusive nature of the franchisees' contractual undertakings with Defendants.  Plaintiffs and the Class are not parties to franchisees' contractual franchise agreements with Defendants.  Nor are these contracts routinely provided to Plaintiffs.

143.    Although Defendants provided their form franchise documents to some state regulators, franchise disclosure documents and form franchise agreements are made available by Defendants only upon request by legitimate prospective franchisees. Obtaining Defendants' historic franchise disclosure documents and form franchise agreements is even more difficult.

---

[34] *Id.*

[35] *See* https://www.bk.com/careers/in-restaurant/1354 (last visited Mar. 12, 2019).

144.    In order to obtain Defendants' current franchise disclosure documents and form franchise agreement from Burger King, a prospective franchisee must submit a Personal Profile Franchise Application and pay an application fee of $250 per individual applicant.  The application requires submission of a personal financial statement on a Burger King form, along with detailed financial information.  Only after Burger King reviews the application to ensure that the franchisee meets initial qualifications does Burger King provide the franchise disclosure document. Prospective franchisees are told that in order to qualify for consideration, they should have a minimum of $500,000 in liquid assets, a net worth of $1,500,000 or greater, and have the ability to obtain financing to cover the cost of opening a location.

145.    Defendants' franchise disclosure documents and form franchise agreements are not routinely provided to employees (or prospective employees) of franchisees, whether by Defendants, by franchisee employers, by regulators, or by anyone else.  Historic franchise disclosure documents and form franchise agreements would never be available to franchisee employees or prospective employees.

146.    Even upon entering into the AOD with the Attorney General of Washington relating to the no-poach and no-hire agreement evidenced in Burger King's franchise agreement, Burger King purported to deny that it was in violation of Washington state law or any other law and further purported to deny that the no-poach and no-hire agreement constitutes a "restraint of trade in violation of the Consumer Protection Act, RCW 1986.030, or any other law, rule or regulation."

147.    Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiffs and Class members had no reason to know Defendants had conspired to depress compensation or employee mobility.

148.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of

any statute of limitations has been tolled with respect to the claims that Plaintiffs and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CLAIMS FOR RELIEF

**COUNT 1: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, *et seq*.**

149.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint and further allege against Defendants as follows:

150.    Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

151.    Defendants engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition among Burger King and its franchisees, which unfairly depressed employee wages and unreasonably restrained trade.

152.    Defendants' conduct included concerted efforts, actions, and undertakings among the Defendants and franchise owners with the intent, purpose, and effect of: (a) artificially depressing the compensation of Plaintiffs and Class members; (b) eliminating competition among BKC and franchise owners for labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

153.    Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

154.    Defendants' conduct in furtherance of the No-Hire Agreement was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

155.     Plaintiffs and Class members have received lower compensation from BKC and Burger King's franchise businesses than they otherwise would have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

156.     Defendants' contracts, combinations, and/or conspiracies are *per se* violations of § 1 of the Sherman Act.

157.     In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor.

158.     Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

159.     As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiffs and Class members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

160.     Plaintiffs and the Class members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit and, pursuant to 15 U.S.C. § 26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

## REQUEST FOR RELIEF

Plaintiffs and the Class respectfully request that the Court:

A.     Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure and issue an order certifying the Class as defined above;

B.      Appoint Plaintiffs as representatives of the Class and their counsel as Class Counsel;

C.      Declare that Defendants' actions as set forth in this Complaint violate the law;

D.      Award Plaintiffs and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. § 1, to be trebled in accordance with those laws;

E.      Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

F.      Order Defendants and Burger King franchisees to rescind the No-Hire Agreement in current franchise agreements;

G.      Order Defendants to inform franchisees that enforcing the No-Hire Agreement is unlawful;

H.      Order Defendants to notify all Class members that they have the unrestricted right to seek employment at any Burger King restaurant (whether corporate-owned or franchisee-owned);

I.      Order Defendants to notify current and former employees at all Burger King branded restaurants (whether corporate-owned or franchisee-owned) that the No-Hire Agreement that existed in the past will no longer be enforced;

J.      Grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

K.      Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

L.      Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give

immediate notification to Class members;

M.     Award pre-judgment and post-judgment interest on such monetary relief;

N.     Award reasonable attorneys' fees and costs; and

O.     Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  March 15, 2019                 Respectfully submitted,

                                       */s/ Peter Prieto*
                                       Peter Prieto
                                       Peter Prieto (FBN 501492)
                                       Matthew P. Weinshall (FBN 84783)
                                       Alissa Del Riego (FBN 99742)
                                       **PODHURST ORSECK, P.A.**
                                       SunTrust International Center
                                       One S.E. Third Ave., Suite 2300
                                       Miami, Florida 33131
                                       Tel: (305) 358-2800/Fax: (305) 358-2382
                                       pprieto@podhurst.com
                                       mweinshall@podhurst.com
                                       adelriego@podhurst.com

                                       *Proposed Interim Liaison Counsel and Plaintiffs'*
                                       *Steering Committee*

                                       Joseph H. Meltzer
                                       Kimberly A. Justice
                                       Peter A. Muhic
                                       **KESSLER TOPAZ**
                                       **MELTZER & CHECK LLP**
                                       280 King of Prussia Road
                                       Radnor, PA 19087
                                       Tel: (610) 667-7706
                                       Fax: (610) 667-7056
                                       jmeltzer@ktmc.com
                                       kjustice@ktmc.com
                                       pmuhic@ktmc.com

                                       *Proposed Interim Co-Lead Counsel*

Derek Y. Brandt
Leigh M. Perica
**McCUNE WRIGHT AREVALO, LLP**
101 West Vandalia Street, Suite 200
Edwardsville, IL  62025
Tel: (618) 307-6116
Fax: (618) 307-6161
dyb@mccunewright.com
lmp@mccunewright.com

Richard D. Mccune
Michele M. Vercoski
**McCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road, Suite 100
Ontario, CA  91761
Tel: (909) 557-1250
rdm@mccunewright.com
mmv@mccunewright.com

*Proposed Interim Co-Lead Counsel*

Paul J. Geller (FBN 984795)
Stuart A. Davidson (FBN 0084824)
Jason H. Alperstein (FBN 64205)
**ROBBINS GELLER RUDMAN
& DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000
Fax: (561) 750-3364
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
jalperstein@rgrdlaw.com

David W. Mitchell
Carmen A. Medici
**ROBBINS GELLER RUDMAN
& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel: (619) 231-1058
Fax: (619) 231-7423
davem@rgrdlaw.com
cmedici@rgrdlaw.com

*Proposed Plaintiffs' Steering Committee*

John Radice
Daniel Rubenstein
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
drubenstein@radicelawfirm.com

Walter W. Noss
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA  92101
Tel: (619) 233-4565
Email: wnoss@scott-scott.com

Dean M. Harvey
Anne B. Shaver
Yaman Salahi
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111
Tel: (415) 956-1000
dharvey@lchb.com
ashaver@lchb.com
ysalahi@lchb.com

Michael L. Schrag
Eric H. Gibbs
Joshua J. Bloomfield
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
mls@classlawgroup.com
ehg@classlawgroup.com
jjb@classlawgroup.com

George W. Sampson
**SAMPSON DUNLAP LLP**
1001 4th Ave., Suite 3200
Seattle, WA 98154
Tel: (206) 369-3962
george@sampsondunlap.com

*Proposed Class Counsel*