# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 18-24128-CIV-MARTINEZ-OTAZO-REYES**

| | |
|---|---|
| JARVIS ARRINGTON, GENEVA BLANCHARD, and SANDRA MUNSTER, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | [PROPOSED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |
| BURGER KING WORLDWIDE, INC., BURGER KING CORPORATION, RESTAURANT BRANDS INTERNATIONAL, INC., and RESTAURANT BRANDS INTERNATIONAL LIMITED PARTNERSHIP, | JURY TRIAL DEMANDED |
| Defendants. | |

## [PROPOSED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Jarvis Arrington, Geneva Blanchard, and Sandra Munster (together, "Plaintiffs"), on behalf of themselves and all others similarly situated, with knowledge as to their own actions and events and upon information and belief as to other matters, complain and allege against the herein-named defendants as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, challenging an employee no-poach and no-hiring agreement orchestrated by Defendants Burger King Worldwide, Inc., Burger King Corporation, Restaurant Brands International, Inc., and Restaurant Brands International Limited Partnership (together, "Defendants" or "Burger King") between and among Defendants and Burger King's nationwide restaurant franchisees, pursuant to which Burger King and the franchisees agreed not to solicit, poach, or hire each other's employees (hereafter the "No-Hire Agreement").

2.      Burger King orchestrated, designed, dispersed, and enforced the No-Hire Agreement among all of its franchisees, at least in part, through explicit contractual agreements (and penalties for violations) in standard franchise documents. The No-Hire Agreement was not reasonably necessary to any legitimate procompetitive benefit. It was nothing more than a market allocation agreement, a category of restraint long held to be *per se* unlawful under antitrust laws.

3.      Plaintiffs and the Class (defined below) are current and former employees of Burger King branded restaurants operated by Burger King or a Burger King franchisee from at least 2010 forward. Plaintiffs and the Class suffered depressed wages and benefits and diminished opportunities as a result of the No-Hire Agreement.

4.      Founded in 1954, Burger King is one of the largest fast food chains in the world, with over 15,000 restaurants globally. Burger King has stores in all fifty United States states (plus the District of Columbia) and in multiple international markets.

5.      According to Burger King's 2017 Franchise Disclosure Document ("FDD"), more than 99% of its more than 15,000 restaurants worldwide are franchise restaurants. Likewise, as of December 31, 2016, 7,105 of the 7,156 Burger King branded restaurants in the United States (more than 99%) were franchise restaurants. Burger King franchise restaurants are independently owned and operated by franchisees who have executed a standard form franchise agreement with Burger King. Franchisees are separate and distinct legal entities from Burger King.

6.      The FDD expressly warns franchisees that they may face competition from other franchisees or from Burger King's owned and operated restaurants. While this should include competition for both customers and employees, Burger King and the franchises have unreasonably restrained competition for employees.

7.      As part of the system that has made Burger King the fastest-growing fast food restaurant chain in the United States, Burger King franchisees, at the direction of and with the assistance of Burger King itself, have together colluded to depress the wages and employment opportunities of employees who work in Burger King branded restaurants throughout the United States.

8.      Specifically, Burger King and its franchisees have agreed not to solicit or hire each other's employees. In order to obtain a Burger King franchise, a prospective franchisee is required to sign a standard franchise agreement with Burger King Corporation. Since at least 2010 and continuing through at least September 13, 2018, Burger King incorporated the No-Hire Agreement into its standard franchise agreement. Under the heading "Interference with Employment Relations of Others," Burger King and franchisees agreed:

> Neither BKC [Burger King Corporation] nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.[1]

Every franchisee signing a Burger King franchise agreement since at least 2010 and before September 2018 executed and agreed to be bound by this No-Hire Agreement.

9.      Repeated breaches of the Burger King franchise agreement may entitle Burger King to terminate the agreement. Franchisees violating the No-Hire Agreement agree that Burger King may terminate the franchise of a franchisee for repeated violations, thus triggering forfeiture of the franchisee's initial franchise fee, potential legal costs and expenses, and imposition of other onerous post-termination restrictions.

10.     The Burger King No-Hire Agreement is an unreasonable restraint of trade. As the Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals* (October 2016) (hereinafter "DOJ/FTC *Guidance*") states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."[2] The DOJ/FTC *Guidance* elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[3]

---

[1] Burger King Corporation 2017 Franchise Agreement (Individual/Owner-Operator) (hereafter "FA"), ¶ 5.K (the No-Hire Agreement).

[2] *Available at* https://www.justice.gov/atr/file/903511/download (last visited Mar. 12, 2019).

[3] *Id.*

The No-Hire Agreement between and among Burger King and its franchisees has eliminated employers' incentives and ability to compete for employees, and it has depressed employees' wages and restricted employees' mobility.

11. Consistent with the DOJ/FTC's *Guidance*, the Washington Attorney General concluded in July 2018 that Burger King's No-Hire Agreement constituted an agreement in restraint of trade that "restricts worker mobility and decrease[s] competition for labor by preventing workers from moving among the chain[]'s franchise locations." The Washington AG also determined that this reduction in competition artificially reduced employee compensation during the Class Period by "put[ting] downward pressure on wages." In September 2018, Burger King and the Washington AG entered into a judicial consent order requiring Burger King to eliminate the No-Hire Agreement from future franchise agreements and not to enforce existing agreements. However, the damage had already been done to Burger King employees.

12. Economists have confirmed the Washington AG's findings that no-hire agreements (often referred to as no-poach agreements), like the one implemented among Burger King and its franchisees, depress employee compensation by artificially reducing competition in the labor market. Princeton University economists Alan Krueger and Orley Ashenfelter have studied franchise agreements extensively, and they conclude: (1) that "[a]greements to refrain from recruiting and hiring away employees from other units in a franchise chain are common in franchise contracts;" (2) that those agreements can reduce labor market competition and reduce workers' job opportunities; and (3) that the prevalence of such agreements may help to explain why wage growth has been sluggish despite low unemployment rates.[4]

---

[4] Alan B. Kreuger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, NAT'L BUREAU OF ECON. RES. (July 2018) at 20-1.

13.     The Burger King No-Hire Agreement has and had the effect of restraining competition for hiring employees among Burger King branded restaurants. It is a restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. As a result of the No-Hire Agreement, Plaintiffs and the Class suffered antitrust injury in the form of depressed wages.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15.     The Court has both general and specific personal jurisdiction over Defendants. Defendants Burger King Worldwide, Inc. and Burger King Corporation maintain principal places of business in Miami, Florida and are citizens of this district. Both of these Defendants are subsidiaries of Defendant Restaurant Brands International, Inc., which owns the Burger King brand. Defendant Restaurant Brands International Limited Partnership is a guarantor and has assumed the duties and obligations of Burger King Corporation. Defendants' collusive acts which gave rise to Plaintiffs' claims took place, in substantial part, in this district.

16.     Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. §§ 1391(b)(2), (c)(2).  Burger King transacts or has transacted business in this district. A substantial part of the events that gave rise to this action occurred in this district, including the participation in the conspiracy by and between Burger King and Burger King's franchisees located throughout the United States.

17.     Defendants' acts were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States.  Burger King branded restaurants are in each state in the United States. Burger King engages in substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the

owner of the franchise. Burger King engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## THE PARTIES

### Plaintiffs

18.     Plaintiff Jarvis Arrington is a citizen and resident of Dolton, Illinois. He was employed as a line cook at a Burger King restaurant from June through August 2017. Mr. Arrington was paid $10 per hour for his work as a line cook at the Burger King restaurant located in Dolton, Illinois. As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Mr. Arrington was paid artificially depressed wages and suffered decreased benefits and job mobility.

19.     Plaintiff Geneva Blanchard is a citizen and resident of New Orleans, Louisiana.  She was employed since 2013 by GPS Hospitality Partners IV, LLC, a Burger King franchisee that owned and operated the Burger King store located at 120 Brownswitch Road, Slidell, Louisiana. Ms. Blanchard was employed by GPS Hospitality Partners IV, LLC in job roles including crew member. As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Ms. Blanchard was paid artificially depressed wages and suffered decreased benefits and job mobility.

20.     Plaintiff Sandra Munster is a citizen and resident of Ottawa, Illinois. She was employed by Cave Enterprises, Inc., a Burger King franchisee that owns and operates more than 100 Burger King branded restaurants located in Wisconsin, Michigan, Illinois, Indiana, Minnesota, and South Dakota. Ms. Munster was employed for about fifteen years at the Burger King branded restaurant located at 209 East Norris Drive, Ottawa, Illinois, 61350, starting as a supervisor and eventually rising to the position of general manager. As a result of Defendants' and their co-

conspirators' collusive and anticompetitive conduct, Ms. Munster was paid artificially depressed wages and suffered decreased benefits and job mobility.

***Defendants***

21.     Defendant Burger King Worldwide, Inc. ("BKW") is a Delaware corporation with its principal place of business at 5505 Blue Lagoon Drive, Miami, Florida 33126. BKW is a citizen of Florida. BKW is the parent of Burger King Corporation.

22.     Defendant Burger King Corporation ("BKC") is a Florida corporation with its principal place of business at 5505 Blue Lagoon Drive, Miami, Florida 33126.  BKC is a citizen of Florida.  BKC is the current franchisor of Burger King brand franchise restaurants in the United States and also owns and operates approximately fifty Burger King branded restaurants in the Miami area.  BKC is a wholly-owned indirect subsidiary of BKW.

23.     In 2010, private investment firm 3G Capital acquired BKC and BKW.  In 2014, 3G Capital merged Burger King into Defendant Restaurant Brands International, Inc. ("RBI").

24.     RBI is an Ontario corporation based in Oakville, Ontario, Canada. RBI owns the Burger King brand through its subsidiaries, BKW and BKC.  RBI is a citizen of Canada.

25.     RBI is one of the world's largest quick-service restaurant companies, with approximately $23 billion in system sales and over 18,000 restaurants in 100 countries.  In addition to Burger King, RBI also owns Tim Hortons® brand restaurants and Popeyes® brand restaurants.

26.     Defendant Restaurant Brands International Limited Partnership ("RBI Ltd. Partnership") is an Ontario limited partnership based in Oakville, Ontario, Canada. RBI Ltd. Partnership is a citizen of Canada.

27.     RBI serves as the sole general partner of RBI Ltd. Partnership.

28.     RBI Ltd. Partnership, pursuant to an April 5, 2017 Guarantee filed with the State of Minnesota, "absolutely and unconditionally guarantees to assume the duties and obligations of

Burger King Corporation, located at 5505 Blue Lagoon Drive, Miami, Florida 33126 (the 'Franchisor'), under its franchise registration in each state where the franchise is registered, and under its Franchise Agreements identified in its 2017 Franchise Disclosure Document, as it may be amended, and as those Franchise Agreements may be entered into with franchisees and amended, modified or extended from time to time."

29.     Burger King is in the business of selling food to customers primarily through independently owned and operated franchise restaurants. It has multiple franchise restaurants in every U.S. state and the District of Columbia.

## AGENTS AND CO-CONSPIRATORS

30.     Defendants' agents, including their officers, employees, or other representatives, ordered, authorized, or performed the acts alleged in this Complaint on Defendants' behalf in the normal course of their duties as Defendants' agents engaged to manage and operate Defendants' businesses or affairs.

31.     Various other corporations and persons not named as defendants in this Complaint, including Burger King's franchisees, participated as co-conspirators in the violations alleged and performed acts in furtherance of the conspiracy to depress wages.

32.     Defendants are jointly and severally liable for the acts of their co-conspirators, whether named or not named as defendants in this Complaint.

## FACTUAL ALLEGATIONS

## I.     BACKGROUND

***The Burger King No-Hire Agreement Benefits Burger King and Franchisees at the Expense of Their Employees, Depressing Wage Growth***

33.     In a properly functioning and lawfully competitive labor market, Burger King and its franchisees would compete for labor. A properly functioning market would involve prospective

employers freely communicating with prospective employees—even if the employee does not first express interest—and employees communicating intra-store and at other Burger King branded restaurants about wages and other employment opportunities.

34.     For instance, if Franchise A wants to hire a certain employee who works at Franchise B, then Franchise A would be free to contact that employee about an employment opportunity. Conversely, if an employee of Franchise A perceives Franchise B to be a better organization—whether because of increased wages, better benefits, or otherwise—then the employee would be free to communicate with Franchise B about potential employment. Soliciting is a key competitive tool for companies seeking to recruit employees.

35.     Burger King's No-Hire Agreement, however, prohibits such lateral hiring of employees because Franchise A cannot solicit or hire Franchise B's current employees or even former employees who worked at Franchise B within the past six months. Franchises also cannot solicit or hire current or former employees of restaurants operated by Burger King under the same terms.

36.     No-hire agreements, in general, significantly impact employee compensation. For example, an employee of Franchise B will lack information regarding Franchise A's compensation, benefits, and conditions of employment unless communications are permitted; without such information, the employee lacks leverage when negotiating for a raise or promotion, among other things, with Franchise B. Similarly, when unconstrained by a No-Hire Agreement, if an employee of Franchise B receives an offer of higher compensation from Franchise A or a restaurant operated by Burger King, the employee can either accept that offer or attempt to negotiate a pay increase with Franchise B. Either way, the employee's compensation increases. Burger King's No-Hire Agreement eliminated this competition.

37.     The beneficial effects of competition (and beneficial effects on compensation) are not limited to those particular individuals who speak to a rival company about an employment opportunity. The effects also reach all similarly-situated employees because of the effect on information flow and on competition for labor. An employee of Franchise B who receives information regarding potential compensation from a rival employer will also likely inform other Franchise B employees. These Franchise B employees can then use that information to negotiate pay increases or move to another higher-paying franchise employer. Increased mobility combined with increased information and transparency regarding compensation levels tends to increase compensation across all employees. After all, there is pressure amongst rival employers to match or exceed the highest compensation package offered by rivals in order to gain and retain employees.

38.     Because the owners of Franchise A and Franchise B know that they have eliminated labor competition between them through the No-Hire Agreement, each understands that they do not need to compensate their employees as much as they would otherwise to retain them and head off competitive threats.

39.     Agreements to allocate service markets, such as the No-Hire Agreement, are functionally the same as agreements to allocate territories for the sale of products. Both are simply a means to fix prices. "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says business economics and public policy Professor Joseph Harrington of the Wharton School of Business.[5]

---

[5] Knowledge@Wharton, *Silicon Valley's No-poaching Case: The Growing Debate over Employee Mobility*, WHARTON SCH. OF THE UNIV. OF PENN. (Apr. 30, 2014), http://knowledge.wharton.upenn.edu/article/silicon-valleys-poaching-case-growing-debate-employee-mobility/ (last visited Mar. 12, 2019).

40.     According to Professor Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, agreements not to compete for each other's employees are unfair to employees, and such a pact "benefits the companies at the expense of their employees."[6] Mr. Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."[7]

41.     Agreements to allocate service markets can be much more pernicious than agreements to allocate product markets, which are *per se* illegal under the antitrust laws. Every employer exercises market power over its employees in a manner that surpasses the market power of nearly every seller of products over its customers. Employment relationships are much stronger than customer relationships for at least three reasons. First, it is difficult and costly to switch employers: employees must decide to apply to another job, submit an application, be interviewed, and, if offered a job, change a fundamental and regular part of their life. By contrast, a customer of products may freely switch from one brand to another. Second, the value of an employee varies from one potential employer to another. An employee trained and experienced in the Burger King system is more valuable to Burger King branded stores than to other rival fast food brands. The pay that employees can earn varies from one employer to another depending in large part on the direct relationship between additional in-job experience and employer-specific value. A customer, on the other hand, does not pay more for a Whopper if the customer has not purchased a Whopper before. The prices of products are the same across customers, while the pay for work earned by employees grows over time. Third, employers regularly discourage or outright prohibit employees

---

[6] *Id*.

[7] *Id*.

from sharing compensation information with each other.  The reason is that information is power: asymmetrical information allows the employer to pay its employees less, because employees generally do not know what competitors pay unless they apply for a job and receive an offer, or learn that information from other employees. In contrast, product markets are very different with transparent and advertised prices.

42.     For example, a customer of Burger King may easily decide to buy a hamburger from McDonald's on a particular night, then try Wendy's for lunch the next day, go back to Burger King for dinner that night, and so on, with no switching costs and no reputational injury in the process. An employee of Burger King, on the other hand, has no such freedom with respect to her employment.

43.     Thus, in many ways, employment relationships are much "stickier" and are far harder to change than customer relationships. The strength of the employer/employee relationship provides employers with the power to depress pay, particularly when they act in concert with their direct labor competitors to eliminate competition among them.

44.     In the absence of a No-Hire Agreement, a Burger King store or a franchise owner would face increased pressure to offer periodic pay increases, superior benefits, better working hours, and better work-schedule flexibility to retain employees.

45.     Thus, the No-Hire Agreement raises Burger King's and franchisees' power in the labor market at the expense of employees' bargaining power. This is especially harmful to employees of Burger King branded restaurants, as those employees are frequently paid below a living wage. Further, the marketable skills they acquire through their work at Burger King branded restaurants primarily have value only to other Burger King branded restaurants and do not transfer to other quick-service restaurants. *See* ¶¶ 141-146, *infra*.

46.     If Burger King and franchisees did not bind themselves to the No-Hire Agreement, they would compete with each other to hire and retain employees by offering higher wages and better benefits, to prevent their employees from moving to another Burger King restaurant. The No-Hire Agreement eliminates any incentive for, and in fact prohibits, Burger King branded restaurants from competing with each other for employees. Thus, employees are deprived of higher wages and better job growth opportunities.[8]

***Employees at Quick-Service Restaurants Face Difficult Economic Conditions***

47.     Although current unemployment figures in the United States are relatively low, wage growth has been slow. A decade removed from the Great Recession, annual wage growth has remained stuck below 3%. A growing number of commentators have identified proliferating employer no-poach agreements—including those used within franchise systems—as significant contributors to this stagnant wage growth.[9]

48.     Approximately 4.5 million people are currently employed by quick-service restaurants.

---

[8] *See* Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, IZA INST. OF LABOR ECONS. (July 2018), http://ftp.iza.org/dp11672.pdf (last visited Mar. 12, 2019).

[9] *See, e.g.*, Rachel Abrams, *Why Aren't Paychecks Growing? A Burger-Joint Clause Offers a Clue*, N.Y. TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html (last visited Oct. 23, 2018); Alan B. Krueger & Eric Posner, *Opinion: Corporate America Is Suppressing Wages For Many Workers*, N.Y. TIMES (Feb. 28, 2018), https://www.nytimes.com/2018/02/28/opinion/corporate-america-suppressing-wages.html (last visited Mar. 12, 2019). Although unemployment and other economic factors have changed, the data and information set out in accompanying text Paragraphs 47-54 is unaltered from that presented in Plaintiffs' Consolidated Amended Complaint, filed on March 15, 2019 (Dkt. No. 34).

49.     In 2014, the average hourly wage of fast food employees was $9.09, or less than $19,000 per year for a full-time worker.  The poverty level of a family of four in the United States is $23,850.[10]

50.     Employees at quick-service restaurants are consistently paid wages that are below the level necessary to be considered a living wage. According to a report issued by researchers at the University of California, Berkeley, Center for Labor Research and Education and the University of Illinois at Urbana-Champaign Department of Urban and Regional Planning (the "Berkeley Report"), employees at fast-food restaurants received an average of $7 billion of public assistance annually from 2007 to 2011.[11]

51.     The Berkeley Report describes the dire situation faced by fast-food workers in the United States as a result of low wages and lack of benefits: "Low wages paid by employers in the fast-food industry create especially acute problems for the families of workers in this industry. Benefits are also scarce for front-line fast-food workers; an estimated 87 percent do not receive health benefits through their employer. The combination of low wages and benefits, often coupled with part-time employment, means that many of the families of fast-food workers must rely on taxpayer-funded safety net programs to make ends meet."[12]

52.     According to one estimate, Burger King and its franchisees pay entry-level employees approximately $8.87 to $9.17 per hour. A full-time employee, earning $9.17 per hour,

---

[10] Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack*, CNN BUSINESS (May 20, 2014), http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited Mar. 12, 2019).

[11] Sylvia Allegretto, et al., *Fast-food, Poverty Wages: The Public Cost of Low-Wage Jobs in the Fast-Food Industry*, at 1 (Oct. 15, 2013) U.C. BERKELEY LABOR CTR., http://laborcenter.berkeley.edu/pdf/2013/fast_food_poverty_wages.pdf (last visited Mar. 12, 2019).

[12] *Id.*

receives about $19,074 annually, before taxes and other deductions. The average pay for a shift manager is approximately $10.57 per hour, or $21,986 annually; and the average pay for an assistant manager is approximately $11.10 per hour, or $23,088 annually.[13]

53.     Defendants do not dictate, and do not have the power to dictate, the hourly rate Burger King franchise employees must be paid.  Instead (and as described in more detail below), Defendants provide that franchisees are independent decision-makers as to employment issues, including the wages to be paid to employees.  Nevertheless, the low wages described above are consistent across the Burger King branded restaurants owned by Defendants and franchisees, in part because of the No-Hire Agreement, which eliminates each independent franchisee's incentive to compete for employees by offering more competitive wages and benefits.

54.     Defendants' No-Hire Agreement artificially depresses wages and decreases benefits and job mobility, thus exacerbating the conditions faced by Burger King fast-food workers. Further, because the No-Hire Agreement limits workers' mobility and lowers their quit rate, the share of profits captured by Defendants and their franchisees (as opposed to the workers) is higher than it would have been in a competitive market.  The No-Hire Agreement thus enables Defendants and their franchisees to earn supra-competitive profits by enabling them to purchase labor at sub-competitive wages.

***Responding to Government Action, Burger King Eventually Discontinued Use and Enforcement of the No-Hire Agreement***

55.     In July 2018, Attorneys General from eleven states announced an investigation into no-poaching practices at a number of fast food franchise chains, including Burger King. According to a press release from Illinois Attorney General Lisa Madigan, the state of Illinois is investigating

---

[13] *Burger King Salaries in the United States*, Indeed.com, https://www.indeed.com/cmp/Burger-King/salaries (last visited Mar. 12, 2019).

no-poach agreements because those agreements "unfairly stop[] low-income workers from advancing and depress[] their wages."[14] The state AGs demanded documents and information from franchisors about agreements not to compete for employees.

56.     In July 2018, Washington Attorney General Bob Ferguson announced that seven franchisors had reached agreements to discontinue enforcement of no-hire and/or no-poach provisions and to take steps to remove such language from franchise agreements going forward. Burger King was not among these franchisors.

57.     In August 2018, Attorney General Ferguson announced that in order to avoid lawsuits, eight additional restaurant chain franchisors had agreed to discontinue enforcement of no-hire and no-poach provisions and to take steps to remove such language from franchise agreements going forward. Burger King was also not among these franchisors.

58.     In September 2018, Burger King finally entered into an Assurance of Discontinuance ("AOD") relating to the No-Hire Agreement evidenced in its then-current franchise agreement.  AG Ferguson announced on September 13, 2018, that among eight additional restaurant chain franchisors, Burger King had agreed to discontinue enforcement of no-poach / no-hire provisions and to take steps to remove such language from some franchise agreements going forward. In particular, Burger King agreed that it would, among other things, (i) no longer include the no-solicit and no-hire provision in any of its new (or renewing) franchise agreements in the United States; (ii) not enforce the no-solicit and no-hire provision in any existing franchise agreements in the United States; (iii) notify all current U.S. franchisees of its agreement with the Washington AG; and (iv) take steps to encourage franchisees that have stores in the state of

---

[14]  Hailey Mensik, *Illinois, 10 other states take aim at 'no-poaching' clauses that critics say limit fast food workers' pay*, CHICAGO TRIBUNE (July 9, 2018), https://www.chicagotribune.com/business/ct-biz-fast-food-non-compete-investigation-20180709-story.html (last visited Mar. 12, 2019).

Washington to remove the provisions immediately and to replace them with a proposed amendment. The AOD specifically notes that Burger King "is under no obligation to offer its franchisees any consideration—monetary or otherwise—in order to induce them to sign the proposed amendment [removing the provisions], or take any adverse action against such franchisees if they refuse to do so."

59.     Defendants, however, made no assurance that they will attempt to remove the provisions from existing franchise agreements with non-Washington franchisees. Nor did any action taken by AG Ferguson or by Burger King resolve any civil liability to franchisee employees in Washington or anywhere else. For example, the AOD did *not* require: (i) Burger King and franchises to rescind the No-Hire Agreement in current franchise agreements; (ii) Burger King to *inform* franchisees that enforcing the No-Hire Agreement is unlawful and in violation of the AOD; (iii) Burger King or franchisees to inform current and former employees that the No-Hire Agreement existed in the past and will no longer be enforced; or (iv) that any compensation for past wage depression be paid to Burger King current or former employees.

60.     As of January 2019, *fifty* franchisors had entered into legally binding agreements with the Washington AG to remove no-hire / no-poach provisions from their franchise agreements.

61.     Washington is not the only state to investigate Burger King's no-poach practices. On March 12, 2019, Maryland Attorney General Brian E. Frosh (and other state attorneys general) announced that four national fast food franchisors had reached multi-state agreements to discontinue enforcement of no-hire and/or no-poach provisions. "'No-poach agreements limit a worker's job opportunities and earning potential,' stated AG Frosh. 'These settlements mean fairer

hiring practices for thousands of workers in Maryland and across the country.'" Burger King was not among the settling franchisors, and investigations into Burger King continued.[15]

62.     In or about February or March of 2020, Defendant BKC entered into a Settlement Agreement with the states of Massachusetts, California, Illinois, Iowa, Maryland, Minnesota, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and the District of Columbia ("Multi-State AG Agreement").  Pursuant to the Multi-State AG Agreement, BKC agreed to not include No-Poach Provisions in any of its franchise agreements in the United States after the execution thereof, and agreed that it would not enforce any No-Poach Provision in any existing franchise agreement in the United States.  BKC further agreed to seek to amend existing franchise agreements with those franchisees that operate Burger King restaurants in the aforementioned states.

## II.     THE BURGER KING SYSTEM:  INDEPENDENT BUSINESS OWNERS AGREE NOT TO COMPETE FOR LABOR

### *Burger King Restaurants, Responsible for Their Own Employment Matters, Are Labor Market Competitors*

63.     Burger King Corporation's revenues come from three sources: (i) franchise revenues, consisting primarily of royalties based on a percentage of gross sales reported by franchise restaurants and franchise fees paid by franchisees; (ii) property revenues from properties it leases or subleases to franchisees; and (iii) sales at restaurants owned and operated by Burger King rather than franchisees.[16]

---

[15] *Attorneys General Reach Settlements with Four Fast Food Chains to End Use of No-Poach Agreements*, Maryland Attorney General Press Release (Mar. 12, 2019), *available at* http://www.marylandattorneygeneral.gov/press/2019/031219.pdf (last visited Mar. 13, 2019).

[16] RBI 2016 Form 10-K Annual Report, at 4.

64.     Burger King franchises the majority of its restaurants. As of 2017, there were 16,767 Burger King branded restaurants worldwide, with 7,226 restaurants located in the United States. Approximately fifty of those restaurants are owned directly by Burger King. The rest are independently owned and operated by franchisees.

65.     Burger King's franchises are significant to its profitability, with franchisee and property revenues making up approximately 91-92% of its total revenues in 2015, 2016, and 2017.

66.     As Burger King's standard franchise agreement established, Burger King franchises are independently owned and operated by individuals or entities that are separate legal entities from Defendants. The standard agreement every Burger King franchisee executed includes the following description of the parties' independence:

**11.B. Independent Contractor**

> Franchisee is an independent contractor and is not an agent, partner, joint venturer, joint employer, or employee of BKC, and no fiduciary relationship between the parties exists.  Franchisee shall be the sole and exclusive employer of its employees with the sole right to hire, discipline, discharge, and establish wages, hours, benefits, employment policies, and other terms and conditions of employment for its employees without consultation with or approval by BKC.  BKC shall have no control over the terms and conditions of employment of Franchisee's employees. Franchisee shall have no right to bind or obligate BKC in any way nor shall he represent that he has any right to do so.[17]

67.     The same section of the franchise agreement underscores that franchisees will hold themselves out to the public and to their own employees as independent businesses and decisionmakers:

> In all public records and in Franchisee's relationship with other persons, on stationery, business forms and checks Franchisee shall indicate independent ownership of the Franchised Restaurant and that it is operated under a Franchise granted by BKC.

---

[17] FA, ¶ 11.B.

Franchisee shall exhibit at the Franchised Restaurant, in such places as may be designated by BKC, a notification that the Franchised Restaurant is operated by an independent operator and not by BKC.[18]

68.     Franchisees are responsible for all day-to-day operations, including all employment matters.  The foregoing statements concerning franchisees' independence from BKC appear in each standard franchise agreement from at least 2014-2019.  BKC's 2016-2019 standard franchise agreement further admitted that each franchisee is "solely responsible for all aspects of the employment relationship with its employees[.]"[19]

69.     Likewise, the hiring section of Burger King's website directs prospective employees to the particular openings available at specific franchise and store locations in the geographic area selected by the prospective employee. Burger King's website asserts that "[j]ob descriptions, compensation, benefits and other employment terms and conditions applicable to positions at independent franchised BURGER KING® Restaurants will vary and are determined solely by the Franchisee."   Thus, Burger King represents to prospective employees that franchisees—not Burger King—decide issues like wages and benefits on an independent basis.

70.     In addition to the above, Burger King also confirms the independence of its franchisees with respect to employment matters in its Franchise Disclosure Document, and notifies prospective franchisees that it disclaims any relationship with or responsibilities towards their employees.  For instance, in discussing training, Defendant BKC is careful to assert that:

[Franchisees] are solely responsible for all aspects of employment decisions and functions for the Restaurant, such as those related to hiring, firing, promoting, demoting, discharging, establishing wages, hours, benefits, employment policies, and other terms and conditions of employment of employees.  The people that [they] hire to work in [their] Restaurant will be

---

[18] *Id.*

[19] *Id.*

[their] agents and employees.  They are not our agents or employees and we are not a joint employer of those persons.[20]

71.    In the Franchise Disclosure Document, Burger King is also careful to notify prospective franchisees that as of the date it transfers ownership of a restaurant to a franchisee, "BKC shall no longer be deemed to be the employer of [the restaurant's employees]."[21]

72.    Burger King's Franchise Disclosure Document contains a "BKC Employee Franchise Ownership Program Addendum," which also specifies:

> **5.(f) Employees.**
> (i) No employees or independent contractors of FRANCHISEE shall be deemed to be employees or agents of BKC.  FRANCHISEE has the sole and exclusive control over FRANCHISEE's labor and employee relations policies, and its policies relating to wages, hours and working conditions of employees.  FRANCHISEE has the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, adjust grievances and discharge FRANCHISEE'S employees.
>
> (ii) FRANCHISEE is solely responsible for all salaries and other compensation of all FRANCHISEE'S employees and for all contractually required payments to its independent contractors.[22]

73.    Defendant BKC specifies that franchisees are independent (and warns prospective franchisees of this) even with respect to facets of their relationship that involve collaboration, such as advertising or marketing.  The BKC Franchise Disclosure Document characterizes the franchisor/franchisee relationship in the Designated Marketing Area (DMA) Program Agreement as follows:

> **Relationship of Parties.**  The parties hereto are independent contractors, and nothing in this Agreement shall be deemed or construed to create, or have been intended to create a partnership, joint venture, employment or agency relationship between the parties hereto.[23]

---

[20]  BKC 2019 Franchise Disclosure Document, Item 11.

[21]  BKC 2010 Franchise Disclosure Document, Ex. H, §15.  The same confirmation exists in later FDDs.

[22]  *Id.* at Ex. L-3.  The same confirmation exists in later FDDs.

[23]  *Id.* at Ex. J, DMA Program Agreement, p. 2 §13. The same confirmation exists in later FDDs.

74.     In order to obtain a Burger King franchise, a prospective franchisee must sign a standard franchise agreement with BKC, with a typical term of twenty years, and pay Burger King a franchise fee of approximately $50,000. The total investment necessary to begin operating a Burger King restaurant is between approximately $323,000 and $3.1 million. Once open for business, franchisees pay Burger King royalties of up to 4.5% of gross sales and an "Advertising Contribution" of 4% of gross sales.

75.     Each franchisee is responsible for locating an appropriate restaurant site, which must be approved by Burger King. The franchise is required to operate the restaurant at the specific site that Burger King approves, and it may not relocate without Burger King's approval.

76.     A Burger King franchisee agrees contractually to identify itself as an independent owner of the franchised restaurant in all public records, stationery, business forms, and checks. It agrees to exhibit in the restaurant "a notification that the Franchised Restaurant is operated by an independent operator and not by BKC."[24]

77.     In executing the Burger King franchise agreement, franchisees agree that the franchise "is for the specified location only and does not in any way grant or imply any area, market, or territorial rights proprietary to Franchisee."

78.     In the FDD, Burger King tells prospective franchisees that "the quick service restaurant industry in which you will operate is intensely competitive. You compete with other restaurants in the quick service industry and other food service companies."[25] The Burger King franchise is for a single restaurant at a specified location and "does not grant [the franchisee] or imply any type of area or territory, exclusive, protected or otherwise, or protected customer

---

[24] FA, ¶ 11.B.

[25] BKC 2010 Franchise Disclosure Document, Item 1.  The same confirmation exists in later FDDs.

base."[26] The FDD informs franchisees that they "do not have any right to prevent or restrict the development of other restaurants at any other location, at any time."[27]

79.     Burger King notifies franchisees that "[o]ther BURGER KING Restaurants may compete with your Restaurant or may affect customer trading patterns. Because you will not receive an exclusive territory, you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."[28]

80.     Restaurants owned by Burger King and franchisees thus compete, and have the potential to compete, with one another. The No-Hire Agreement, addressing the labor market, is the only aspect of the standard franchise agreement that purports to limit competition between and amongst Burger King and the franchisees.

***The Burger King No-Hire Agreement***

81.     BKC and independent Burger King franchisees have expressly agreed not to compete with each other with respect to the employment market.  This agreement is evidenced by and memorialized in explicit contractual terms contained in franchisees' Burger King franchise agreements.

82.     Since at least 2010, Burger King and each franchisee contractually agreed that they would not:

> attempt, directly or indirectly, to entice or induce or attempt to entice or induce any employee of [BKC] or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.[29]

---

[26]  *Id.* at Item 12.  The same confirmation exists in later FDDs.

[27]  *Id.*  The same confirmation exists in later FDDs.

[28]  *Id.*  The same confirmation exists in later FDDs.

[29]  *Id.* at ¶ 5.K ("No-Hire Agreement").

83.    Burger King uses a slightly different form franchise agreement for franchisees that are corporate entities (rather than individuals). Under that form agreement, Burger King and franchisees also agree to not solicit or employ any employee of the other or of another franchisee within six months after his or her termination of employment with such employer, except with prior written consent of the employer. As to those franchisees, the agreement also contemplates that where "such employee is employed by a parent, Affiliate or subsidiary of Franchisee, the period of such employment will not be counted towards the six (6) month period[.]"[30]

84.    The No-Hire Agreement contractually prohibits Burger King franchisees from competing with each other and with BKC to obtain (or retain) employees. In this way, although each franchise employer is a separate and independent decision-maker, each employer has nevertheless agreed to artificially divide the labor market and refrain from competing to hire certain employees who work for, or have recently worked for, Burger King or other franchisees.

85.    Franchisees also agreed that BKC or franchisees would be entitled to recover all costs and attorneys' fees and costs (including those incurred on appeal) incurred in legal action brought to enforce the No-Hire Agreement.[31]

86.    Pursuant to the No-Hire Agreement, BKC itself agreed to follow the same no-solicitation and no-hire provisions with respect to hiring employees for its directly-owned Burger King branded restaurants.

87.    Burger King franchisees also agreed that BKC has the unilateral power to terminate the franchisees' right to operate their Burger King franchises upon franchisees' commitment of an act of default, which includes failure of the franchisees to comply with the No-Hire Agreement.

---

[30] 2017 Burger King Franchise Agreement (Corporate).

[31] *See* FA, ¶ 21.J. ("Attorney's Fees").

88.     Repeated breaches of the franchise agreement can amount to "default" of the agreement. In executing the franchise agreement, franchisees agree that if Burger King provides notice of intent to terminate due to repeated breach, it thereafter has the right to terminate the agreement upon notice and without further opportunity to cure. Violations of the No-Hire Agreement thus risk the franchisee's entire investment in the business.

89.     Franchise termination carries additional risks. In executing franchise agreements, Burger King franchisees contractually covenant that they will not operate or have any interests in any hamburger business for a period of one year after termination of the agreement within a two-mile radius.[32] Thus, termination also entails a period of one year in which the former franchisee's business activities may be limited.

90.     Where a franchisee is a non-individual business entity, managing owners of the franchisee must also execute notarized personal guarantees pursuant to which they agree to be personally bound by the non-competition covenants contained in the franchise agreement.

91.     The No-Hire Agreement is not in the independent interest of Burger King or each independent franchisee. Employees are critical to the success of Burger King franchises and restaurants. A significant component of making the franchise profitable is hiring qualified employees. Therefore, it is in the independent interest of each Burger King franchisee to compete for the best employees.

92.     The No-Hire Agreement artificially restricts the kind of competition between franchisees to hire employees in a manner that would be consistent with their own unilateral economic interests. By acting in concert, however, they also protect themselves from having their own employees poached by other franchisees. This allows Burger King and franchisees to retain

---

[32] *Id.* at ¶ 19.

employees without having to pay competitive wages to these employees or compete over working conditions and promotion opportunities.

93.     Crucially, the No-Hire Agreement does not serve restaurant employees because it does not incentivize Burger King or franchisees to invest in higher wages, benefits, and improved working conditions, *i.e.*, to compete for their labor. It also dis-incentivizes employees from performing their best because franchisees do not have to offer compensation increases or improved benefits to retain employees. Competition among employers helps actual and potential employees through higher wages, better benefits, or other employment terms.

***Burger King and its Franchisees Are Labor Competitors***

94.     People who work in Burger King-branded restaurants are employed by the owner of the restaurant in which they work.  In the case of restaurants owned and operated by Burger King Corporation, the employer is Burger King.  In the case of restaurants owned and operated by franchisees, the employer is an independent business with a license to operate the restaurant in accordance with Burger King's standards.  Burger King and its franchisees are different employers, legally and economically.

95.     Every franchisee-owner of a Burger King restaurant is legally distinct and separate, and has the capacity to make its own independent decisions about the material terms of employment, such as pay rates, hours, and other employment benefits.  Thus, from the perspective of workers and potential workers, Burger King and each franchisee have the potential to compete on issues like wages and benefits.

96.     In fact, Burger King franchisees hold themselves out as distinct employers with various benefit programs.  This can be demonstrated by the example of Burger King franchisees in New Orleans, Louisiana.  According to Burger King's 2017 franchise disclosure document, there were three different franchisees licensed to operate eleven Burger King restaurants in the city

of New Orleans at that time:  Brooks Restaurants, Inc.; GPS Hospitality Partners IV, LLC; and Johnson & Johnson Commodities, Inc.  Like all Burger King franchisees, each of these is a separate and independently owned and operated business entity that has received a franchise license from Burger King.  Each handles its recruitment and hiring independently, and each attempts to hire the most qualified employees (subject to the limitations of the No-Hire Agreement).

97.     On its website, GPS Hospitality solicits applications from prospective restaurant employees, stating "We're looking for leaders – and those who are interested in learning and growing.  Our pledge is to provide you the support, training and rewards that create a winning team of high performers."[33]  To attract employees, GPS Hospitality boasts:

- it "recogniz[es] and reward[s] top performers;"

- "[t]he Restaurant Manager in each Region with the highest scorecard receives the keys to a Jeep Wrangler or Chevy Camaro for one month;"

- it "paid out more than $5,000,000 in bonus money to our management team during 2018;" and,

- "[e]very year we recognize those who achieved top sales and operational results."  *Id.*

98.     Similarly, Brooks Restaurants, Inc. operates its own website to recruit and solicit applications from restaurant workers, stating: "Brooks Restaurants, Inc. is a wonderful company to work for.  With competitive wages, outstanding employee benefits, and a vast variety of positions, all jobs here are accommodating to any schedules."[34]

99.     The Johnson & Johnson franchisee does not appear to operate its own website, though it accepts applications through Burger King's website under the disclaimer:  "Note that if the restaurant is independently owned and operated by a Franchisee, the information you provide

---

[33]   *See* https://gpshospitality.avature.net/careers/RestaurantCareers (last visited Apr. 17, 2020).
[34]   *See* http://brooksrestaurants.com/blank.html (last visited Apr. 17, 2020).

will be submitted to the Franchisee *who is solely responsible for making employment decisions* for the franchised restaurant."[35]  Those applications are forwarded to Johnson & Johnson to make its own hiring decisions.

100.    From a worker or potential worker's perspective, then, GPS Hospitality, Brooks Restaurants, and Johnson & Johnson are three different competing employers in the same metro area with the potential to offer different wages, benefits, and intangibles related to company culture.  That is so despite the fact that all three operate Burger King-branded restaurants.  Johnson & Johnson is free to offer higher wages than GPS Hospitality, for example.  A worker at GPS Hospitality would have been able to seek employment with Johnson & Johnson, or leverage that opportunity to obtain better wages at GPS Hospitality, but for the No-Hire Agreement.

101.    This dynamic holds true around the country: as of December 31, 2019, over 85% of Burger King-branded restaurants in the United States were located within 25 miles of another restaurant owned and operated by a different Burger King franchisee or the Burger King corporation itself.  Workers or potential workers in these places were thus deprived of potential independent centers of decision-making with respect to the price of labor.

***The Economic Interests of Burger King and its Franchisees Are Not Coextensive***

102.    Burger King and each of its franchisees are independent businesses and decision-makers with separate economic interests that often conflict.

103.    Prospective Burger King franchisees can choose between Burger King and many other restaurant formats.  Burger King, like other franchisors, works to attract entrepreneurs to join its franchise system by offering competitive terms regarding initial fees and royalties, and support and services to reduce the management burden on prospective franchisees.  For example, Burger

---

[35] *See* https://company.bk.com/careers/in-restaurant-signup?job_role=1354&restaurant_id=24105 (last visited Apr. 17, 2020).

King's website features a page directed at prospective franchisees.  The page has the headline, "Be Your Own King," and boasts that "we can ensure we will help you make the right decisions, so you can hit the ground running and grow *your* business, quickly and easily. . . ."[36]  Burger King cannot compel any entrepreneur to join its franchise; rather, it solicits applications and then both parties must make a mutual decision to work together.

104.    Even so, Burger King informs prospective franchisees that "BKC's approval of your application for a franchise does not ensure the success of your franchised BURGER KING Restaurant.  Your success will depend upon your own ability as an independent businessperson and on other factors."[37]  Likewise, with respect to the initial investment necessary to become a franchisee, BKC warns prospective franchisees, "You may receive assistance from BKC in making decisions as to a particular Restaurant facility and site, but you must make an independent decision whether the facility you propose to develop and operate will meet your expectations based on your own projections."[38]

105.    Further, Burger King does not exercise control over its franchisees' day-to-day operations.  In its 2010 Form 10-K, Burger King Holdings, Inc. highlighted the independence of its franchisees and acknowledged that Burger King and its franchisees are separate economic actors, notwithstanding the existence of a franchise relationship.  (Defendant BKC was a wholly-owned subsidiary of Burger King Holdings, Inc. at the times relevant to its 2010 Form 10-K.)  For instance, Burger King noted that the relatively high percentage of its restaurants that are franchised

---

[36]  *See* https://company.bk.com/franchising (last visited Apr. 17, 2020).
[37]  BKC 2010 Franchise Disclosure Document, Item 1.  The same confirmation exists in later FDDs.
[38]  *Id.*, Item 7.  The same confirmation exists in later FDDs.

("approximately 90%") "**presents a number of disadvantages and risks.**"[39]  As compared with

its major competitors, Burger King viewed one "drawback" of this ownership mix as its "limited

influence over franchisees and reliance on franchisees to implement major initiatives[.]"[40]  Burger

King noted that its "franchisees may not continue to support our marketing programs and strategic

initiatives[.]"[41]  Burger King noted a risk to its operating results because "**our franchisees are**

**independent operators and we have limited influence over their restaurant operations.**"[42]  It

also stresses that "our franchisees are **independent** operators and **we cannot control many factors**

**that impact the profitability of their restaurants**."[43]  Burger King further noted its "**limited**

**influence over the decision of franchisees to invest in other businesses or to incur excessive**

**indebtedness.**"[44]  In particular, it emphasized (again), "[o]ur franchisees are independent operators

and, therefore, we have limited influence over their ability to invest in other businesses or incur

excessive indebtedness.  Some of our franchisees have invested in other businesses, including other

restaurant concepts."[45]  Burger King made the same, or very similar, acknowledgments in its 2011,

2012, and 2013 Forms 10-K.[46]

---

[39] *See* Burger King Holdings, Inc. Form 10-K (Transition Period Ending December 31, 2010), at pp. 23-24, https://www.rbi.com/Cache/IRCache/21fccaa8-2d3f-2bc4-fb11-0c2451068ecd.PDF?O=PDF&T=&Y=&D=&FID=21fccaa8-2d3f-2bc4-fb11-0c2451068ecd&iid=4591210 (last visited Apr. 10, 2020) (emphasis in original).

[40] *Id.*

[41] *Id.*

[42] *Id.* (emphasis added).

[43] *Id.* at p. 23 (emphasis added).

[44] *Id.* (emphasis added).

[45] *Id.*

[46] *See* Burger King Holdings, Inc. Form 10-K (year ending Dec. 31, 2011), at p. 15-16 https://www.sec.gov/Archives/edgar/data/1352801/000119312512114564/d264345d10k.htm (last visited Apr. 13, 2020); Burger King Worldwide, Inc. Form 10-K (2012) at, *e.g.*, pp. 17-20 https://www.sec.gov/Archives/edgar/data/1547282/000119312513071144/d444026d10k.htm (last visited Apr. 13, 2020); Burger King Worldwide, Inc. Form 10-K (2013) at, *e.g.*, pp. 14-18 https://www.sec.gov/Archives/edgar/data/1547282/000119312514061827/d648966d10k.htm (last visited Apr. 13, 2020).

106.    As acknowledged in the aforementioned 10-K, many Burger King franchisees also operate other restaurant brands that are unaffiliated with Burger King or any Defendants.  For example, GPS Hospitality (the employer of Plaintiff Geneva Blanchard) operates Burger King, Popeye's, and Pizza Hut restaurants.[47]  Pizza Hut is unaffiliated with Burger King.  Burger King franchisee Meridian Restaurants Unlimited, LLC operates 200 restaurants spread across three top-tier brands (Burger King, Chili's, and Black Bear Diner) in eleven states.[48]  Chili's and Black Bear Diner are not affiliated with Defendants.  Another franchisee, Quality Dining, Inc. operates more than 160 Burger King restaurants, 41 Chili's restaurants, and additional brands.[49]  A franchisee known as Alsea operates 419 Burger King restaurants, along with more than 1,200 Domino's restaurants, in addition to Chili's, P.F. Chang's, Cheesecake Factory, and TGI Friday's restaurants—which are not affiliated with Defendants.[50]  Another prominent Burger King franchisee, Sun Holdings LLC, also operated restaurants for Arby's, CiCi's, and Golden Corral, which also are unaffiliated with Defendants.

107.    Other Burger King franchisees engage in business activities totally unrelated to food sales.  For example, as of December 31, 2019, the Army Air Force Exchange Services had a license to operate Burger King restaurants at 109 military locations around the country.  Yet the Exchange also sells a variety of other commodity products, such as books, newspapers, magazines, DVDs, and clothing, and also operates many restaurants, including Subway, Taco Bell, Church's Chicken, Pizza Hut, Einstein Bros Bagels, Cinnabon, Dunkin Donuts, Starbucks, and its own signature restaurant brands.  These business activities, too, have no relationship to Burger King.

---

[47]  *See* https://www.gpshospitality.com/about/ (last visited Apr. 13, 2020).
[48]  *See* https://www.meridianrestaurantsunlimited.com/ (last visited Apr. 13, 2020).
[49]  *See* https://www.qdi.com/ (last visited Apr. 13, 2020).
[50]  *See* https://www.alsea.net/marcas-de-alsea (last visited Apr. 13, 2020).

108.    The aforementioned franchisees, therefore, pursue numerous business activities in pursuit of their own self-interest, not Burger King's.   All Burger King franchisees have the potential to engage in similar business activities in pursuit of their own, independent economic interests because they are independent businesses.

109.    Burger King and its franchisees have divergent and conflicting economic interests in another respect, too.   Burger King's earnings are based in large part on royalties paid to it by its franchisees based on their gross food sales, in addition to other mandatory franchising fees.   Burger King, therefore, has a self-interest in maintaining those fees at their current levels or raising them in order to raise its own profits.   However, Burger King's franchisees have a self-interest in the opposite: franchisees can raise their own profits by reducing the royalties and other fees that they are required to pay to Burger King, so they can retain a greater share of money earned through food sales themselves.   Thus, Burger King and its franchisees' economic interests are actually in conflict.   In fact, Burger King has sued franchisees over underpayment of royalties at least 50 times in the past 10 years alone.

110.    Indeed, the history of Burger King's relationship with its franchisees is an acrimonious one.   Burger King has often made decisions that it deemed to be in its own economic self-interest, but which were contrary to its franchisees' profitability and economic interest.   In 2009, for example, Burger King franchisees, acting through their National Franchisee Association, sued Defendant BKC seeking to halt its efforts to impose a $1 maximum sale price (i.e., inclusion on the "Value Menu") for double cheeseburgers sold at Burger King restaurants.   *See Nat'l Franchisee Ass'n v. Burger King Corp.*, 715 F. Supp. 2d 1232 (S.D. Fla. 2010).   Franchisees had twice previously rejected the proposal, arguing, in part, that Burger King's requirement forced franchisees to sell the burgers at a loss because it cost them more than $1 to produce them.   This was not the first time Burger King's "Value Menu" had prompted litigation between Defendant

BKC and franchisees.  *See Burger King Corp. v. E-Z Eating, 41 Corp.*, 572 F.3d 1306 (11th Cir. 2009) (affirming summary judgment for BKC on franchisees' claim for violation of implied covenant of good faith and fair dealing regarding Value Menu "exception request").  Around the same time, the Burger King franchisee association also sued Burger King over its attempt to divert millions of rebate dollars that franchisees receive from beverage companies to national advertising efforts.  Burger King franchisees also sued Burger King over mandatory late-night restaurant hours imposed by the franchisor.  Both disputes related to actions Burger King took that ate into franchisee profits, and thus demonstrate that Burger King and its franchisees' economic interests are not identical and often conflict.

111.    Along these lines, in 1988, Burger King franchisees criticized the corporation for trying to "produce profits at the expense of our own bottom lines."[51]  In 2009, the Burger King National Franchisee Association (representing more than 80% of the Burger King franchisees) accused Burger King of violating franchisees' rights and harming franchisees' businesses.  In response, Burger King accused the franchisee association of hampering brand-building efforts. Relations were so "sour," investment brokerages downgraded Burger King stock.[52]

112.    Defendant BKC has also been involved in numerous litigations pertaining to termination of franchisees, further evidencing that franchisees' and its economic interests are not always in harmony.  *See*, *e.g.*, *Burger King Corp. v. Lee*, 766 F. Supp. 1149 (S.D. Fla. 1991) (termination for failure to pay royalties, dispute over ongoing use of trademarks); *Burger King*

---

[51] *See* Eric N. Berg, *COMPANY NEWS: Burger King's Angry Franchisees*, N.Y. TIMES (Nov. 14, 1988), https://www.nytimes.com/1988/11/14/business/company-news-burger-king-s-angry-franchisees.html (last visited Apr. 17, 2020).
[52] *See* Richard Gibson, *Have It Whose Way? At Burger King, management and franchisees are locked in battle over the company's direction*, THE WALL STREET JOURNAL (May 17, 2010) https://www.wsj.com/articles/SB10001424052748704869304575109240807702512 (last visited Apr. 17, 2020).

*Corp. v. Cabrera*, No. 10-20480-CIV, 2010 WL 5834869 (S.D. Fla. Dec. 29, 2010) (termination based on franchisee failure to install new technology); *Burger King Corp. v. Duckrey*, 851 F. Supp. 2d 1325 (S.D. Fla. 2011) (termination for failure to timely pay royalties); *Burger King Corp. v. E-Z Eating 8th Corp.*, No. 07-20181-CIV-COOKE, 2008 WL 384554 (S.D. Fla. Feb. 11, 2008) (termination for franchisee default on multiple payments).

### *In Regulatory Filings, Litigation, and Lobbying, Burger King Has Consistently Highlighted that its Franchisees Are Independent Centers of Decision-making*

113.    Even beyond the fact that Burger King and its franchisees are separate legal entities who contractually disclaim any agency, partnership, joint venture, joint employer, or fiduciary relationship, and who specify in legally significant documents that franchisees are "solely responsible" for all aspects of the employment relationship with their own employees, Burger King and its franchisees also have consistently admitted and urged to courts and government bodies that they represent independent centers of decision-making in relation to labor and employment.

#### *Burger King's Regulatory Filings*

114.    In its 2010 and 2011 Form 10-Ks, Burger King Holdings, Inc. acknowledged that "Company restaurant operations and our relationships with franchisees are subject to federal and state antitrust laws…."[53]

115.    It also highlighted that that it has "limited influence over franchisees and reliance on franchisees to implement major initiatives,"[54]   and that "**our franchisees are independent**

---

[53]  Burger King Holdings, Inc. Form 10-K (Transition Period Ending December 31, 2010), at p. 14, https://www.rbi.com/Cache/IRCache/21fccaa8-2d3f-2bc4-fb11-0c2451068ecd.PDF?O=PDF&T=&Y=&D=&FID=21fccaa8-2d3f-2bc4-fb11-0c2451068ecd&iid=4591210 (last visited Apr. 10, 2020); Burger King Holdings, Inc. Form 10-K (year ending Dec. 31, 2011), at p. 14. https://www.sec.gov/Archives/edgar/data/1352801/000119312512114564/d264345d10k.htm (last viewed Apr. 10, 2020).
[54]  *Id.* at p. 15 ("Risk Factors") (emphasis in original).

**operators and we have limited influence over their restaurant operations.**"[55]  In its 2012 and 2013 Forms 10-K, Defendant BKW made the same, or very similar, acknowledgements about the independence of Burger King franchisees.

116.   In its 2014-2019 Forms 10-K, Defendant RBI (which had by then acquired Burger King) made the same, or very similar acknowledgements about the independence of Burger King franchisees.   Defendant RBI additionally emphasized that "[o]ur franchisees are independent business owners so their employees are not our employees and therefore are not included in our employee count."[56]  RBI states in its "Code of Business Ethics and Conduct" that the antitrust laws "are complex and evolving, and affect virtually every phase of our business, including our relationships with … franchisees … ."[57]

_Burger King's Representations to the Courts_

---

[55] _Id._ at p. 16 (emphasis in original).

[56]  _See_ Restaurant Brands International, Inc. Form 10-K (2014), at pp. 9, 13, 17 https://www.rbi.com/Cache/IRCache/8e3ae93a-2e90-1e94-9901-9635e248f113.PDF?O=PDF&T=&Y=&D=&FID=8e3ae93a-2e90-1e94-9901-9635e248f113&iid=4591210 (last visited Apr. 13, 2020); Restaurant Brands International, Inc. Form 10-K (2015), at pp. 10, 13-14, 18, https://www.rbi.com/Cache/IRCache/23d664a8-d7e3-6c5d-c490-562b7d664258.PDF?O=PDF&T=&Y=&D=&FID=23d664a8-d7e3-6c5d-c490-562b7d664258&iid=4591210 (last visited Apr. 13, 2020); Restaurant Brands International, Inc. Form 10-K (2016), at pp. 9, 13, 14 https://www.rbi.com/Cache/IRCache/047a4a1b-364a-3c08-ebd1-f70977330f2f.PDF?O=PDF&T=&Y=&D=&FID=047a4a1b-364a-3c08-ebd1-f70977330f2f&iid=4591210
 (last visited Apr. 13, 2020); Restaurant Brands International, Inc. Form 10-K (2017), at pp. 8, 11-12                              https://www.rbi.com/Cache/IRCache/b460f894-c8a3-7aeb-039a-e9d50c611c7f.PDF?O=PDF&T=&Y=&D=&FID=b460f894-c8a3-7aeb-039a-e9d50c611c7f&iid=4591210 (last visited Apr. 13, 2020); Restaurant Brands International, Inc. Form 10-K (2018), at pp. 8, 11-12 https://www.rbi.com/Cache/IRCache/da012e22-9691-c35f-614a-66449833c7f9.PDF?O=PDF&T=&Y=&D=&FID=da012e22-9691-c35f-614a-66449833c7f9&iid=4591210 (last visited Apr. 13, 2020); Restaurant Brands International, Inc. Form 10-K (2019), at pp. 8, 12-13 https://www.rbi.com/Cache/IRCache/3f90e51d-5826-b7a7-4549-0aaf8015dea7.PDF?O=PDF&T=&Y=&D=&FID=3f90e51d-5826-b7a7-4549-0aaf8015dea7&iid=4591210 (last visited Apr. 13, 2020).

[57]  _See_ https://www.rbi.com/Cache/IRCache/ed9b8c07-af97-b260-4dc6-3b9b89bfb6eb.PDF?O=PDF&T=&Y=&D=&FID=ed9b8c07-af97-b260-4dc6-3b9b89bfb6eb&iid=4591210  (last visited Apr. 20, 2020).

117.   Defendants routinely have relied upon the terms of the Burger King franchise agreement in order to highlight the independence of franchisees, and to avoid liability arising from franchisees' decision-making and behavior, in litigation relating to franchisee employees.

118.   For instance, in *Folsom v. Burger King*, 135 Wash. 2d 658, 958 P. 2d 301 (Wash. 1998), Defendant BKC argued that it owed no duty to the employees of its franchisee because the franchisee "had exclusive control over the operation of the restaurant location," the franchise agreement "requires the parties to the agreement to maintain an independent contractor-contractor relationship," and "the Franchise Agreement specifically states that the Corporation [BKC] has no control over the terms and conditions of employment of franchisee's employees."[58]   Defendant BKC acknowledged that franchising documents required the franchisee "to adhere to [BKC's] comprehensive restaurant format and operating system" for "uniform restaurant operations for purposes of brand identification."[59]   Nonetheless, Defendant BKC argued that it "Did Not Retain Control over the Work Place or Operations" of the franchisee store and so did not owe a duty of care to the franchisee's employees.[60]   Defendant BKC specifically argued that while "[t]he crux of a franchise operation is uniformity[,]" "[s]tandards of uniformity dictated by the franchisor do not . . . create a special relationship between the franchisor and the employees of the franchisee" that would liken it to the franchisee itself.[61]   Adopting this argument, the Supreme Court of Washington agreed, affirming summary judgment *for BKC*.   135 Wash. 2d 658 at 673 (noting that BKC did not have the "ability to make decisions concerning the daily operation of the franchised

---

[58] *See* Nov. 4, 1997 Brief of Resp't Burger King Corporation, filed in *Hartvigsen, et al. v. Burger King, et al.*, No. 64479-9, 1997 WL 33834520, at pp. 4-5, (Wash.).

[59] *Id.* at pp. 6-7.

[60] *Id.* at 13; *see also id.* at 11-12, 14 (citing provisions of franchise agreement establishing independent contractor relationship, lack of control over "terms and conditions of employment of Franchisee's employees").

[61] *See id.* at 15.

restaurant," where franchise agreement expressly identified parties as independent contractors and where BKC had "no control over the terms and conditions of the franchisee's employees").

119.     Defendant BKC made similar arguments in *Bartholomew v. Burger King Corp.*, 15 F. Supp. 3d 1043 (D. Haw. 2014), which involved tort claims brought by a franchise restaurant customer against both Burger King and its franchisee.  Just as it had in *Folsom*, above, defendant BKC argued that it was legally separate from its franchisee and was thus entitled to summary judgment.  In fact, BKC supported its legal position in *Bartholomew* by pointing to the same franchise agreement terms that Plaintiffs here allege (and agree) show that BKC and its franchisees are separate legal entities and decisionmakers, that BKC has no control over franchisee day-to-day operations, and no control over franchisee employment matters.  BKC argued that the franchise agreement "defines the legal relationship and responsibilities" between it and its franchisee; that under the franchise agreement the franchisee "'is not an agent, partner, joint venturer or employee of [BKC], and no express or implied fiduciary relationship exists between the parties'"; and that under the franchise agreement "BKC 'has and will have no control over the terms and conditions of employment of [the franchisee's] employees.'"   Motion for Summary Judgment & Mem. in Support, filed by Burger King Corporation in *Bartholomew v. Burger King Corp.*, No. 1:11-cv-00613-JMS-BMK (D. Haw.) (Dkt. No. 189, filed Feb. 3, 2014), at Mem. p. 2 ¶¶ 3, 4, 7, 8; *see also* BKC "Concise Statement of Facts" (Dkt. 189-1, filed Feb. 3, 2014) at pp. 3-4.  *See also Ketterling v. Burger King Corp.*, 152 Idaho 555, 561, 272 P. 3d 527, 533 (Idaho 2012) (affirming summary judgment for franchisor in tort action based on accident at franchisee-operated restaurant, where franchisee was "independent owner and operator" of business and "responsible for day-to-day operation" of store).

120.     Defendant BKC made the same arguments in support of its motion for summary judgment in *Cram v. Burger King Corp.*, No. 18-cv-394-LM, 2019 WL 4095570 (D.N.H. Aug.

29, 2019).  BKC there argued that it could not legally be responsible for an injury that occurred at the franchisee's restaurant.  The court specifically noted BKC's arguments that its franchise agreement describes the franchisee as "an independent contractor, and is not an agent, partner, joint venture, joint employer, or employee of [Burger King], and no fiduciary relationship between the parties exist[,]" and that the franchisee is "responsible for hiring and training its own employees[.]"  *Id.* at *2 (docket citations omitted).  This result was "not undermined" by BKC's general right to enforce brand uniformity standards.  *See id.* at *5 n.5.

121.     Defendant BKC pointed to these same facts—establishing its own lack of control over franchisee labor matters and that franchisees and BKC are independent, not agents or joint venturers—to earn summary judgment in *Perry v. Burger King Corp.*, 924 F. Supp. 548, 551 (S.D.N.Y. 1996) (quoting franchise agreement terms concerning BKC-franchisee relationship).  This case involved customer allegations of race discrimination carried out by a franchisee employee.  Despite the "contention that BKC exerts a high level of control over its franchises," 924 F. Supp. at 554, Defendant BKC successfully distanced itself from any conduct undertaken by its franchisee or the franchisee's employee.  The court noted the evidentiary record included a franchise agreement providing that the franchisee was "an independent contractor, not an agent or employee of BKC," and BKC had "no control over the terms and conditions of employment of Franchisee's employees."  *Id.* at 553.

122.     BKC is now judicially estopped from arguing to the contrary.

*Representations to Government Bodies*

123.     As set forth above, BKC has long relied upon the portion of its standard franchise agreement asserting, *inter alia*, that it is not a "joint employer" of its franchisees' employees to avoid legal liability for the franchisees' treatment of their employees.  Under the Fair Labor Standards Act, "joint employers" may both be held liable for wage-and-hour violations.  Burger

King and its franchisees have vigorously opposed any efforts that would increase the likelihood of a finding that Burger King is a "joint employer" of its franchisees' restaurant employees.  Indeed, stakeholders in the Burger King system and franchising organizations have mobilized to emphasize the independence of franchisees from franchisors in matters of employment.

124.    For example, on August 27, 2015, Alex Salgueiro, the President and CEO of Savannah Restaurants Corporation, offered sworn Congressional testimony opposing efforts to expand "joint employer" liability.[62]  Mr. Salgueiro acknowledged that the franchise model requires him to use "certain trademarks and other identifiers consistent with the Burger King brand" for "brand recognition [and] quality control measures designed to ensure that customers receive a high quality experience no matter what franchise they visit."  He testified, however, that this in no way affects his independence as an employer:

> That being said, I've signed agreements specifically identifying myself as an independent owner and operator of my Burger King restaurants. I became a franchisee because of the opportunity to be my own boss and hire people from my community. I own my business and I'm in complete control of the hiring, firing, scheduling, and duty assignments of all my employees among many, many, many other responsibilities that I have. In fact, in my 45 years working for both the Corporation and on the franchisee side of the business, I have never been part of any discussion with Burger King Corporation and a franchisee over personnel matters. Franchisor-franchisee discussions have always been limited to non-labor business issues such as advertising, marketing, restaurant operations, and vendor sourcing, just to name a few. The franchise agreement specifically establishes franchisee independence, the cornerstone of the entrepreneurial spirit. By changing the definition of control from indirect to direct, the proposed joint employer language destroys an essential element of the franchise model.[63]

125.    On September 29, 2015, another Burger King franchisee, Ed Braddy, also offered sworn Congressional testimony on the same topic.  Mr. Braddy, the franchisee owner of a Burger

---

[62] *See* https://www.govinfo.gov/content/pkg/CHRG-114hhrg95830/html/CHRG-114hhrg95830.htm (last visited Apr. 13, 2020).

[63] *Id.*

King restaurant in Baltimore, Maryland, testified "on behalf of myself and my association, the National Franchisee Association, which represents Burger King Franchisees."[64]   Like Mr. Salgueiro, Mr. Braddy testified to franchisees' independence from franchisors in labor and employment matters.  He, too, acknowledged that he is "required to carry certain trademarks and other identifiers consistent with the BURGER KING® brand."  "However, I signed my franchise agreement specifically identifying myself as an independent owner and operator of my BURGER KING® restaurant.  That means that I am my own boss.  I am in complete control of the hiring, firing, scheduling, and duty assignments of my employees among many, many other responsibilities."[65]

126.   The International Franchise Association, which calls itself "the preeminent voice and acknowledged leader for franchising worldwide,"[66] has also lobbied against the expansion of "joint employer" liability.  Burger King has been a member of IFA since 1964.[67]  "Franchise Advocacy" is part of IFA's "Code of Ethics": "We're fighting for you. … We protect and promote franchising by educating lawmakers and the public and fighting for the future of our business model.  IFA is your determined political advocate defending the future of the franchising community."[68]

127.   One of IFA's top advocacy issues was "ensuring policies that extend joint employer liability are eliminated."[69]  According to IFA's Chairwoman, in 2017, "[t]he most critical issues

---

[64]  *See* https://edlabor.house.gov/imo/media/doc/Braddy%20Testimony%20FINAL.pdf (last visited Apr. 13, 2020).
[65]  *Id.*
[66]  *See* https://www.franchise.org/about-us (last visited Apr. 13, 2020).
[67]  *See* https://www.franchise.org/franchise-opportunities/burger-king-corporation (last visited Apr. 13, 2020).
[68]  *See* https://www.franchise.org/about-us (last visited Apr. 13, 2020).
[69]  *See* IFA Franchise Advocacy "Issues" available at https://www.franchise.org/advocacy/issues (last visited Apr. 13, 2020).

facing the franchising industry overall include rolling back regulations [expanding the joint employer standard and] passing a legislative fix to joint employer[.]"[70]   According to a "Government Relations" post on the IFA website by IFA President and CEO Robert Cresanti, Burger King franchisee Ed Braddy (also referenced above) appeared at a press conference alongside the past Chair of the IFA Board of Directors and other stakeholders to praise the work of the IFA Government Relations and Public Policy Department for their work in support of proposed legislation addressing the joint employer issue.[71]

128.   In September 2018, the NLRB published notice of proposed rulemaking to roll back a broader interpretation of the "joint employer" standard that had been adopted under the Obama administration.  83 Fed. Reg. 179, at 46681, 46686 (Sept. 14, 2018).  On January 28, 2019, IFA submitted comment supporting the proposed rulemaking (hereafter, "Comment" or "IFA Comment").[72]  IFA recounted a recent history of union organizing activities and fast food worker protests, including by Burger King employees.[73]  According to the IFA Comment, although franchisors and franchisees are "commonly confused as being part of the same enterprise in light of the fact that they use common Marks and rely on the same branding,"[74] such is not actually the case.  IFA argued that "commonplace" standards imposed by franchisors on their franchisees are simply necessary requirements of federal trademark law, under which "franchisors are compelled

---

[70]  *See* https://www.franchise.org/blog/meet-the-new-ifa-chair-shelly-sun-cfe (last visited Apr. 13, 2020).

[71]  *See* Robert Cresanti, *Joint Employer Progress: The Job Is Not Done* (Sept. 11, 2017) available at https://www.franchise.org/franchise-information/government-relations/joint-employer-progress-the-job-is-not-done (last visited Apr. 20, 2020).

[72]  *See The Economic Impact of an Expanded Joint Employer Standard*, International Franchise Association Comments in response to National Labor Relations Board Notice of Proposed Rulemaking on the Standard for Determining Joint Employer Status (Jan. 28, 2019), https://www.franchise.org/sites/default/files/2019-05/JE%20Econ%20Impact%200128.pdf (last visited Apr. 13, 2020).

[73]  *Id.* at pp. 9-10 & n.35.

[74]  *Id.* at p. 15.

to establish and monitor brand standards and provide global oversight with regard to their franchisees."[75] Notwithstanding this, the franchisee "function[s] as an independent operator under a Brand License … to protect the trademark value in implementing brand standards, and exercise[e] day-to-day management over the operation[.]"[76]  As the IFA Comment confirmed, "[a] franchisor's exercise of controls limited to brand standards is not day-to-day management over the business operations of its franchisees."[77]  IFA's Comment asserted that "global oversight [of brand standards], unlike the exercise of control over the essential terms and conditions of employees' work lives, is 'a routine feature of independent contracts.'"[78]  IFA urged the Board to "clarify that those exercises of 'control' which are vital to the franchise model, but may in no way touch directly on the terms and conditions of franchisee employees' employment, are *not* indicia of joint employment."[79]

### Burger King Employees Are Not Made Aware of the No-Hire Agreement

129.    Burger King franchises, like other franchises, are made available on standardized terms. So a franchisee who enters into a Burger King franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

130.    The Burger King FDD includes a list of all Burger King franchisees, organized by state, city, and street address.  Franchisees thus know that the No-Hire Agreement memorialized in the franchise agreement applies to all Burger King branded restaurants.

---

[75] *Id.* at pp. 3-4.
[76] *Id.* at p. 4.
[77] *Id.* at p. 5.
[78] *Id.* at p. 7 (quoting *Browning-Ferris*, 2018 U.S. App. LEXIS 36706 at *51).
[79] *Id.* at p. 8 (emphasis in original).

131.    The standard Burger King employment application available online specifically asks whether an applicant has previously worked for a Burger King restaurant, which helps franchisees and BKC identify prospective employees subject to the No-Hire Agreement.

132.    Burger King informs job applicants that "[t]here are many ways to bring it at Burger King Corporation. Our in-restaurant jobs range from Team Members all the way through to Restaurant General Managers. . . . And of course, we look for experienced professionals to join our above-restaurant functions."[80]

133.    In the "Careers" section of its website, Burger King tells prospective employees that "if you are looking for a chance to really make something of yourself, that's exactly what you'll find at BKC." Burger King assures prospective employees that ". . . you'll never be short of opportunities to show what you've got[]" and that "there's no limit to how far you could go here."[81]

134.    Yet, Burger King fails to inform prospective employees and actual employees about the No-Hire Agreement or its anticompetitive effects on employee wages, benefits, and job mobility. As far as advancement within the Burger King system, the No-Hire Agreement effectively limits employees to the four walls of a particular Burger King where the worker is employed, because the worker cannot be employed by another Burger King without his or her current employer's written permission.

***The No-Hire Agreement Remains a Part of Many Burger King Franchise Agreements***

135.    Even though Burger King purportedly removed the no-poach, no-hire language from new franchise agreements on a going-forward basis, beginning in September 2018, there

---

[80] *See Team Member Application*, Burger King, https://www.bk.com/careers/in-restaurant-signup?job_role=1354&restaurant_id=331566 (last visited Mar. 12, 2019).

[81] http://www.bk.com/careers/bring-it-bkc (last visited Mar. 12, 2019).

were and are thousands of Burger King franchise restaurants already in existence and operating under older versions of the franchise agreement that contained those provisions.

136.    Franchisees specifically contract for a franchise agreement that can be modified or amended only by a subsequent written document executed by both Burger King and the franchisee. Unless franchisees agree to amend their existing franchise agreements, the No-Hire Agreement remains a part thereof.

137.    The No-Hire Agreement is short-sighted and ultimately not in the franchisees' independent interest, even though it is in the interest of the conspirators as a whole when acting together.

138.    In addition to their shared motivation to enforce the No-Hire Agreement and their actual understanding of the No-Hire Agreement, Burger King franchisees also have abundant opportunity to communicate about and coordinate the collusive No-Hire Agreement.

139.    More than 75% of Burger King franchise restaurants in the U.S. and Canada are represented by the National Franchisee Association ("NFA"), which holds annual conferences for franchisee networking and education. Other regional franchisee associations, such as the Great Western Franchisee Association ("GWFA") and the New South Coalition ("NSC"), also provide forums and advocacy for hundreds of Burger King franchise restaurants. The GWFA hosts at least two franchisee meetings each year and both groups foster franchisee communication to advance the cause of working together to enhance the value of franchise investment.

140.    By acting in concert, Burger King and the franchisees artificially protect themselves from having their own employees poached by one another. This allows Burger King franchisees and BKC to retain their employees while paying restricted wages and offering substandard benefits, working conditions, and promotion opportunities.

***Burger King Employees Cannot Easily Leverage Their Skills to Gain Employment Elsewhere and Thus Employment with Non-Burger King Brands Is Not a Reasonable Alternative***

141.     Training, education, and experience within the Burger King system are not transferrable to other restaurant brands for a number of reasons.  For example, Burger King's food products are proprietary, and must be prepared according to specific methods and protocols. Employees at all Burger King restaurants must prepare food according to these standardized protocols in order to ensure a consistent customer experience.  Such skills are specific to Burger King, and are thus easily transferrable from one Burger King restaurant to another, regardless of whether the restaurant is owned and operated by an independent franchisee or by Burger King. However, because every restaurant brand has its own custom food products and preparation methods, learning the ins-and-outs of the Burger King system does not prepare a worker to transfer seamlessly into a company with different food products or protocols (such as a Wendy's or McDonald's restaurant).

142.     Further, Burger King franchises are required to utilize Burger King's own operations systems, including its Manual of Operating Data or "MOD Manual," which is considered confidential and proprietary information that each franchisee must agree not to disclose. The MOD Manual is comprised of the Burger King operations manual, the restaurant equipment manual, approved brands and distributors list, approved equipment list, and the brand standards guide, among other documents. The purpose of the MOD Manual is to protect Burger King's standards, the Burger King system, and the Burger King trademarks. Experience and training with these systems is of little value to other restaurant brands.

143.     Burger King also reserves for itself the right to specify or require certain brands or models of communications equipment, computer systems, hardware for back-office and point-of-

sale systems, printers and peripherals, backup systems, and the like. Experience with these systems is of little value to other brand restaurants.

144.     Franchisees use approved or mandatory suppliers and vendors affiliated with Burger King. Experience with these vendors is of little value to other restaurants.

145.     Moreover, franchisees must use the computers, point-of-sale equipment, and systems specified by Burger King and must also collect, process, and store customer data specified by Burger King. Franchisees are required to generate reports and records required by Burger King and allow access to all such records and reports.  In addition, Burger King requires that all franchisees transmit point-of-sale data to Burger King through data reporting systems approved by Burger King. Training or skill in the operation of these systems is of little use to non-Burger King branded restaurants.

146.     In sum: The No-Hire Agreement resulted in greater profits for Defendants and franchisees, and it has resulted in, and continues to result in, depressed wages and reduced employment opportunities for Plaintiffs and Class members.

III.     **REPRESENTATIVE PLAINTIFFS' ALLEGATIONS AND ANTITRUST INJURY**

*Plaintiff Jarvis Arrington*

147.     Plaintiff Jarvis Arrington was employed as a line cook at a Burger King restaurant from June through August 2017.  Mr. Arrington was paid $10 an hour for his work as a line cook at the Burger King restaurant located in Dolton, Illinois.  In an effort to increase his pay rate and better his working conditions, Mr. Arrington attempted to transfer to another Burger King restaurant located in Chicago and submitted an application to that restaurant.  Plaintiff was told that his transfer would need to be approved. When he did not hear back from the restaurant to which he had applied, Mr. Arrington sought employment outside of Burger King.

148.    As a result of Defendants' No-Hire Agreement, Mr. Arrington was paid artificially depressed wages and suffered decreased benefits and job mobility.

***Plaintiff Geneva Blanchard***

149.    Plaintiff Blanchard was employed as a "crew member" since 2013 at a Burger King store located at 120 Brownswitch Road, Slidell, Louisiana, a Burger King franchise store owned and operated by GPS Hospitality Partners IV, LLC. Ms. Blanchard earned $7.35 per hour when she started at the store, requiring her to take a second job at a hotel just to survive.

150.    In 2016, Ms. Blanchard's pay was reduced to $7.25 per hour, and she began to lose shifts from five days per week, to four, to three, to two, and eventually, Ms. Blanchard stopped receiving any shifts at all.  Plaintiff has never quit working for Burger King even though she has not received any hours since late 2016.

151.    As a result of Defendants' No-Hire Agreement, Ms. Blanchard was paid artificially depressed wages and suffered decreased benefits and job mobility.

***Plaintiff Sandra Munster***

152.    Plaintiff Sandra Munster began working at the Burger King restaurant in Ottawa, Illinois on February 2, 2002. At all relevant times, Ms. Munster was an at-will employee.

153.    Ms. Munster was initially hired as a supervisor, with an hourly wage of $4.25. Over the years, her excellent work earned her promotions to various roles, including acting assistant manager (hourly wage of approximately $7.50) and assistant manager (hourly wage of approximately $9.50). In or around September 2015, Ms. Munster became the general manager of the Ottawa restaurant, with an annual salary of approximately $28,000. She earned subsequent pay increases that raised her annual salary to approximately $31,000.

154.    After leaving the Ottawa store on April 1, 2017, Ms. Munster applied for a job as general manager of the Burger King restaurant in Marseilles, Illinois, which had a vacancy at that

location and which is only a few miles from where Munster lives in Ottawa; the position would have been an excellent fit for her.

155.    Ms. Munster interviewed with the district manager, who told her that she would need a release from the Ottawa franchise before she could be allowed to be hired at the Marseilles store. The Ottawa franchise owner refused to grant her a release, so Ms. Munster was not able to take the new job.

156.    Because Burger King's No-Hire Agreement prevented Ms. Munster from obtaining work at a competing Burger King restaurant, her only options were to wait six months (during which the General Manager position at the Marseilles franchise would almost certainly be filled) or to start over at an entry-level job with an entry-level wage in another setting.

157.    As a result of Defendants' No-Hire Agreement, Ms. Munster was paid artificially depressed wages and suffered decreased benefits and job mobility.

**Antitrust Injury**

158.    But for the No-Hire Agreement, Burger King branded restaurants (whether corporate-owned or franchisee-owned) would compete with each other for employees.

159.    Plaintiffs and the Class are current or former employees of Burger King branded restaurants. They supply or supplied labor to Burger King branded restaurants (whether corporate-owned or franchisee-owned).

160.    By agreeing to and enforcing the No-Hire Agreement, Burger King and its franchisees unlawfully restrained competition for the supply of employees between all Burger King branded restaurants. They did so to artificially depress wages and benefits and reduce worker mobility.

161.     The proximate and foreseeable results of the No-Hire Agreement was to deprive Plaintiffs and the Class of higher wages, better benefits and working conditions, and greater job choice and mobility that free and open competition promotes.

162.     Depressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flow from that which makes the No-Hire Agreement unlawful.

163.     Burger King's anticompetitive actions had no legitimate business justifications and did not have any pro-competitive benefits.

164.     Burger King is jointly and severally liable for the acts of non-Defendant co-conspirator franchisees.

165.     Burger King therefore caused antitrust injury to Plaintiffs and the Class.

## IV.     CLASS ACTION ALLEGATIONS

166.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and/or (b)(3), on behalf of themselves and the following nationwide class of those similarly situated:

> All persons in the United States who are current or former employees of a Burger King restaurant operated by Burger King or a franchisee from at least 2010 to the present (the "Class").

167.     Excluded from the Class are Defendants and their parents, subsidiaries, and corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators, the court, court staff, Defendants' counsel, and all respective immediate family members of the excluded entities described above. Plaintiffs reserve the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to add Sub-Classes where appropriate.

168.    Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are thousands of Burger King branded restaurants in the United States. While the exact number and identities of the individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that thousands of Class members are the subjects of the Class.

169.    Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, whether:

(a)    Defendants orchestrated and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

(b)    Defendants violated the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*;

(c)    Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

(d)    Plaintiffs and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

(e)    The amount and nature of such relief to be awarded to Plaintiffs and the Class.

170.    Typicality: All of Plaintiffs' claims are typical of the claims of the Class inasmuch as Plaintiffs were Burger King franchisee restaurant employees and each member of the Class either was or is a Burger King franchisee restaurant employee subject to the same agreements and rules as Plaintiffs. Further, Plaintiffs and all the members of the Class sustained the same monetary and economic injuries of being subjected to artificial depression of compensation, wages, benefits, and

growth opportunity, and the remedy sought for each is the same in which Plaintiffs seek relief against Defendants for themselves and all Class members.

171.    Adequacy: Plaintiffs are adequate representatives because Plaintiffs' interests do not conflict with the interests of the Class that Plaintiffs seek to represent, Plaintiffs have retained counsel competent and highly experienced in complex class action litigation, and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

172.    Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' employment records and franchisees' records.

173.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## V.    FRAUDULENT CONCEALMENT

174.    Plaintiffs and Class members had neither actual nor constructive knowledge of the unlawful no-poach and no-hiring conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiffs or the Class have put them on notice of the conspiracy.  Any statute of limitations is therefore tolled by Defendants' intentional concealment of their no-poach and no-hire agreement. Plaintiffs and Class members were deceived regarding Defendants' collusion to depress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

175.    Neither Defendants nor franchisees disclosed the existence of the No-Hire Agreement or the no-poach and no-hire conspiracy to Plaintiffs or Class members.

176.    Burger King's public statements conceal the fact that it orchestrated and engaged in a no-poach and no-hire conspiracy among franchisees.

177.    On its website, Burger King lauds its "Commitment to People." It claims to be "dedicated to supporting and investing in our people—employees, franchisees, suppliers and restaurant guests—because they are the cornerstones of our business.  We do all that we can to serve employees and guests alike."[82] The plaudits go on: "We continue to distinguish ourselves from our competitors by being an exceptional employer" that "vest[s] individuals with the power and control to achieve their goals whether that person is our colleague, our franchisee, our supplier or our restaurant guest."[83]

178.    Burger King also touts its "Commitment to Corporate Governance" on its website:

> Our codes and company policies encompass not only our core ethical principles, but also specific issues that our employees and business partners face on a day-to-day basis. Our goal is to continuously reinforce our policies and procedures to ensure compliance with the law as well as openness and accountability.

---

[82] *See* https://www.bk.com/corp-respon (last visited Mar. 12, 2019).

[83] *Id.*

> The core ethical and governance principles of BKC begin at the top.  The board sets the tone by promoting an ethical culture that respects and values all employees and stakeholders and encourages compliance with all laws and company policies.[84]

179.    Burger King's website goes on to reference its "Code of Business Ethics and Conduct for Vendors" and to tout its recognition as a "good corporate citizen."[85] The Code of Business Ethics asserts that "[o]ur philosophy is simple: integrity, honesty and compliance with the law are not optional."[86] These statements conceal the fact that Burger King and its franchisees have, in fact, conspired to depress the wages and employment mobility of the very employees they purport to value.

180.    Burger King similarly tells employees and prospective employees that "[w]e're a business that's 100% built on the energy and hunger of its people. Whether you join us in a restaurant or in a corporate role, you'll never be short of opportunities to show what you've got. And if we like what we see, there's no limit to how far you could go here."[87]

181.    Burger King refers to itself as a "meritocratic" business and tells prospective employees that "we expect a lot of our people.  You'll need extraordinary levels of ownership, drive, and accountability to join the team here.  Demonstrate all that, though, and you'll quickly discover that this is an environment where great results and great rewards go hand in hand.  It's not a regular job for sure. But if you're looking for the chance to really make something of yourself, that's

---

[84] *Id.*

[85] *Id.*

[86] *See* Restaurant Brands International Code of Business Ethics and Conduct for Vendors, RESTAURANT BRANDS INT'L, http://www.rbi.com/Cache/1500094810.PDF?O=PDF&T=&Y=&D=&FID=1500094810&iid=4591 210 (last visited Mar. 12, 2019).

[87] *See* https://www.bk.com/careers/bring-it-bkc (last visited Mar. 12, 2019).

exactly what you'll find at BKC."[88] These statements conceal the fact that Burger King and its franchisees have in fact colluded to depress the wages of franchise store personnel.

182.    As noted, the "Job Opportunities" section of Burger King's website directs prospective employees to the particular openings available at specific franchise and store locations in the geographic area selected by the prospective employee. It informs visitors that "[j]ob descriptions, compensation, benefits and other employment terms and conditions applicable to positions at independent franchised BURGER KING® Restaurants will vary and are determined solely by the Franchisee."[89] These statements highlight the supposed hiring independence of franchisee-employers and conceal the existence of the collusive No-Hire Agreement.

183.    Plaintiffs and the Class would thus have no reason to know of the No-Hire Agreement and the collusive nature of the franchisees' contractual undertakings with Defendants.  Plaintiffs and the Class are not parties to franchisees' contractual franchise agreements with Defendants.  Nor are these contracts routinely provided to Plaintiffs.

184.    Although Defendants provided their form franchise documents to some state regulators, franchise disclosure documents and form franchise agreements are made available by Defendants only upon request by legitimate prospective franchisees.  Obtaining Defendants' historic franchise disclosure documents and form franchise agreements is even more difficult.

185.    In order to obtain Defendants' current franchise disclosure documents and form franchise agreement from Burger King, a prospective franchisee must submit a Personal Profile Franchise Application and pay an application fee of $250 per individual applicant.  The application requires submission of a personal financial statement on a Burger King form, along with detailed

---

[88] *Id.*

[89] *See* https://www.bk.com/careers/in-restaurant/1354 (last visited Mar. 12, 2019).

financial information.  Only after Burger King reviews the application to ensure that the franchisee meets initial qualifications does Burger King provide the franchise disclosure document. Prospective franchisees are told that in order to qualify for consideration, they should have a minimum of $500,000 in liquid assets, a net worth of $1,500,000 or greater, and have the ability to obtain financing to cover the cost of opening a location.

186.    Defendants' franchise disclosure documents and form franchise agreements are not routinely provided to employees (or prospective employees) of franchisees, whether by Defendants, by franchisee employers, by regulators, or by anyone else.  Historic franchise disclosure documents and form franchise agreements would never be available to franchisee employees or prospective employees.

187.    Even upon entering into the AOD with the Attorney General of Washington relating to the no-poach and no-hire agreement evidenced in Burger King's franchise agreement, Burger King purported to deny that it was in violation of Washington state law or any other law and further purported to deny that the no-poach and no-hire agreement constitutes a "restraint of trade in violation of the Consumer Protection Act, RCW 1986.030, or any other law, rule or regulation."

188.    Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiffs and Class members had no reason to know Defendants had conspired to depress compensation or employee mobility.

189.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiffs and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CLAIMS FOR RELIEF

**COUNT 1: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, *et seq*.**

190.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint and further allege against Defendants as follows:

191.     Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

192.     Defendants engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition among Burger King and its franchisees, which unfairly depressed employee wages and unreasonably restrained trade.

193.     Defendants' conduct included concerted efforts, actions, and undertakings among the Defendants and franchise owners with the intent, purpose, and effect of: (a) artificially depressing the compensation of Plaintiffs and Class members; (b) eliminating competition among BKC and franchise owners for labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

194.     Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

195.     Defendants' conduct in furtherance of the No-Hire Agreement was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

196.     Plaintiffs and Class members have received lower compensation from BKC and Burger King's franchise businesses than they otherwise would have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

197.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of   §
1 of the Sherman Act.

198.    In the alternative, Defendants are liable under a "quick look" analysis where an
observer with even a rudimentary understanding of economics could conclude that the arrangements
in question would have an anticompetitive effect on employees and labor.

199.    Defendants' contracts, combinations, and/or conspiracies have had a substantial effect
on interstate commerce.

200.    As a direct and proximate result of Defendants' contract, combination, and/or
conspiracy to restrain trade and commerce, Plaintiffs and Class members have suffered injury to
their business or property and will continue to suffer economic injury and deprivation of the benefit
of free and fair competition.

201.    Plaintiffs and the Class members are entitled to treble damages, attorneys' fees,
reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. § 26, injunctive relief, for the violations
of the Sherman Act and the threatened continuing violations alleged herein.

## REQUEST FOR RELIEF

Plaintiffs and the Class respectfully request that the Court:

A.    Determine that the claims alleged herein may be maintained as a Class Action under
Rule 23 of the Federal Rules of Civil Procedure and issue an order certifying the Class as defined
above;

B.    Appoint Plaintiffs as representatives of the Class and their counsel as Class Counsel;

C.    Declare that Defendants' actions as set forth in this Complaint violate the law;

D.    Award Plaintiffs and the Class damages in an amount according to proof against
Defendants for Defendants' violations of 15 U.S.C. § 1, to be trebled in accordance with those laws;

E.      Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

F.      Order Defendants and Burger King franchisees to rescind the No-Hire Agreement in current franchise agreements;

G.      Order Defendants to inform franchisees that enforcing the No-Hire Agreement is unlawful;

H.      Order Defendants to notify all Class members that they have the unrestricted right to seek employment at any Burger King restaurant (whether corporate-owned or franchisee-owned);

I.      Order Defendants to notify current and former employees at all Burger King branded restaurants (whether corporate-owned or franchisee-owned) that the No-Hire Agreement that existed in the past will no longer be enforced;

J.      Grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

K.      Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

L.      Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

M.      Award pre-judgment and post-judgment interest on such monetary relief;

N.      Award reasonable attorneys' fees and costs; and

O.      Grant such further relief that this Court deems appropriate.

### **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:   April 20, 2020                    Respectfully submitted,

                                           */s/ Peter Prieto*
                                           Peter Prieto
                                           Peter Prieto (FBN 501492)
                                           Matthew P. Weinshall (FBN 84783)
                                           Alissa Del Riego (FBN 99742)
                                           **PODHURST ORSECK, P.A.**
                                           SunTrust International Center
                                           One S.E. Third Ave., Suite 2300
                                           Miami, Florida 33131
                                           Tel: (305) 358-2800/Fax: (305) 358-2382
                                           pprieto@podhurst.com
                                           mweinshall@podhurst.com
                                           adelriego@podhurst.com

                                           *Interim Liaison Counsel and Plaintiffs' Steering
                                           Committee*

                                           Joseph H. Meltzer
                                           **KESSLER TOPAZ
                                           MELTZER & CHECK LLP**
                                           280 King of Prussia Road
                                           Radnor, PA 19087
                                           Tel: (610) 667-7706
                                           Fax: (610) 667-7056
                                           jmeltzer@ktmc.com

                                           *Interim Co-Lead Counsel*

                                           Derek Y. Brandt
                                           Leigh M. Perica
                                           **McCUNE WRIGHT AREVALO, LLP**
                                           231 North Main Street, Suite 20
                                           Edwardsville, IL  62025
                                           Tel: (618) 307-6116
                                           Fax: (618) 307-6161
                                           dyb@mccunewright.com
                                           lmp@mccunewright.com

                                           Richard D. Mccune
                                           Michele M. Vercoski
                                           **McCUNE WRIGHT AREVALO, LLP**
                                           3281 East Guasti Road, Suite 100
                                           Ontario, CA  91761

Tel: (909) 557-1250
rdm@mccunewright.com
mmv@mccunewright.com

*Interim Co-Lead Counsel*

Paul J. Geller (FBN 984795)
Stuart A. Davidson (FBN 0084824)
Jason H. Alperstein (FBN 64205)
**ROBBINS GELLER RUDMAN
& DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000
Fax: (561) 750-3364
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
jalperstein@rgrdlaw.com

David W. Mitchell
Carmen A. Medici
**ROBBINS GELLER RUDMAN
& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel: (619) 231-1058
Fax: (619) 231-7423
davem@rgrdlaw.com
cmedici@rgrdlaw.com

*Plaintiffs' Steering Committee*

John Radice
Daniel Rubenstein
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
drubenstein@radicelawfirm.com

Walter W. Noss
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA  92101
Tel: (619) 233-4565

60

Email: wnoss@scott-scott.com

Dean M. Harvey
Anne B. Shaver
Lin Y. Chan
Yaman Salahi
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111
Tel: (415) 956-1000
dharvey@lchb.com
ashaver@lchb.com
lchan@lchb.com
ysalahi@lchb.com

Michael L. Schrag
Eric H. Gibbs
Joshua J. Bloomfield
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
mls@classlawgroup.com
ehg@classlawgroup.com
jjb@classlawgroup.com

George W. Sampson
**SAMPSON DUNLAP LLP**
1001 4th Ave., Suite 3200
Seattle, WA 98154
Tel: (206) 369-3962
george@sampsondunlap.com

*Class Counsel*