**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 18-24128-CIV-MARTINEZ/OTAZO-REYES**

JARVIS ARRINGTON, GENEVA BLANCHARD,
and SANDRA MUNSTER, individually and on
behalf of all others similarly situated,

      Plaintiffs,

vs.

BURGER KING WORLDWIDE, INC., BURGER
KING CORPORATION, RESTAURANT
BRANDS INTERNATIONAL, INC., and
RESTAURANT BRANDS INTERNATIONAL
LIMITED PARTNERSHIP,

      Defendants.

_____/

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE AN
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Stuart H. Singer
Florida Bar No. 377325
ssinger@bsfllp.com
Carl E. Goldfarb
Florida Bar No. 125891
cgoldfarb@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL  33301

Luis E. Suarez
Florida Bar No. 390021
lsuarez@hsmpa.com
Mark J. Heise
Florida Bar No. 771090
mheise@hsmpa.com
Patricia A. Melville
Florida Bar No. 475467
pmelville@hsmap.com
**HEISE SUAREZ MELVILLE, P.A.**
1600 Ponce De Leon Blvd., Suite 1205
Coral Gables, FL 33134

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................II

INTRODUCTION ............................................................................................................ 2

STANDARD OF REVIEW ................................................................................................ 2

ARGUMENT .................................................................................................................. 3

1.     THE PROPOSED AMENDMENT SHOULD BE DENIED AS FUTILE. ...................... 3

2.     THE FACTS ALLEGED IN THE PROPOSED AMENDED COMPLAINT AND THE REFERENCED FRANCHISE AGREEMENT DEMONSTRATE THAT THE AMENDMENT WOULD BE FUTILE. ........................................................................ 5

3.     COURTS HAVE REPEATEDLY FOUND TWO ENTITIES CANNOT CONSPIRE FOR PURPOSES OF SHERMAN ACT LIABILITY EVEN WHERE ONE ENTITY MAINTAINS SOME MINIMAL AUTONOMY. ........................................................... 10

4.     JOINT EMPLOYMENT TEST IS IRRELEVANT TO *COPPERWELD* ANALYSIS. ... 13

5.     BKC'S POSITION IS FULLY CONSISTENT WITH ITS SEC FILINGS .................... 15

CONCLUSION ............................................................................................................... 16

I

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010) ........................................................................................ *passim*

*Bilinski v. Keith Haring Foundation, Inc.,*
  96 F.Supp.3d 35, (S.D.N.Y. 2015) .................................................................... 12

*Brown v. Fred's, Inc.,*
  494 F.3d 736 (8th Cir. 2007) ............................................................................. 13

*Bryant v. Dupree,*
  252 F.3d 1161 (11th Cir. 2001) .......................................................................... 2

*Burger King Corp. v. Weaver,*
  169 F.3d 1310 (11th Cir. 1999) .......................................................................... 3

*Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n,*
  95 F.3d 593 (7th Cir. 1996) ............................................................................... 10

*City of Mt. Pleasant Iowa v. Associated Elec. Coop. Inc.,*
  838 F.2d 268 (8th Cir.1988) .............................................................................. 10

*Commonwealth ex rel. Martino-Fleming v. South Bay Mental Health Center, Inc.,*
  334 F.Supp.3d 394 (D. Mass. 2018) .................................................................. 11

*Copperweld Corp. v. Indep. Tube Corp.,*
  467 U.S. 752 (1984) ..................................................................................... *passim*

*Corsello v. Lincare, Inc.,*
  428 F.3d 1008 (11th Cir. 2005) .......................................................................... 2

*Coventry First, LLC v. McCarty,*
  605 F.3d 865 (11th Cir. 2010) ............................................................................ 2

*Florez v. Holly Corp.,*
  154 Fed.Appx. 707 (10th Cir. 2005) .................................................................. 14

*Frank v. U.S. West, Inc.,*
  3 F.3d 1357 (10th Cir.1993) .............................................................................. 14

*Hall v. Burger King Corp.,*
  912 F. Supp. 1509 (S.D. Fla. 1995) ................................................................... 13

*Healthamerica Pennsylvania, Inc. v. Susquehanna Health System*,
    278 F.Supp.2d 423 (M.D. Pa. 2003) ................................................................. 12

*In re Term Commodities Cotton Futures Litigation*,
    No. 12 CIV. 5126) 2014 WL 5014235 (S.D.N.Y., Sept. 30, 2014) ...................... 9

*Jack Russell Terrier Network of Northern Ca. v. American Kennel Club, Inc.*,
    407 F.3d 1027  (9th Cir. 2005) .......................................................................... 10

*Klein v. L-3 Communications Corp.*,
    No. 1:12-CV-956-MEF), 2013 WL 5913776 (M.D. Ala., Nov. 1, 2013) ............... 14

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ................................................................................... 15, 16

*Minnesota Made Hockey, Inc. v. Minnesota Hockey, Inc.*,
    789 F.Supp.2d 1133 (D. Minn. 2011) ................................................................. 11

*Shaw v. Rolex Watch, U.S.A., Inc.*,
    673 F. Supp. 674 (S.D.N.Y.1987) ...................................................................... 9

*Siegel Transfer, Inc. v. Carrier Exp., Inc.*,
    54 F.3d 1125 (3d Cir.1995) ................................................................................ 11

*Wesley Health System, LLC v. Forrest County Bd. of Sup'rs*,
    No. 2:12-CV-59-KS-MTP) 2014 WL 232109 (S.D. Miss., Jan. 22, 2014) ........... 12

*Williams v. I.B. Fischer Nev.*,
    999 F.2d 445 (9th Cir. 1993) .............................................................................. 13

## **Rules**

Fed. R. Civ. P. 15(a) ................................................................................................. 2

## INTRODUCTION

In granting Defendants' motion to dismiss, this Court applied binding U.S. Supreme Court precedent and held: "As guideposts, *Copperweld* and *American Needle* compel the conclusion that Burger King's relationship with its franchisees more closely resembles a corporation organized into divisions or *de facto* branches, or that of a parent-subsidiary, than the relationship between similarly-situated NFL teams."  March 24, 2020 Order Granting Motion To Dismiss ("Order") at 8.  That conclusion drove this Court's decision to dismiss the complaint and nothing in Plaintiffs' 59-page, 201-paragraph, proposed first amended consolidated class action complaint calls that fundamental conclusion into question.  Accordingly, this Court should deny Plaintiffs' motion for leave to amend their complaint because the proposed amendment would be futile under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) and *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010).

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, the court must accept the facts as alleged in the complaint.  *Corsello v. Lincare*, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005).  Denial of a motion to amend a complaint is reviewed for abuse of discretion, although the underlying legal conclusion of whether an amendment to the complaint would be futile is reviewed *de novo. Id.* Under Federal Rule of Civil Procedure 15(a), a court should give leave to amend a complaint freely, "when justice so requires." Though a party ordinarily must be given at least one opportunity to amend her complaint, the district court "need not 'allow an amendment . . . where amendment would be futile.'" *Corsello*, 428 F.3d at 1014 (quoting *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). A proposed amendment is futile "when the complaint as amended would still be properly dismissed." *Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010) (court affirmed district court's denial of motion to amend finding amendment would be futile). *See also*

2

*Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999) (court affirmed denial of motion to amend as futile).

## ARGUMENT

**1.  The proposed amendment should be denied as futile.**

In dismissing Plaintiffs' consolidated amended complaint, the Court found, among other things:

- "Indeed, to view BKC and its franchisees as independent decision makers and competitors relative to employment decisions, as Plaintiffs urge, is to parcel out one component of a broader symbiotic relationship, which is entirely predicated on uniform operations."  Order at 9.

- "More significantly, in the absence of uniformity guaranteed by the Burger King franchise agreement, there would be no franchise and hence, no independent source of economic power. The relationship is more than symbiotic.  It is totally derivative." *Id.* at 9.

- "The success of BKC and its franchises are wholly dependent on systemwide uniformity."  *Id.* at 9.

- "Because Plaintiffs have not sufficiently alleged that BKC and its franchisees are separate economic actors for antitrust purposes, the Amended Complaint fails to state a claim for relief pursuant to Section 1 of the Sherman Act."  *Id.* at 12.

Nothing in Plaintiffs' lengthy, proposed, first amended consolidated class action complaint casts doubt on those conclusions by this Court, and accordingly the motion for leave to amend should be denied as futile.  *See Burger King Corp.*, 169 F.3d at, 1320 (11th Cir. 1999) (affirming denial of motion to amend as futile).

In reaching those conclusions, the Court acknowledged and considered the key allegations in Plaintiffs amended consolidated complaint.  The Court noted that Plaintiffs alleged that "Burger King franchisees are independently owned and operated and generally responsible for their own hiring;" that each franchisee is "an independent contractor and is not an agent, partner, joint venture or joint employer" with BKC; that "no fiduciary relationship" exists between BKC and its

franchisees; that "each franchisee possesses the sole right to hire, discipline, promote, demote, transfer, discharge, and establish wages, hours, benefits, employment policies, and other terms and conditions of employment;" and that each "franchisee agrees to contractually identify itself as an independent owner of the franchised restaurant in all public records, stations, business forms, and checks." Order at 2 (quoting the consolidated amended class action complaint). The Court further noted that the franchise agreements warn franchises that "other Burger King Restaurants may compete with your Restaurant" and that [b]ecause you will not receive an exclusive territory, you may face competition from other franchisees, from outlets we own, or from other channels of distribution or competitive brands that we control." Order at 3 (quoting consolidated amended class action complaint).

The key issues raised in Plaintiffs' motion for leave to amend is whether Burger King Corporation ("BKC" or Burger King") and its franchisees constitute one unified economic entity or separate and competing economic actors. In their proposed new complaint, plaintiffs expound on the allegations in their operative complaint, allegations that this Court considered in dismissing that complaint, but Plaintiffs do not break new ground, thereby rendering their proposed amendment futile.

In its dismissal order, the Court noted that it was required under Supreme Court precedent to perform a "fact-specific and functional" analysis and then stated: "In this case, however, it appears that the allegations of concerted action are wholly coextensive with the standard franchise agreement before the Court. Accordingly, based on the standard franchised agreement and other portions of the record here, together with the foregoing authorities, the Court concludes that Burger King's No-Hire Agreement constitutes an 'internal 'agreement' to implement a single firm's policies,' *Copperweld*, 467 U.S. at 769, and does not implicate antitrust principles." Order at 11-

4

12.  In allowing Plaintiffs an opportunity to seek to amend their complaint, the Court provided them with an opportunity to make allegations that are not "wholly extensive with the standard franchise agreement before the Court."  They failed to do so, thereby making their proposed amendment futile.

> **2.  The facts alleged in the proposed amended complaint and the referenced franchise agreement demonstrate that the amendment would be futile.**

Although Plaintiffs argue that BKC and its franchisees compete in the market for labor, the facts in the proposed complaint and franchise agreement show that not only does BKC exert substantial control over almost all facets of the restaurant operations of its more than 7,000 franchised BURGER KING® restaurants, but also that BKC asserts substantial control over key requirements relating to franchisees' senior management and the operations training required of the franchisees' restaurant-level employees as well.

Burger King imposes requirements for certain senior management roles to ensure that the day to day operations of the Burger King restaurants comply with its stringent operational standards.  To set up a franchise as an Individual/Owner-Operator or as an Entity, there are specific requirements Burger King has put in place.  For instance, "Individual/Owner-Operator Ownership" requires that there be one individual designated (with Burger King's approval) as the "Operating Partner" responsible for operating the Restaurant. *See* BKC 2019 Franchise Disclosure Document Item 11.  Similarly, "Entity Ownership" requires the Franchisee to designate an individual (again, with Burger King's approval) as the "Managing Director" responsible for Restaurant operations. *Id.*  Both the Operating Partner and Managing Director must be dedicated to the supervision of the restaurant on a full-time basis. BK Franchise Agreement, ECF DKT 42-2, at page 2; 2019 BK Franchise Disclosure Document, Item 15.  The Operating Partner must live in the same locality of the restaurant; similarly, the Managing Director must live in the vicinity of the restaurant, as

5

reasonably determined by BKC. BK Franchise Agreement at 2; 2019 BK Franchise Disclosure Document, Item 15. The process of approval for a Managing Director includes a list of requirements, such as the submission of background checks, credit reports, motor vehicle records, and release of financial information. BK 2019 Franchise Disclosure Document, Item 11

Burger King also requires that certain key employees undergo uniform training before the opening of a franchised restaurant. For instance, every Operating Partner and Managing Director must successfully complete "The Burger King Training Program." *Id.*  This training program includes up to hundreds of hours of orientation and in-person programs, which must be completed by the Operating Partner and Managing Director, as determined by Burger King. (*Id*. ¶¶ 62, 63; (outlining the requirements of Burger King's training program for Operating Partners and Managing Directors, respectively).) Even after completion, Burger King "may require additional training programs for individual Owner/Operators or Managing Directors to implement current operations, standards, and procedures and to facilitate the growth and changes of the Franchisee." *Id.* Though BKC does not set the terms and conditions of employment of franchisees' employees (BK Franchise Agreement at 12), this continuous oversight is part of Burger King's substantial control over the training of key employees who are tasked with managing the day-to-day operations of franchised restaurants.

In addition to the requirements for the Operating Partner, Managing Director, and the designated restaurant manager, the Franchisee is required to "implement a training program for [restaurant] employees in accordance with training standards and procedures prescribed by BKC and shall staff the Franchised Restaurants at all times … with a sufficient number of trained employees including at least one (1) manager who has, within six (6) months after becoming

managers, successfully completed BKC's training program for restaurant managers…" BK Franchise Agreement at 7.

BKC's regulation of its franchisees is not limited to controls regarding senior executives and training of restaurant-level workers.  As this Court found, the key requirements imposed by BKC on its franchisees include: Payment of royalties; payment toward joint advertising budget, use of a uniform operations manual, uniform appearance and image, uniform menu, uniform service and manner of food preparation, standardized equipment, uniform training standards, and uniform hours of operation.  Order at 8-9.

The franchise agreement sets forth in detail the policies, procedures, and requirements that the franchisees must follow and shows how encompassing those controls are.  It states in pertinent part:  "Franchisee acknowledges and agrees that prompt adoption of and adherence to the BURGER KING system, including all of the provisions of the MOD Manual, as amended from time to time, are reasonable, necessary, and essential to the image and success of all BURGER KING Restaurants.  The MOD Manual, which is comprised of the BURGER KING Operations Manual, the Restaurant Equipment Manual, the RSI Equipment and Facilities E-Red Book, the Approved Brands and Distributors' List, Approved Equipment List, the Brand Standards Guide, the Ops Emphasis Guide, alerts and amendments thereto, and the applicable policies established by BKC, or the then-current equivalent versions of those documents, contains the official mandatory restaurant operating, equipment and product standards, specifications and procedures prescribed form time to time by BKC for the operation of a BURGER KING Restaurant." BK Franchise Agreement at 3.  The franchise agreement further specifies that BKC has the right to change those procedures unilaterally, limited only by a good faith and reasonableness requirement, stating: "Franchisee agrees that changes in the standards, specifications and procedures may

become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary." *Id.*

The franchise agreement also gives BKC a blanket right to conduct an inspection of the franchisee to make sure a franchisee is complying with the multifold requirements set forth in the franchise agreement and referenced MOD Manual.  The agreement specifies that "BKC shall have the unrestricted right to enter the Franchised Restaurant to conduct such activities as it deems necessary to ascertain Franchisee's compliance with this Agreement.  The inspections may be conducted without prior notice at any time when the Franchisee or one of its employees in at the Franchised Restaurant." *Id*. at 6.

As this Court found, its decision on Defendants' motion to dismiss was driven by the application of *Copperweld* and *American Needle* to the record in this action, which demonstrates that the Burger King system functions as a single economic unit, dependent on uniformity for its success.   The facts alleged in the proposed amended complaint do not alter the analysis.  And the standard franchise agreement itself still has "controlling significance."   Order at 12. Notwithstanding the allegations in the proposed amended complaint, there is no gainsaying that BKC dominates virtually all aspects of the Burger King system.

In its dismissal order, the Court noted, "Fortifying this conclusion, the Court considers the anomaly that would result if BKC corporate stores were considered to be part of a single corporate conscious, but franchised stores were not.  Vis-à-vis the employees and the general public, the distinction is imperceptible.  To expose a corporation to substantial legal liability based solely on the franchise status of its restaurants would elevate from over substance, directly contrary to the teachings of the Supreme Court."  Opinion at 10.   Supreme Court cases strongly support that

8

conclusion, which weighs in favor of a finding of futility here:  *See Copperweld*, 467 U.S. at 772 ("Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary.") **Tellingly, Plaintiffs do not address, in either their lengthy proposed amended complaint or their memorandum of law, the Court's point that the BKC-owned and franchised restaurants are virtually indistinguishable from one another in an apparent acknowledgement that they have no meaningful response.**

As this Court also stated, "Indeed, Burger King's products, and all of the operational parameters necessary to bring them into the marketplace, are fully realized long before a franchisee joins the Burger King system, and [is] subject to close supervision by BKC."  *Id.*  Plaintiffs do not challenge that finding either, which is another factor that weighs against finding BKC can conspire with its franchisees and so also weighs in favor of a finding of futility.  *See American Needle*, 560 U.S. at 196 ("'[a] division within a corporate structure pursues the common interests of the whole,' and therefore 'coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power *previously pursuing separate interests*'") (quoting *Copperweld*, 467 U.S. at 770–771) (emphasis added); *Copperweld*, 467 U.S. at 769 ("In any conspiracy, two or more entities that *previously pursued their own interests separately* are combining to act as one for their common benefit.") (emphasis added); *see also In re Term Commodities Cotton Futures Litigation*, No. 12 CIV. 5126) 2014 WL 5014235, at *7 (S.D.N.Y., Sept. 30, 2014) ("Nothing in the SCAC [second consolidated amended complaint] demonstrates a rational possibility that Defendants were '*previously separate and competing entities* [that combined] to act as one for their common benefit.'") (emphasis added) (quoting *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F.Supp. 674, 677–78 (S.D.N.Y.1987)).

**3.   Court have repeatedly found two entities cannot conspire for purposes of Sherman Act liability even where one entity maintains some minimal autonomy**

Although the relationship between a parent corporation and its wholly-owned subsidiary is a paradigmatic example of a case where the two entities cannot conspire for purposes of the Sherman Act, two entities do not have to have a "complete unity of interests", *Copperweld*, 467 U.S. at 771, to be incapable of conspiring.   "Although that phrase appears in *Copperweld*, the Court offered it as a statement of fact about the parent-subsidiary relation, not as a proposition of law about the limits of permissible cooperation. As a proposition of law, it would be silly." *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 95 F.3d 593, 598 (7th Cir. 1996) (Easterbrook, J.). "Even a single firm contains many competing interests. One division may make inputs for another's finished goods. The first division might want to sell its products directly to the market, to maximize income (and thus the salary and bonus of the division's managers); the second division might want to get its inputs from the first at a low transfer price, which would maximize the second division's paper profits. Conflicts are endemic in any multi-stage firm . . . " *Id.*

Joint ownership, or complete economic unity, is not required for *Copperweld* to apply.  *See, e.g.*, *Jack Russell Terrier Network of Northern Ca. v. American Kennel Club, Inc.*,   407 F.3d 1027 (9th Cir. 2005) (National dog breed club and its regional affiliates were not capable of conspiring as separate entities under the Sherman Act's conspiracy in restraint of trade provision; national club and affiliates had common goal of promoting particular breed of dog and identical economic interests in current and future value of the breed, and affiliates acted as extensions of the national club, rather than as independent economic actors in competition with the national club.);  *City of Mt. Pleasant Iowa v. Associated Elec. Coop., Inc.*, 838 F.2d 268 (8th Cir.1988) (holding that a rural electrical cooperative consisting of three tiers of cooperatives with interlocking ownership

was a single entity because member cooperatives shared a common goal of providing low-cost electricity); *Minnesota Made Hockey, Inc. v. Minnesota Hockey, Inc.*, 789 F.Supp.2d 1133, 1143-44 (D. Minn. 2011) (holding hockey teams were incapable on conspiring because "a review of Minnesota Hockey's by-laws makes clear that each team within a district operates under the direction of the District Director").

Courts have regularly found that two entities are incapable of conspiring because the overall allegations or factual record established that they acted as one economic unit even though certain facts, if taken in isolation, would suggest divergent interests or even that they were competitors. So, too, in this case, while the franchisees "retain some residual economic autonomy with respect to employment decisions," BKC and its franchisees constitute a single economic entity for purposes of federal antitrust law, "wholly dependent on systemwide unity."  Order at 9-10.  *See Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1135 (3d Cir.1995) (Freight broker and company which managed its day-to-day operations, receiving as its fee a percentage of the broker's revenue, were a single economic unit so that the management company and agents of the broker could not conspire with the broker or with each other, or with the broker's parent corporations, to violate the Sherman Act. Sherman Act, § 1); *Commonwealth ex rel. Martino-Fleming v. South Bay Mental Health Center, Inc.*, 334 F.Supp.3d 394, 403 (D. Mass. 2018) ("Here, the Complaint does not adequately allege a conspiracy among independent centers of decision making. The Commonwealth alleges that H.I.G. Growth owns 71.1 percent of C.I.S., and that H.I.G. placed its managing director and two of its principals/employees on C.I.S.'s five-member Board, thereby controlling both C.I.S. and South Bay. It alleges that the H.I.G. Defendants -- private equity investors in South Bay, not competitors -- oversaw and managed C.I.S. and South Bay. As alleged, H.I.G. and C.I.S. are not independent centers of decision making, and the

11

formalistic legal distinctions among the multiple corporate entities are not dispositive. Even when all reasonable inferences are drawn in the Commonwealth's favor, the allegations in the Complaint do not support the contention that C.I.S., H.I.G., and South Bay are independent actors.); *Bilinski v. Keith Haring Foundation, Inc.*, 96 F.Supp.3d 35, 45, (S.D.N.Y. 2015) (holding, in a case where owners of artwork brought action against foundation to which majority of artist's work was bequeathed alleging a conspiracy to inflate the price of Keith Harking's artwork, "The participation in the Foundation of three or more directors alleged to own Haring artwork does not "deprive the marketplace of independent centers of decision making" in any sense. There is no allegation that these directors are art dealers or play a role akin to the other institutions alleged to be co-conspirators with the Foundation."); *Wesley Health System, LLC v. Forrest County Bd. of Sup'rs*, No. 2:12-CV-59-KS-MTP) 2014 WL 232109, at *9 (S.D. Miss., Jan. 22, 2014) ("The evidence cited above demonstrates that Forrest General controls AAA, and that they do not constitute two separate, independent decisionmakers. Forrest General controls two-thirds of the voting power on AAA's Board, and AAA's officers are Forrest General employees. Through these positions and the authority granted it by the General Management Services Agreement, Forrest General controls all of AAA's operations—in spite of the Agreement's apparently empty provision that AAA maintains 'ultimate control and direction' of its operations."); *Healthamerica Pennsylvania, Inc. v. Susquehanna Health System*, 278 F.Supp.2d 423 (M.D. Pa. 2003) (finding two health systems and their constituent hospitals, which collectively made up the Susquehanna Health System, could not conspire even though the hospitals had required representation on the Susquehanna Health System Board and even the Boards of Directors of the two constituent health systems retained authority and responsibility for mission and values, governance, credentialing, medical staff issues and quality assurance of the hospitals).

Plaintiffs contend (Mot. at 16-17) that BKC and its franchisees cannot be considered one economic unit because BKC has at times acted contrary to the franchisees' economic interests. The fact that BKC can act contrary to a franchisee's interest is irrelevant.  A parent company can always act contrary to the interests of a wholly-owned subsidiary, but that does not negate the holding of *Copperweld* that a parent and wholly-owned subsidiary cannot conspire.[1]

Plaintiffs try to distinguish the numerous cases that find a franchisor cannot conspire with its franchisees such as *Williams v. I.B. Fischer Nev.*, 999 F.2d 445 (9th Cir. 1993) and *Hall v. Burger King Corp.*, 912 F. Supp. 1509 (S.D. Fla. 1995) on the basis that they predate *American Needle*.  (Mot. at 19-20).  That argument fails for multiple reasons.  First, Plaintiffs never explain why it matters whether a case pre-dates or post-dates *American Needle*.  Second, and even more important, this Court's holding was driven by *Copperweld* and *American Needle*, not the lower court cases.

### 4.  Joint Employment Test is Irrelevant to *Copperweld* Analysis.

In the normal course, a parent company is not the employer of a subsidiary's employees— yet there is no question that a parent and its wholly-owned subsidiary enjoy *Copperweld* immunity from Section 1 antitrust claims.  The fact that Burger King is not—and has consistently claimed it is not –the joint employer of the franchisee's employees, does not affect the *Copperweld* analysis.

While *Copperweld* holds that a corporation cannot conspire for purposes of the Sherman Act with its wholly-owned subsidiary, absent unusual circumstances an employee of a wholly-owned subsidiary is not also an employee or joint employee of the parent.  *See*, *.e.g.*, *Brown v. Fred's, Inc.*, 494 F.3d 736, 739 (8th Cir. 2007) ("There is a strong presumption that a parent

---

[1] The fact that the companies that own some BKC franchisees also operate restaurants for Arby's or Golden Corral (Mot. at 17-18) is irrelevant.  The question is whether the BKC franchisees are part of a single economic unit with BKC, not whether an Arby's or Golden Corral restaurant is.

company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances.")  (internal quotation omitted); *Florez v. Holly Corp*., 154 Fed.Appx. 707, 708 (10th Cir. 2005) ("The law allows businesses to incorporate to limit liability and isolate liabilities among separate entities.... The doctrine of limited liability creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances.") (quoting *Frank v. U.S. West, Inc*., 3 F.3d 1357, 1362 (10th Cir.1993)); *Klein v. L-3 Communications Corp.*, No. 1:12-CV-956-MEF), 2013 WL 5913776, at *7 (M.D. Ala., Nov. 1, 2013) ("Courts typically consider a parent company to be a separate corporate entity from its wholly owned subsidiary. . . [A]t least in the employment context, courts have imposed liability on a parent company for its subsidiary's conduct if the parent company qualified as the employee's employer under either the single or joint employer theory."). Thus, *Copperweld*'s holding does not turn on whether the parent has an employer/employee relationship with an employee of the subsidiary, and so the fact that BKC has repeatedly argued that it is not a joint employer of its franchisees' employees (Mot. at 6-10) has no bearing on whether it can conspire for purposes of the Sherman Act with its franchisees, and Plaintiffs' judicial estoppel argument is a non-starter.[2]

---

[2] The test for determining when employees are deemed joint employees under the National Labor Relations Act is subject to rules promulgated by the National Labor Relations Board, which are changed from time to time. *See* Proposed First Amended Consolidated Complaint, ECF Dkt. 71-2 at ¶128 (citing the Federal Register and noting that in September 2018, the Trump Administration published notice of a "proposed rulemaking to roll back the broader interpretation of the 'joint employer' standard that had been adopted under the Obama administration."). The proper application of the Sherman Act should not be subject to the vagaries of regulations promulgated by the NLRB and subject to political pressures.

**5.  BKC's position is fully consistent with its SEC filings.**

Plaintiffs contend that Defendants admit (Mot. at 18) that BKC's relationship with its franchisees are subject to the antitrust laws.  But Plaintiffs' misread Defendants' SEC filings. Defendants do not acknowledge that BKC and its franchisees constitute separate and independent economic actors for purposes of the antitrust laws, and it is clear they do not.  Rather, the statement "our relationships are subject to state and federal antitrust laws" is simply a cautionary statement indicating that BKC's operations could be subject to antitrust scrutiny in some instances.  For example, if BKC's franchisees were to enter into an illicit, horizontal agreement with one another and then pressure BKC to enforce that horizontal agreement, then arguably that would constitute a hub-and-spoke conspiracy under federal antitrust laws.  *Cf. Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) ("A group of retailers might collude to fix prices to consumers and then compel a manufacturer to aid the unlawful arrangement with resale price maintenance.")  Here, however, in in their proposed first amended consolidated class action complaint, Plaintiffs have no factual allegations that the franchisees reached a horizontal agreement with one another about anything, let alone that they entered into an illicit agreement.

The scenario involving an illicit horizontal agreement among the franchisees is the precise one being described in the well-known antitrust treatise that Plaintiffs cite (Mot. at 19), which states: "For example, McDonald's as a franchisor may have contractual franchise relationships with thousands of individually owned McDonald's franchisees, each of which is separately incorporated and owned by a separate franchisee.  In that case **an agreement among the franchisees to do something affecting individual franchisee market behavior** would be addressable under section 1 of the Sherman Act."  Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1478 (4th ed. 2018)

(emphasis added).  Tellingly, the quoted language does not concern an agreement between the franchisor and its franchisees.  And, of course, as just noted, Plaintiffs make no factual allegation here of "an agreement among franchisees to do something affecting franchisee market behavior."

      **6.  Antitrust law focuses on inter-brand competition, not intra-brand competition.**

As Defendants demonstrated in their reply in support of their motion to dismiss, the No-Hire provision "incentivize[d] franchisees to invest in employee training for the benefit of the franchisees and employees alike by eliminating free-riding."  Dkt. 55 at 6.  That benefitted the entire BKC franchise system, which, in turn, as this Court noted, "does not diminish—but on the contrary—enhances Burger King's ability to compete with other chain burger restaurants[.]"  Fostering such inter-brand competition should be encouraged because it is the principal key goal of antitrust law.  *See Leegin Creative Leather Prod.,* 551 U.S. at 879 ("antitrust laws primarily are designed to protect intrabrand competition from which lower prices can result").

CONCLUSION

For the foregoing reasons, the proposed amendment should be denied as futile.[3]

                      Respectfully submitted,

                      **HEISE SUAREZ MELVILLE, P.A.**

                      By: */s/  Luis E. Suarez*
                          Luis E. Suarez
                          (Florida Bar No. 390021)
                          Patricia Melville
                          (Florida Bar No. 475467)
                          Mark J. Heise

---

[3]The proposed amended complaint is also futile because it fails to correct the numerous other pleading deficiencies identified in Plaintiffs' motion to dismiss and which the Court found unnecessary to reach.

16

(Florida Bar No. 771090)
1600 Ponce De Leon Boulevard
Suite 1205
Coral Gables, Florida 33134
Telephone: (305) 800-4476
Email: lsuarez@hsmpa.com
Email: pmelville@hsmpa.com
Email; mheise@hsmpa.com

**BOIES SCHILLER FLEXNER LLP**

By: /s/ _Carl E. Goldfarb
       Stuart H. Singer, Esq.
       (Florida Bar. No. 377325)
       Carl E. Goldfarb, Esq.
       (Florida Bar No. 125891)
       401 East Las Olas Boulevard, Suite 1200
       Fort Lauderdale Florida 33301
       Telephone: (954) 356-0011
       Facsimile: (954) 356-0022
       Email: ssinger@bsfllp.com
       Email: cgoldfarb@bsfllp.com
       Email: ftleserve@bsfllp.com

       *Attorneys for Defendants*