# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-24128-CIV-MARTINEZ/OTAZO-REYES

JARVIS ARRINGTON, GENEVA BLANCHARD,
and SANDRA MUNSTER, individually and on
behalf of all others similarly situated,

      Plaintiffs,

vs.

BURGER KING WORLDWIDE, INC., BURGER
KING CORPORATION, RESTAURANT
BRANDS INTERNATIONAL, INC., and
RESTAURANT BRANDS INTERNATIONAL
LIMITED PARTNERSHIP,

      Defendants.
_____/

## ORDER GRANTING MOTION TO DISMISS

**THIS MATTER** comes before the Court upon the Rule 12(b)(6) Motion to Dismiss ("Motion") filed by Defendants, Burger King Worldwide, Inc., Burger King Corporation, Restaurant Brands International, Inc., and Restaurant Brands International Limited Partnership (DE 42). The Court has reviewed the Motion, response and reply thereto, and is otherwise fully advised. For the following reasons, the Motion is **GRANTED**.

    I.    **Background**

Burger King Corporation ("BKC") issues franchise licenses to own and operate Burger King branded restaurants pursuant to a standard franchise agreement. (DE 34, Am. Compl. ¶¶ 8, 22). As of 2007, the Burger King chain has more than 7,226 restaurants in the United States. (*Id.* ¶ 63). BKC owns and operates 50 of these, all of which are located in the Miami area. (*Id.* ¶¶ 22, 63). The remainder are franchised. (*Id.*)

1

A franchisee joins the Burger King system by executing a standard franchise agreement with BKC. According to Plaintiffs, "[e]very franchisee signing a Burger King franchise agreement since at least 2010 and before September 2018 executed and agreed to be bound" by a "No-Hire Agreement" incorporated into the standard franchise agreement. (*Id*. ¶ 8). That agreement provides:

> Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

(Am. Compl. ¶ 6).

The heart of the dispute, Plaintiffs allege, is that through the No-Hire Agreement the "franchisees, at the direction of and with the assistance of Burger King itself, have together colluded to depress wages and employment opportunities of employees who work in Burger King branded restaurants through the United States." (*Id*. ¶ 7). To support their claim of collusion, Plaintiffs point out that Burger King franchises are independently owned and operated and generally responsible for their own hiring. (Am. Compl., ¶¶ 53, 65-67; *see also id*. ¶ 65 (stating that each franchisee is an "independent contractor and is not an agent, partner, joint venturer, joint employer . . . of [Burger King], and no fiduciary relationship between the parties exists"); *id*. ¶ 66 (stating that each franchisee possesses the "the sole right to hire, discipline, promote, demote, transfer, discharge, and establish wages, hours, benefits, employment policies, and other terms and conditions of employment")). Additionally, "a Burger King franchisee agrees contractually to identify itself as an independent owner of the franchised restaurant in all public records, stationery, business forms, and checks." (Am. Compl. ¶70).

2

Burger King also warns franchisees that "other Burger King Restaurants may compete with your Restaurant" and, "[b]ecause you will not receive an exclusive territory, you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control." (*Id.* ¶ 74).

Significantly, although the standard franchise agreement provides a degree of autonomy to franchisees in certain respects, it also imposes substantial restrictions consistent with its essential purpose of "granting franchises": these include "a uniform and comprehensive restaurant format and operating system, including standardized design, décor, equipment system, color scheme, style of building and signage, as well as uniform operating and quality standards, specifications, and procedures of operation, and uniformity of products and services offered . . . ." (DE 42-2, Franchise Agreement).

Against this backdrop, Plaintiffs claim that the No-Hire Agreement constitutes an unreasonable restraint on trade and is "*per se* unlawful" under Section 1 of the Sherman Act, 15 U.S.C. §1. (Am. Compl. ¶¶ 10, 13, 156). Alternatively, Plaintiffs assert that Defendants are liable under a "quick look analysis," stating that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anti-competitive effect on employees and labor." (*Id.* ¶ 157). Plaintiffs seek an award of damages and equitable relief on behalf of every person who has worked at a Burger King restaurant from "at least 2010 to the present." (*Id.* ¶¶ 125, 160).

Defendants move to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6). This matter is now ripe for adjudication.

## II. Legal Standard

A motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint;

it does not decide the merits of the case. *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984). At the pleading stage, a complaint must contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). Although Rule 8(a) does not require "detailed factual allegations," it does require "more than labels and conclusions"; a "formulaic recitation of the cause of action will not do." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

In considering a 12(b)(6) motion to dismiss, a court must review the complaint in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). And while review is generally limited to the pleadings themselves, Fed. R. Civ. P. 12(b)(6), a court may also consider those "documents incorporated into the complaint by reference . . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

The Amended Complaint in this case references a standard franchise agreement. A document is incorporated by reference into a complaint where (1) it is central to the plaintiff's claim, (2) its contents were alleged in the complaint, and (3) no party questions those contents. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Here, all three factors are met, so the Court will consider the franchise agreement attached to Defendants' Motion to Dismiss. (DE 42-2).

4

### III. Analysis

#### A. The Sherman Act

The Supreme Court has explained that

> [t]he Sherman Act contains a basic distinction between concerted and independent action. The conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization.
>
> . . . .
>
> Section 1 of the Sherman Act, in contrast, reaches unreasonable restraints of trade effected by a "contract, combination . . . or conspiracy" between separate entities. It does not reach conduct that is wholly unilateral. Concerted activity subject to § 1 is judged more sternly than unilateral activity under § 2.

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767-8 (1984) (quotations and citations omitted). The Amended Complaint invokes Section 1. To state a plausible claim, accordingly, Plaintiffs must allege concerted action that restrains trade. And because "[t]he question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade," *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010), the Court addresses this issue first.

To qualify as concerted action, the alleged arrangement must be (i) an agreement (ii) between two or more entities capable of engaging in concerted action. *Id.* at 189-90. Here the parties dispute whether BKC and its franchisees are capable of engaging in concerted action. *Copperweld* and *American Needle* are the relevant authority in considering whether a franchisee and franchisor should be treated as a single entity under the antitrust laws.

Entities are legally capable of engaging in concerted action if the arrangement alleged to exist between them "'deprives the marketplace of independent centers of decisionmaking' . . . and thus of actual or potential competition." *Am. Needle*, 560 U.S. at 195 (quoting *Copperweld*, 467 U.S. at 769).

5

Determining whether this standard is met requires "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Id*. at 191. In *Copperweld*, the Supreme Court stated further:

> In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction. Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.

*Id*., 467 U.S. at 768–69.

On the other hand, the Court noted, "it is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police." *Id*. That is because

> [t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition. In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively.

*Id*. at 770-771.

Consequently, the Court concluded, "there can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor," explaining that "a rule that punished coordinated conduct simply because a corporation delegated certain responsibilities to autonomous units . . . . would serve no useful antitrust purpose but could well deprive consumers of the efficiencies that decentralized management may bring." *Id*.

Consistent with this reasoning, the *Copperweld* Court ultimately held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act" because they "have a complete unity of interest. Their

6

objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Id*. at 771.

In *American Needle*, by contrast, the Supreme Court applied Section 1 to the conduct of a cooperative arrangement that restrained actual or potential competition among its members. There, the Court held that the National Football League Properties (NFLP), a separate entity formed by the 32 teams in the National Football League, engaged in concerted action when it made decisions about the licensing of the teams' trademarks and other "separately owned intellectual property." *Am. Needle*, 560 U.S. at 201. The Court in *American Needle* explained that the teams were acting through the NFLP, but "not like the components of a single firm that act to maximize the firm's profits." *Id*. Instead, the teams "remain[ed] separately controlled, potential competitors with economic interests that are distinct from [the jointly owned corporation's] financial well-being." *Id*.

The Court emphasized that "[e]ach of the teams is a substantial, independently owned, and independently managed business . . . . The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with managerial and playing personnel." *Id*. at 196–97. Thus, the Court determined that decisions by NFL teams to license their separately owned trademarks collectively and to only one vendor demonstrated that the teams were separately controlled, potential competitors, capable of conspiring under § 1 of the Sherman Act. *Id*. at 197, 200.

Beyond its function as a bookend to *Copperweld*, the Supreme Court's opinion in *American Needle* provided historical context that is particularly instructive for present purposes. In tracing the decline of the "intraenterprise conspiracy doctrine," the Supreme Court approvingly cited *United States v. Citizens & Southern Nat. Bank*, 422 U.S. 86 (1975), which concluded that the

7

relationship between a bank and sponsored associate banks did not implicate Section 1. In that case, a large bank, Citizens and Southern (C&S), formed a holding company that owned five percent of sponsored associate banks, which were designed to operate as *de facto* branch banks in suburban Atlanta, while much of the remaining stock of those banks was owned by parties friendly to C&S and subject to close C&S oversight. *Id*. at 193-194 (citing *Citizens & Southern*, 422 U.S. at 89). The organizational format was devised to evade Georgia banking regulations intended to benefit small suburban banks. *Id*. The Court observed that "because the sponsored banks were not set up to be competitors, § 1 did not compel them to compete." *Id*.; *Citizens & Southern*, 422 U.S. at 86 (noting that "[e]xcept for that sponsorship, they would very probably not exist.")

### B. The Burger King System

As guideposts, *Copperweld* and *American Needle* compel the conclusion that Burger King's relationship with its franchisees more closely resembles a corporation organized into divisions or *de facto* branches, or that of a parent-subsidiary, than the relationship between similarly-situated NFL teams. As relevant here, some key requirements imposed by BKC on franchisees are as follows:

- Payment of royalties
- Payment toward joint advertising budget
- Use of a uniform operations manual
- Uniform appearance and image
- Uniform menu
- Uniform service and manner of food preparation
- Standardized equipment
- Uniform training standards

8

Case 1:18-cv-24128-JEM Document 67 Entered on FLSD Docket 03/24/2020 Page 9 of 12

- Uniform hours of operation

(DE 42-2: 5-13).

It is acknowledged that, similar to sponsored banks in *Citizens & Southern*, franchises are, at least in an abstract sense, potentially capable of competing with each other for employees or customers. But this alone does not answer the question of whether a franchisor and franchisee should be treated as a single entity under the antitrust laws. Indeed, to view BKC and its franchisees as independent decisionmakers and competitors relative to employment decisions, as Plaintiffs urge, is to parcel out one component of a broader symbiotic relationship, which is entirely predicated on uniform operations. This is contrary to the totality-of-the-circumstances approach employed by the Supreme Court in *American Needle*. More significantly, in the absence of uniformity guaranteed by the Burger King franchise agreement, there would be no franchise and hence, no independent source of economic power. The relationship here is more than merely symbiotic. It is totally derivative.

Further, as the Amended Complaint and standard franchise agreement reveal, Burger King's products, and all of the operational parameters necessary to bring them to the marketplace, are fully realized long before a franchisee joins the Burger King system, and subject to close supervision by BKC.[1] The success of BKC and its franchises are wholly dependent on systemwide uniformity. And this general format does not diminish—but on the contrary—enhances Burger King's ability to compete with other chain burger restaurants by providing a consistent product at a predictable price. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 879

---

[1] (*See* Am. Compl. ¶¶7-8 (alleging that Burger King's No-Hire Agreement was imposed "at the direction of and with the assistance of Burger King itself"; and, "[i]n order to obtain a Burger King franchise, a prospective franchisee is required to sign a standard franchise agreement with Burger King Corporation"); *see also id.* at ¶9 (identifying severe penalties for noncompliance)).

9

(2007) (instructing that "antitrust laws primarily are designed to protect interbrand competition from which lower prices can later result"). That a franchisee retains some residual economic autonomy with respect to employment decisions is insufficient to convert it into a separate economic actor. Rather, this case presents a paragon example of the type of unity decisionmaking untouched by §1.

Fortifying this conclusion, the Court considers the anomaly that would result if BKC corporate stores were considered to be part of a single corporate conscious, but franchised stores were not. Vis-à-vis the employees and general public, the distinction is imperceptible. To expose a corporation to substantial legal liability based solely on the franchise status of its restaurants would elevate form over substance, directly contrary to the teachings of the Supreme Court. *See Am. Needle*, 560 U.S. at 191 ("[W]e have eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate."); *Copperweld*, 467 U.S. at 773 (counseling against "impos[ing] grave legal consequences upon organizational distinctions that are of de minimis meaning and effect"). Doing so would provide no anticompetitive benefit, but merely encourage corporations to avoid antitrust liability by the simple expedient of altering their organizational structure, and if unable to do so, potentially depriving consumers of the readily apparent conveniences of franchised restaurant systems. To this end, "in view of the increasing complexity of corporate operations, a business enterprise should be free to structure itself in ways that serve efficiency of control, economy of operations, and other factors dictated by business judgment without increasing its exposure to antitrust liability." *Id*. at 772-773.

In a very similar case to the matter before this Court, the Ninth Circuit in *Williams v. I.B. Fischer Nevada*, 999 F.2d 445 (9th Cir. 1993) affirmed a district court's grant of summary

10

judgment to a restaurant franchisor (Jack-in-the-Box) against a franchisee's claims that a compulsory "no-switching" agreement violated Section 1 of the Sherman Act. The agreement provided that franchisees would not offer employment to the manager of another Jack-in-the-Box restaurant within six months of that manager's termination from employment, unless that manager obtained a release from the franchisee of the Jack-in-the-Box he or she is leaving. *Id*. at 447. The appellate court agreed with the district court that, as a matter of law, the "no-switching" agreement did not violate Section 1 of the Sherman Act because the franchisor was incapable of conspiring with the franchisee. *Id*. The no-switching agreement in *Fischer* is materially indistinct to the No-Hire Agreement in this case. *See also Hall v. Burger King Corp.*, 912 F. Supp. 1509, 1548 (S.D. Fla. 1995) (concluding on summary judgment that a plaintiff's Section 1 conspiracy claim failed due to a lack of evidence, but also opining that "it still would fail because BKC and its franchisees are incapable of conspiring with each other"); *Danforth & Assoc., Inc. v. Caldwell Banker Real Estate, LLC*, 2011 WL 338798, at *2 (W.D. Wash. Feb. 3, 2011) (granting motion to dismiss Section 1 claim, reasoning that "coordinated activity between a franchisor and franchisee does not implicate the Sherman Act"); *Search Int'l, Inc. v. Snelling & Snelling, Inc.*, 168 F. Supp. 2d 621, 626 (N.D. Tex.) ("In the present case, the Amended Complaint reveals a unity of interests between Snelling and its franchisees such that these two entities are incapable of conspiring within the meaning of Section 1."), *aff'd*, 31 Fed. Appx 151 (5th Cir. 2001).

The Court is mindful of the fact-specific and functional approach required in assessing whether a franchisor-franchisee relationship is capable of constituting a concerted action. *Am. Needle, Inc*, 560 U.S. at 191. In this case, however, it appears the allegations of concerted action are wholly coextensive with the standard franchise agreement before the Court. Accordingly, based on the standard franchised agreement and other portions of the record in this case, together

11

with the foregoing authorities, the Court concludes that Burger King's No-Hire Agreement constitutes an "internal 'agreement' to implement a single, unitary firm's policies," *Copperweld*, 467 U.S. at 769, and does not implicate antitrust principles.

### IV. Conclusion

Because Plaintiffs have not sufficiently alleged that BKC and its franchisees are separate economic actors for antitrust purposes, the Amended Complaint fails to state a claim for relief pursuant to Section 1 of the Sherman Act. As this issue is dispositive, the Court declines to consider Defendants' remaining arguments in support of dismissal. The Court is concerned about the potential futility of an amended pleading given the controlling significance of the standard franchise agreement in this matter. Nevertheless, Plaintiffs may, but are not required to, file a motion for leave to amend their pleading no later than April 20, 2020. The motion shall allege and identify, with particularity, any additional facts that may operate to establish Section 1 liability, with a focus on concerted action. The motion shall be accompanied by a memorandum of law addressing the Court's concerns. Defendants shall respond to the motion within 7 days. Alternatively, Plaintiffs may notify the Court no later than March 31, 2020, that they are unable to amend their pleading in good faith and prefer the Court enter a final appealable order.

Accordingly, it is **ORDERED** and **ADJUDGED** that the Rule 12(b)(6) Motion to Dismiss filed by Defendants, Burger King Worldwide, Inc., Burger King Corporation, Restaurant Brands International, Inc., and Restaurant Brands International Limited Partnership (DE 42) is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 24th day of March 2020.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

12