UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case Number: 18-24128-CIV-MARTINEZ

JARVIS ARRINGTON, GENEVA
BLANCHARD, and SANDRA MUNSTER,
individually and on behalf of all others similarly
situated,

                Plaintiffs,

    v.

BURGER KING WORLDWIDE, INC.,
BURGER KING CORPORATION,
RESTAURANT BRANDS INTERNATIONAL,
INC., and RESTAURANT BRANDS
INTERNATIONAL LIMITED PARTNERSHIP,

                Defendants.

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW
<u>IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................................1

II.     FACTUAL BACKGROUND .........................................................................................2

III.    THE COMPLAINT SUFFICIENTLY PLEADS A CLAIM UNDER SECTION 1
        OF THE SHERMAN ACT. ...........................................................................................3

        A.      Plaintiffs Plausibly Allege a *Per Se* Unlawful Restraint of Trade: A No-
                Hire Agreement Among Horizontal Competitors for Labor. ..............................4

                1.      *No-Hire Agreements Are Market Allocations Subject to Per Se
                        Treatment.* ..............................................................................................4

                2.      *Burger King and Its Franchisees Are Horizontal Competitors in
                        the Labor Market.* ...................................................................................5

                3.      *Burger King Orchestrated a Horizontal Agreement Amongst
                        Franchisees.* ..........................................................................................10

        B.      Plaintiffs Allege a Plausible Quick-Look Claim. .............................................11

        C.      Plaintiffs Allege a Plausible Rule of Reason Claim. ........................................13

IV.     NO DEFENDANTS SHOULD BE DISMISSED............................................................13

V.      PLAINTIFFS SUFFICIENTLY PLEAD FRAUDULENT CONCEALMENT..............14

VI.     ALTERNATIVELY, PLAINTIFFS REQUEST LEAVE TO AMEND.........................15

VII.    CONCLUSION ............................................................................................................15

# TABLE OF AUTHORITIES

**Page**

## CASES

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
  683 F.3d 328 (7th Cir. 2012) ...................................................................12

*Arrington v. Burger King Worldwide, Inc.*,
  47 F.4th 1247 (11th Cir. 2022) ..........................................................1, 2, 6

*Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ....................................................................7

*Ballew v. A.H. Robins Co.*,
  688 F.2d 1325 (11th Cir. 1982) ...............................................................14

*Bd. of Regents of Univ. of Okla. v. NCAA*,
  707 F.2d 1147 (10th Cir. 1983) .................................................................8

*Blackburn v. Sweeney*,
  53 F.3d 825 (7th Cir. 1995) ......................................................................8

*Blanton v. Domino's Pizza Franchising LLC*,
  No. 18-13207, 2019 WL 2247731 (E.D. Mich. May 24, 2019) .........................4, 11

*Butler v. Jimmy John's Franchise, LLC*,
  331 F. Supp. 3d 786 (S.D. Ill. 2018) .................................................4, 11, 13

*Cal. Dental Ass'n v. F.T.C.*,
  526 U.S. 756 (1990) .....................................................................2, 11, 13

*Cal. ex rel. Harris v. Safeway*,
  651 F.3d 1118 (9th Cir. 2011) .................................................................12

*Cent. Fla. Sterilization, LLC v. Synergy Health AST, LLC*,
  No. 6:15–cv–2120, 2016 WL 8944643 (M.D. Fla. June 27, 2016) .......................15

*Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*,
  101 F. Supp. 3d 1319 (N.D. Ga. 2015) ......................................................13

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
  433 U.S. 36 (1977)..................................................................................9

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Credit Bureau Servs., Inc. v. Experian Info. Solutions, Inc.*,
    No. 12–61360–CIV , 2012 WL 6102068 (S.D. Fla. Dec. 7, 2012) ........................................14

*Deslandes v. McDonald's USA, LLC*,
    81 F.4th 699 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024) ...................... 1, 5, 6, 7, 8, 9

*Eichorn v. AT&T Corp.*,
    248 F.3d 131 (3d Cir. 2001) ........................................................................................9

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ....................................................................................8

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986) .................................................................................................13

*Fuentes v. Royal Dutch Shell PLC*,
    No. CV 18-5174, 2019 WL 7584654 (E.D. Pa. Nov. 25, 2019) .........................................4, 11

*Garcia v. Clarins USA, Inc.*,
    No. 14-cv-21249, 2014 WL 11997812 (S.D. Fla. Sept. 5, 2014)..........................................14

*Hammes v. AAMCO Transmissions, Inc.*,
    33 F.3d 774 (7th Cir. 1994) ........................................................................................4

*Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*,
    910 F.3d 1186 (11th Cir. 2018) ...................................................................................4

*Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*,
    889 F.2d 751 (7th Cir. 1989) ......................................................................................9

*In re Blue Cross Blue Shield Antitrust Litig.*,
    26 F. Supp. 3d 1172 (N.D. Ala. 2014) ..........................................................................4

*In re Blue Cross Blue Shield Antitrust Litig.*,
    308 F. Supp. 3d 1241 (N.D. Ala. 2018), *pet. for leave to app. denied*, *In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018).........................................4

*In re Insurance Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ......................................................................................7

*In re January 2021 Short Squeeze Trading Litig.*,
    105 F.4th 1346 (11th Cir. 2024) ..................................................................................4

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Managed Care Litig.*,
No. 00-1334-MD, 2009 WL 855963 (S.D. Fla. Mar. 30, 2009)..............................................15

*In re Outpatient Med. Ctr. Employee Antitrust Litig.*,
630 F. Supp. 3d 968 (N.D. Ill. 2022) .....................................................................................8

*In re Papa John's Employee & Franchisee Employee Antitrust Litig.*,
No. 3:18-CV-00825-JHM, 2019 WL 5386484 (W.D. Ky. Oct. 21, 2019) .........................4, 11

*In re Polyurethane Foam Antitrust Litig.*,
799 F. Supp. 2d 777 (N.D. Ohio 2011) ................................................................................15

*In re Southeastern Milk Antitrust Litigation*,
739 F.3d 262 (6th Cir. 2014) ...............................................................................................12

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) .................................................................................................8

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) .............................................................................................13

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
334 U.S. 219 (1948)...............................................................................................................5

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
734 F.2d 705 (11th Cir. 1984) .........................................................................................9, 10

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
198 F.3d 823 (11th Cir. 1999) .............................................................................................14

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
779 F.2d 592 (11th Cir.1986) ............................................................................................4, 7

*NCAA v. Alston*,
594 U.S. 69 (2021)..................................................................................................................5

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)..............................................................................................................13

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990).........................................................................................................4, 5, 6

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Procaps S.A. v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) ....................................................................12, 13

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*,
  917 F.3d 1249 (11th Cir. 2019) .............................................................................14

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ...............................................................................7

*Schering-Plough Corp. v. FTC*,
  402 F.3d 1056 (11th Cir. 2005) ..............................................................................7

*Seagood Trading Corp. v. Jerrico, Inc.*,
  924 F.2d 1555 (11th Cir. 1991) ..............................................................................5

*Sprint Sols., Inc. v. Fils-Amie*,
  44 F. Supp. 3d 1224 (S.D. Fla. 2014) ...................................................................14

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ...................................................................................................7

*This That And The Other Gift And Tobacco, Inc. v. Cobb Cnty.*, Ga.,
  439 F.3d 1275 (11th Cir. 2006) ..............................................................................6

*Toback v. GNC Holdings, Inc.*,
  No. 13-80526-CIV, 2013 WL 5206103 (S.D. Fla. Sept. 13, 2013)........................14

*Toys 'R' Us, Inc. v. F.T.C.*,
  221 F.3d 928 (7th Cir. 2000) ................................................................................10

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ...........................................................................6, 10

*United States v. eBay, Inc.*,
  968 F. Supp. 2d 1030 (N.D. Cal. 2013).................................................................5

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972)............................................................................................4, 8

*Williamson Oil Co., Inc. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ............................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Worldwide Basketball & Sport Tours, Inc. v. NCAA,*
  388 F.3d 955 (6th Cir. 2004) ...................................................................................12

**TREATISES**

ABA, Model Jury Instructions in Civil Antitrust Cases, Instruction A-1 (2016 ed.) ...................11

Areeda & Hovenkamp, XI *Antitrust Law*, ¶ 1908 (3d ed. 2012).....................................................7

Areeda & Hovenkamp, XII *Antitrust Law* ¶ 2013b (3d ed. 2012).................................................5

## I.  <u>INTRODUCTION</u>

Burger King's standardized franchise agreement prohibited Burger King[1] and its franchisees from hiring or soliciting one another's employees ("No-Hire Agreement"). The sole purpose of this market allocation agreement was to reduce labor costs by eliminating competition for workers among Burger King-branded entities. The No-Hire Agreement is a classic horizontal restraint of trade, *per se* unlawful under Section 1 of the Sherman Act. Burger King's remaining arguments for dismissal of Plaintiffs' First Amended Consolidated Complaint fare no better than those that the Eleventh Circuit rejected in *Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247 (11th Cir. 2022), reversing the prior dismissal and remanding the case for further proceedings.[2]

The Seventh Circuit's recent decision in *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024), should guide this Court's analysis. *Deslandes* involved an almost identical "no-poach clause" that "barred one franchise from soliciting another's employee." *Id.* at 702. McDonald's, like Burger King, operates some restaurants itself, so the no-poach clause worked as a horizontal restraint, the Seventh Circuit ruled, *id.* at 703, undercutting Burger King's primary line of attack here. *See* Mot. (ECF No. 42) at 7. And like Burger King does here, McDonald's claimed that the no-poach clause was not *per se* unlawful because it was an ancillary restraint in franchise agreements that expanded the output of burgers and fries. *Id.* The Seventh Circuit easily rejected this argument, and thus reversed dismissal on the pleadings, reasoning that "classification of a restraint as ancillary is a defense, and complaints need not anticipate and plead around defenses." *Id.* at 705. Because Plaintiffs here, like the *Deslandes* plaintiffs, have "identified a plausible antitrust claim, further development requires discovery, economic analysis, and potentially a trial." *Id.*

Burger King's efforts to resist *Deslandes* clash with the factual allegations in the Amended

---

[1]"Burger King" shall refer to Defendants Burger King Worldwide, Inc., Burger King Corporation, Restaurant Brands International, Inc., and Restaurant Brands International Limited Partnership.

[2] Plaintiffs sought leave to file the First Amended Consolidated Complaint (hereafter, "Amended Complaint") following this Court's initial dismissal Order. (ECF No. 71.) The Court denied Plaintiffs' motion (ECF No. 74) and thus entered the Final Order of Dismissal (ECF No. 75). Because the Eleventh Circuit reversed this Court's dismissal and evaluated the proposed Amended Complaint (ECF No. 71-1) to reach its decision, *Arrington*, 47 F.4th at 1256, Plaintiffs reference the allegations of the Amended Complaint (ECF No. 71-1). But the material allegations concerning the illegality of the No-Hire Agreement are also found in the initial complaint (ECF No. 34). Plaintiffs incorporate herein their prior opposition to Defendants' motion to dismiss (ECF No. 49) and opposition to Defendants' request for judicial notice (ECF No. 51).

Complaint, an impermissible tactic at this stage. For example, Burger King claims that the No-Hire Agreement was a "*vertical*" restraint—*i.e.*, between noncompetitors. But Burger King analyzes the wrong market, making a similar mistake to the error that the Eleventh Circuit corrected in *Arrington*, 47 F.4th at 1255. The No-Hire Agreement restrains *the market for labor*—not the market for burgers, where Burger King misplaces its attention. Within the *labor* market, Plaintiffs allege and the Eleventh Circuit concluded, Burger King and franchisees are direct, horizontal competitors. The law of the case doctrine precludes re-litigation of the issue now.

Nor can Burger King evade *per se* treatment at this stage by suggesting a procompetitive rationale for the No-Hire Agreement. As the court held in *Deslandes*, that is an affirmative defense that requires discovery. In any event, the procompetitive arguments Burger King hints at again focus on the wrong market: the burger or fast-food market. In the market that matters in this case, the labor market, the No-Hire Agreement, on its face and according to the allegations of the Amended Complaint, only eliminates competition among direct competitors.

The Amended Complaint alternatively presents a claim that is sufficient under the quick-look test because "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on [workers and] markets." *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1990). Because direct evidence of anticompetitive effects, even without a showing of strength in the relevant market, is sufficient for a horizontal restraint under the rule of reason, the claim survives that analysis as well.

In any event, the Court need not decide now which test—*per se*, quick look, or rule of reason—to ultimately apply. Numerous courts have concluded, in similar no-poach cases, that choosing the appropriate test turns on disputed facts and should await completion of fact discovery.

Burger King's remaining arguments fare no better. As discussed below, Plaintiffs plausibly allege the involvement of all Defendants and the franchisees in the No-Hire Agreement and adequately plead that fraudulent concealment tolled the statute of limitations.  The Court should deny the remainder of Burger King's motion and allow the case to proceed with discovery.

## II.      FACTUAL BACKGROUND

Burger King franchises are independently owned and operated businesses responsible for their own day-to-day operations. Am. Compl. (ECF No. 71-1) ¶¶ 53, 64–66, 70. Burger King and franchisees insist they are completely independent with respect to employee hiring and recruitment. *Id.* ¶¶ 66–67. These independently owned businesses are competitors, including for

labor. *Id.* ¶¶ 6, 77–79. Burger King specifically warns franchisees that "*other Burger King Restaurants may compete with your Restaurant . . . .* Because you will not receive an exclusive territory, *you may face competition* from other franchisees*, from outlets that we own, or from other channels of distribution or competitive brands that we control.*" *Id.* ¶ 79 (emphasis added).

Though Burger King is in a "vertical" relationship with franchisees with respect to the use of Burger King's brand to sell food products, it is a horizontal competitor with its franchisees with respect to labor, through its operation of company-owned outlets. *Id.* ¶¶ 5, 79–80. Burger King corporate-owned restaurants and the independent franchisees separately hire restaurant workers, and thus compete in the labor market. *See id.*; *see also* ¶ 6.

In a properly functioning market, Burger King and its franchisees would compete because of their respective self-interest to recruit and retain the most talented and productive employees possible. *Id.* ¶¶ 33-44; *see also* ¶¶ 6, 46, 91. Instead, they do not, because the franchise agreement expressly forbids as much. Burger King and its franchisees agree that:

> [n]either BKC [Burger King Corporation] nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of [Burger King] to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

*Id.* ¶ 8.[3] Burger King is the central enforcer of this agreement and threatens severe sanctions against violators, such as termination of franchising rights, forfeiture of franchising fees, and other post-termination covenants. *Id.* ¶¶ 9, 84–90.

Plaintiffs worked at Burger King restaurants, where their wages were depressed by the No-Hire Agreement. *Id.* ¶¶ 13, 18–20, 46, 54, 147–57. Upon attempting to change jobs to work for a Burger King owned by a different operator, Plaintiffs Arrington and Munster were told that they would need "approvals" or "releases" from their current employer for transfer, which they did not receive. *Id.* ¶¶ 147, 155–56.

### III.   THE COMPLAINT SUFFICIENTLY PLEADS A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.

Burger King's motion rests on the notion that the "rule of reason" governs this case, rather

---

[3] Burger King argues that there is no restraint on the hiring of "non-enticed or non-solicited employees," Mot. at 3 n.2, but this contradicts the language of the agreement and Plaintiffs' allegations. Am. Compl. ¶ 8 (alleging that neither Burger King nor its franchisees "will . . . entice or induce, or attempt to entice or induce . . . *or employ* such employee") (emphasis added).

than the "*per se*" or "quick look" tests. Although which test ultimately applies is a question of law, "[that question] is predicated on a ***factual inquiry*** into the restraint's competitive effect." *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1186 (N.D. Ala. 2014) (emphasis added) (citing *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir.1986)). Because this factual inquiry cannot be resolved on a motion to dismiss, the Court need not determine the standard to apply at this time—a conclusion that several courts have reached in this specific context. *See, e.g.*, *See, e.g.*, *Fuentes v. Royal Dutch Shell PLC*, No. CV 18-5174, 2019 WL 7584654, at *1 (E.D. Pa. Nov. 25, 2019); *In re Papa John's Employee & Franchisee Employee Antitrust Litig.*, No. 3:18-CV-00825, 2019 WL 5386484, at *9 (W.D. Ky. Oct. 21, 2019); *Blanton v. Domino's Pizza Franchising LLC*, No. 18-13207, 2019 WL 2247731, at *5 (E.D. Mich. May 24, 2019); *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 797 (S.D. Ill. 2018).[4]

Nonetheless, even if the Court selects a test to apply at this stage, Plaintiffs have alleged a plausible claim under Section 1 of the Sherman Act.

### A. Plaintiffs Plausibly Allege a *Per Se* Unlawful Restraint of Trade: A No-Hire Agreement Among Horizontal Competitors for Labor.

#### 1. *No-Hire Agreements Are Market Allocations Subject to Per Se Treatment.*

The Supreme Court has "reiterated time and time again that '[market allocation agreements between competitors] are naked restraints of trade with no purpose except stifling of competition.'" *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)). "Such limitations are per se violations of the Sherman Act," *id.*, have effects "almost identical to those of price-fixing and [are] treated the same by the law." *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 782 (7th Cir. 1994); *see also In re Blue Cross Blue Shield*, 308 F. Supp. 3d 1241, 1279 (N.D. Ala. 2018) (applying *per se* standard to market allocation agreement at summary judgment stage), *pet. for leave to app. denied*, *In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018).

While garden variety market allocation agreements restrain competition among sellers, the No-Hire Agreement restrains competition among buyers, *i.e.*, among companies that purchase or

---

[4] While courts may select an antitrust test to use at the motion-to-dismiss stage when facts are undisputed and the choice is clear, *see In re January 2021 Short Squeeze Trading Litig.*, 105 F.4th 1346, 1356 n.11 (11th Cir. 2024), it is, of course, impermissible to resolve any factual disputes against Plaintiffs at this stage, *see Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018).

pay for employee labor. But the *per se* rule applies equally to market allocation conspiracies among buyers. *See*, *e.g.*, *Deslandes*, 81 F.4th at 702 ("[T]he antitrust laws prohibit monopsonies, just as they prohibit monopolies."); *Mandeville Island Farms v. Am. Crystal Sugar Co*., 334 U.S. 219, 235 (1948) (complaint alleging buyers' conspiracy survived motion to dismiss because challenged conduct was precisely the type of activity condemned by Section 1). And the Supreme Court has recently made clear that the Sherman Act protects workers and competition in labor markets. *See NCAA v. Alston*, 594 U.S. 69, 85–96 (2021).

An agreement between competitors not to recruit or hire one another's existing employees, like the No-Hire Agreement, is an unlawful market allocation because "[a]n agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement . . . .  Such agreements are generally unlawful per se." Phillip E. Areeda & Herbert Hovenkamp, XII *Antitrust Law* ¶ 2013b at 148 (3d ed. 2012); *see also United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039-40 (N.D. Cal. 2013) (holding that no-poach agreement between competitors is "'classic' horizontal market division").

Burger King claims that courts lack "experience" with restraints like the No-Hire Agreement, so it should not be treated as *per se* unlawful.  Mot. at 10, 13. But the Supreme Court has made clear that application of the *per se* rule does not depend upon the amount of experience with a particular industry; instead, it turns on the amount of experience "with the particular type of restraint challenged." *Arizona v. Maricopa Cty. Med. Soc*., 457 U.S. 332, 349 & n.19 (1982). Here, the "particular type of restraint challenged," *id.*, is a horizontal market allocation agreement, a restraint that courts have "time and again" concluded is *per se* unlawful. *Palmer*, 498 U.S. at 49. Burger King's No-Hire Agreement is no different.

### 2. Burger King and Its Franchisees Are Horizontal Competitors in the Labor Market.

Burger King concedes that horizontal market allocation agreements are *per se* unlawful, but argues that its No-Hire Agreement is inherently "vertical" because it is recorded in a franchise agreement. Mot. at 6-7. Whereas a horizontal restraint involves "agreements among competitors . . . [to] restrain trade at the same level of distribution," a vertical restraint is "between firms occupying different levels in the chain of distribution of a specific product." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1568–69 (11th Cir. 1991). What matters is whether conspirators compete at the same or different levels *of the market that has been restrained*—not

their identity. *See United States v. Apple, Inc.*, 791 F.3d 290, 297 (2d Cir. 2015) ("[T]he Sherman Act outlaws *agreements* that unreasonably restrain trade and therefore requires evaluating the nature of the restraint, rather than the identity of each party who joins in to impose it, in determining whether the *per se* rule is properly invoked.") (emphasis in original).

Burger King and its franchisees restrained the labor market by agreeing not to hire each other's employees. There are no different "levels of distribution" at which Burger King and its franchisees employ labor: they all operate their own restaurants and hire employees. Am. Compl. ¶¶ 5, 79–80. Needless to say, Burger King does not manufacture and distribute workers to its franchisees. The relationship is not vertical in the labor market. Instead, Burger King participates at the same market level as franchisees, rendering their relationship *horizontal*, not vertical. *See Deslandes*, 81 F.4th at 703 ("The complaint alleges that McDonald's operates many restaurants itself or through a subsidiary, and that it enforced the no-poach clause at those restaurants. This made the arrangement horizontal: workers at franchised outlets could not move to corporate outlets, or the reverse."). In fact, the horizontal relationship between Burger King and its franchisees is even clearer here than it was in *Deslandes*, because the text of the No-Hire Agreement expressly binds Burger King to reciprocate the restraint. Am. Compl. ¶ 8 ("Neither BKC nor Franchisee will . . .entice or induce . . . or employ . . . .").

In any event, the Eleventh Circuit had no trouble concluding that Plaintiffs alleged a horizontal agreement. *Arrington*, 47 F.4th at 1250 ("Burger King and its separate and independent franchise restaurants ***compete against each other***—in this case, for employees.") (emphasis added); *id.* at 1256 ("There's just no question that Burger King and its franchisees compete against each other and have separate and different economic interests."). The law of the case bars re-litigation of the issue at this stage. *This That And The Other Gift And Tobacco, Inc. v. Cobb Cnty.*, Ga., 439 F.3d 1275, 1283 (11th Cir. 2006) ("The law-of-the-case doctrine bars relitigation of issues that were decided either explicitly or by necessary implication.").

Contrary to Burger King's view, the *per se* rule does not cease to apply just because, in addition to competing in the relevant labor market, the parties to a horizontal restraint also have some vertical relationship—*i.e.*, a franchise relationship. *See Palmer*, 498 U.S. at 47, 49-50 (treating agreement as horizontal where it both created vertical licensor-licensee relationship and divided market in which licensor and licensee could compete). Nor does it cease to apply even if all of Burger King's corporate-owned restaurants are geographically concentrated in the Miami

area.[5] *Id.* (holding that market allocation is *per se* unlawful "regardless of whether the parties split a market within which both do business or [not]"). Rather, the *per se* rule remains applicable unless the defendant can establish that the horizontal restraint is ancillary to a legitimate, pro-competitive agreement in the relevant market. *See, e.g.*, *Deslandes*, 81 F.4th at 704; *Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109–10 (9th Cir. 2021) (applying ancillary restraints doctrine even though the parties were in a vertical "subcontractor-subcontractee relationship," in addition to being competitors); *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 345-47 (3d Cir. 2010) (rejecting the argument that the mere existence of a "vertical arrangement" automatically subjects a horizontal restraint to the rule of reason).

But "a restraint does not qualify as 'ancillary' merely because it accompanies some other agreement that is itself lawful." Areeda & Hovenkamp, XI *Antitrust Law*, ¶ 1908 at 302; *accord Deslandes*, 81 F.4th at 703. Instead, to establish an ancillary-restraints defense, a defendant must make two showings. First, it must demonstrate that the challenged restraint is "subordinate and collateral," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986), to a separate, "legitimate business collaboration," *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006). This requirement ensures that any restraint is "secondary," *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1073 (11th Cir. 2005), to an "economic integration" or "fusion" of "productive capacities" that achieves "procompetitive" results—paradigmatically, a joint venture, *Rothery Storage*, 792 F.2d at 214, 230. Second, for a restraint to be considered ancillary, a defendant must show that it is "necessary" to achieve "procompetitive goals," and even then, the restraint must be "no greater than reasonably necessary," "no[r] broader than necessary." *NaBanco*, 779 F.2d at 601; *see Rothery Storage*, 792 F.2d at 224 (holding that, if "part of the restraint suppresses competition without creating efficiency, the restraint is, to that extent, not ancillary").

As the Seventh Circuit reasoned in *Deslandes*, 81 F. 4th at 704–05, the ancillary-restraint doctrine cannot shield the No-Hire Agreement from *per se* treatment at this stage. This is because "the classification of a restraint as ancillary is a defense, and complaints need not anticipate and

---

[5] Nor can Burger King distinguish *Deslandes* based on the number of restaurants it operates. Plaintiffs allege that Burger King operates at least fifty restaurants, a significant volume by any measure, and *Deslandes*, 81 F.4th at 703, did not rest its characterization of the restraint as horizontal on a specific number of corporate McDonald's restaurants. Just as in *Deslandes*, "workers at franchised [Burger King] outlets could not move to [the fifty-plus] corporate [Burger King] outlets, or the reverse." *Id.* That is sufficient to make the restraint horizontal. *Id.*

plead around defenses." *Id.* at 705. Critically, the Amended Complaint contains no allegations suggesting that the No-Hire Agreement is in any way necessary to a procompetitive goal; in fact, it alleges the exact opposite. Am. Compl. ¶ 2. So, the ancillary-restraints defense cannot justify dismissal. *See In re Outpatient Med. Ctr. Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 988 (N.D. Ill. 2022) (denying motion to dismiss and applying *per se* rule where complaint's "allegations contain no suggestion that the non-solicitation agreements were ancillary to some procompetitive business purpose").[6]

Even if the Court were to examine ancillarity at this stage, Burger King's motion would fail. The No-Hire Agreement on its face *reduces* competition for labor and "prevents workers from reaping the gains from skills they learned." *Deslandes,* 81 F.4th at 705. While Burger King claims that the franchise agreement promotes interbrand competition, Mot. at 13, this refers to interbrand competition for **burger sales**, *i.e.*, the wrong market. "[I]t is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise." *Deslandes*, 81 F.4th at 704.

And the question is not whether the *franchise agreement* itself serves a procompetitive purpose, but whether the *No-Hire Agreement* is necessary to achieve a procompetitive purpose. An anticompetitive restraint in one market (labor) cannot be justified because of purported procompetitive benefits in another market (burger sales). *See Topco*, 405 U.S. at 610 (rejecting notion that competition may "be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy"); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988–89 (9th Cir. 2000) (conspiracy to lower milk prices not justified on theory it would ultimately reduce manufacturing costs of cheese and thus consumer prices). As the Seventh Circuit aptly reasoned, the No-Hire Agreement "promotes profits, to be sure, as franchises capitalize on workers' sunk costs. But it does not promote output and so cannot be called 'ancillary' in the sense antitrust law uses that term." *Deslandes*, 81 F.4th at 704. Even if it were otherwise, Burger King's No-Hire Agreement applies to every restaurant employee, irrespective of geography, job title or

---

[6] Defendants bear the burden of establishing ancillarity. *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1152 (9th Cir. 2003); *Blackburn v. Sweeney*, 53 F.3d 825, 828-29 (7th Cir. 1995); *Bd. of Regents of Univ. of Okla. v. NCAA*, 707 F.2d 1147, 1154 n.9 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984).

function, employment tenure, compensation level, or which franchise or corporate-owned store is the employer. And, in all those cases, it applies for the entire duration of employment *plus six months*. "If the restriction cannot be justified because of its scope and duration, it is difficult to see how it can be reasonably necessary to the achievement of the procompetitive objectives of the franchise agreement." *Deslandes*, 81 F.4th at 705 (Ripple, J., concurring).[7]

Burger King and its franchisees' horizontal relationship in the relevant market distinguishes this case from those that Burger King cites, which involve vertical restraints on sellers in markets for consumer goods. *See, e.g.*, *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49-50 (1977) (manufacturer's restraint on distributor's sale of televisions was vertical). The same is true of Burger King's "dual distributor" argument, because Plaintiffs are not challenging restraints Burger King imposes as a *seller* of food—where it is in a vertical and dual distributor relationship with franchisees—but rather restraints it imposes as a *buyer* of labor—where it is in a horizontal relationship with and among franchisees. *See Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751, 752-54 (7th Cir. 1989) (airline and ticket sellers were in a vertical relationship in which the sellers were agents of the airline).

This critical distinction undermines Burger King's reliance on *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 720 (11th Cir. 1984). In that case, as pertinent here, a franchisee challenged the franchisor's territorial allocation practices, which prevented the plaintiff from opening additional restaurants to compete with the franchisor's own and other franchisees' restaurants. *Id.* The challenged restraints, therefore, limited competition in the sale of a product—dining at a Waffle House restaurant—to consumers, and the franchisor defendant occupied dual roles as both the manufacturer of the product and a direct seller of it. *Id.* Further, the possible procompetitive benefits of the vertical restraints occurred in the same market: food sales. Here, in contrast, the No-Hire Agreement does not limit the sale of any products manufactured by Burger King to consumers, but instead restricts competition among Burger King and its franchisees for labor, a market in which Burger King and its franchisees compete at the same level. It simply makes no sense to characterize Burger King as a "dual distributor" with respect to the labor market,

---

[7] Burger King's reliance on *Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001), misses the mark for the same reasons. That case involved a limited duration no-hire agreement, which was tied to *the discrete sale of a business. Id.* at 136-37. By contrast, Burger King's No-Hire Agreement is not tied to any employee's hiring but binds all employees indefinitely.

- 9 -

and thus *Midwestern Waffles* does not help Burger King. In fact, *Midwestern Waffles* actually undercuts Burger King's position, because the case was decided at summary judgment, not on a motion to dismiss, and the court recognized that characterizing the challenged restraint as horizontal or vertical presented a question of fact, *id.* at 712.

### 3. Burger King Orchestrated a Horizontal Agreement Amongst Franchisees.

In addition to restraining direct competition with its franchisees in the labor market, Plaintiffs also allege "Burger King orchestrated . . . the No-Hire Agreement among all of its franchisees" in order "to depress the wages and employment opportunities of employees." *E.g.*, Am. Compl. ¶¶ 2, 7, 179–84. This describes a classic hub-and-spoke conspiracy where Burger King (the hub) utilizes its power vis-à-vis each individual franchisee (the spokes) to coordinate an agreement between franchisees (forming the rim). *See Apple*, 791 F.3d at 314.

Burger King does not dispute that franchisees are horizontal competitors in every respect, including in the labor market. *See* Mot. at 11 (acknowledging that "franchisees within a single brand" are "intrabrand competitors"); *see also* Am. Compl. ¶¶ 73-74 (franchisees face competition from other franchisees). Instead, Burger King erroneously insists that the vertical organizer of a horizontal conspiracy escapes liability under the *per se* rule even when it competes horizontally in that sphere. Mot. at 11. But that is a "misreading of Supreme Court precedent, which establishes precisely the opposite." *Apple*, 791 F.3d at 297 (reasoning that court must evaluate nature of restraint "rather than the identity of each party who joins in to impose it" to determine whether *per se* rule is invoked). "It is the type of restraint [Burger King] agreed to impose that determines whether the *per se* rule or the rule of reason is appropriate," not Burger King's "role in the scheme." *Id.* at 322. Thus, just as *Apple* was held to the *per se* standard where it used a vertical relationship to orchestrate a horizontal price-fixing agreement among e-book publishers, *id.* at 321-22, Burger King must be held to the *per se* standard here for orchestrating a horizontal no-poach agreement among competing franchisees. *See also Toys 'R' Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (finding vertical agreement used to orchestrate horizontal restraint among suppliers was subject to *per se* treatment).

Although Burger King claims that there is no plausible horizontal agreement, Mot. at 11-12, this argument ignores that every Burger King franchisee *admitted*, in significant business documents, that they agreed not to solicit or hire employees away from every other horizontally aligned franchisee. Am. Compl. ¶ 8. This is the sort of direct evidence of conspiracy rarely found

- 10 -

in an antitrust pleading. The fact that a franchisee requires the "prior written consent" *of another franchisee* (*not* Burger King) in order to hire its employee underscores the horizontal nature of the agreement. *Id.* As to this latter point, perhaps most telling, Plaintiffs Arrington and Munster were specifically told they needed "approvals" or "releases" to transfer between employers. *Id.* ¶¶ 147, 155–56. Plaintiffs also allege numerous "plus" factors, including: (i) the agreement is otherwise against franchisees' self-interest, *id.* ¶ 85; (ii) absent an assurance that all other franchisees were held to the same terms, no franchisee would agree, *see id.*; *see also id.* ¶ 86; (iii) franchisees have numerous opportunities to conspire, *id.* ¶ 98; and (iv) the agreement has been the subject of government investigations, *id.* ¶¶ 11, 56-59. These factors, taken together, demonstrate the plausibility of an agreement at the rim between the franchisees. *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003).[8]

Four judges analyzing no-hire agreements within other franchise systems have had little trouble concluding that they were horizontal restraints and that factual questions precluded dismissal. *See Fuentes*, 2019 WL 7584654, at *1; *In re Papa John's Employee & Franchisee Employee Antitrust Litig.*, 2019 WL 5386484, at *9; *Blanton*, 2019 WL 2247731, at *5; *Butler*, 331 F. Supp. 3d at 797. Although Burger King argues its franchise agreement lacks the third-party enforcement provision present in *Butler*, Mot. at 12 n.10, this argument ignores the other ways which the agreement was made and enforced horizontally. Burger King franchisees, for instance, could independently authorize cross-hiring, Am. Compl. ¶ 8, and franchisees understood that Burger King itself would enforce the agreement, *id.* ¶¶ 84–90.

### B.  Plaintiffs Allege a Plausible Quick-Look Claim.

Even if the Court were to ultimately conclude that the *per se* rule is inapplicable, Plaintiffs still plausibly allege an antitrust violation under the "quick-look" test. Quick-look is an abridged version of the rule of reason approach.  It is applied when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental*, 526 U.S. at 770. In such circumstances, "no elaborate industry analysis is required to demonstrate the anticompetitive character of . . . an agreement." *Bd. of Regents*, 468 U.S. at 109 (citation and quotations omitted). Plaintiffs' allegations satisfy this standard. *See Blanton*, 2019 WL 2247731, at *5.

---

[8] *See* ABA, Model Jury Instructions in Civil Antitrust Cases, Instruction A-1 (2016 ed.) "Contract, Combination, or Conspiracy."

Burger King argues that quick-look does not apply because: (1) Plaintiffs have not pled a horizontal agreement; (2) the no-hire agreement is "ancillary" to a vertical franchise agreement; and (3) the effects of the no-hire are not readily apparent. Plaintiffs have clearly alleged that Burger King and franchisees were horizontal competitors in the labor market, refuting the first argument. *See* Sections III.A, *supra*. There is no ancillarity because, as discussed above, the No-Hire Agreement is neither necessary to nor justified by any procompetitive business purpose in the labor market. *See id.*[9] As to the suggestion that the effects of the restraint are not readily apparent, Defendants rely on *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016), a decision arising from a summary judgment ruling, not a motion to dismiss. The Eleventh Circuit in *Procaps* examined "at bottom . . . a breach of contract case" for which, naturally, the absence of readily apparent effects was "not all that surprising." *Id.* at 1087. By contrast, it is easy to understand that wages will stagnate under this restraint when employers agree not to compete for the very employees they otherwise would be most likely to hire—those with prior Burger King experience and brand-specific skills.

Nor, finally, should the Court give credence to Burger King's erroneous argument that Plaintiffs have failed to sufficiently define a market for quick-look purposes. Burger King cites *Agnew* and other out-of-circuit, out of context cases to support its point. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 345 (7th Cir. 2012). But *Agnew* holds that quick-look permits plaintiffs "to forgo any strict showing of market power, and thus a specific definition of the relevant market." *Id.* at 337. Similarly, Burger King cites *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955 (6th Cir. 2004), but the more recent *In re Southeastern Milk Antitrust Litigation* clarifies that a quick-look plaintiff can meet its burden to defeat *summary judgment* "***even without establishing the relevant geographic market***." 739 F.3d 262, 274-76 (6th Cir. 2014) (emphasis added).

In any event, under quick look, Burger King carries "the burden to show empirical evidence

---

[9] Burger King argues that it controlled "almost every facet of the franchisees' businesses," Mot. at 15, but ignores that employment matters are *specifically* the province of the independent franchisee employers. Am. Compl. ¶¶ 66-67. Burger King hypothesizes that franchisees "benefit from a well-trained and stable staff," but ignores that employers have plenty of other means to encourage their employees to stay without resorting to unlawful market division. Indeed, Burger King's argument would immunize *all* employers who want to retain well-trained staff. Finally, Burger King's repugnant suggestion that depressed wages and employment mobility actually "served the interests of the individual employees," *see* Mot. at 15, impermissibly contradicts Plaintiffs' allegations.

of procompetitive effects," *Cal. Dental*, 526 U.S. at 775 n.12.  As such, Burger King cannot prevail on a motion to dismiss. *See Butler*, 331 F. Supp. 3d at 797 (denying motion to dismiss even in absence of allegations regarding relevant market). In sum, Plaintiffs' allegations suffice to state a claim under the quick-look standard.

### C.  Plaintiffs Allege a Plausible Rule of Reason Claim.

Finally, Plaintiffs have pleaded sufficient allegations to support a claim even under the rule of reason standard. Burger King's argument assumes that pleading a relevant market is required. Mot. at 14-15. But the Supreme Court recently clarified that, when dealing with "horizontal restraints [that] ha[ve] an adverse effect on competition," a plaintiff need not define the relevant market. *Ohio v. Am. Express Co.*, 585 U.S. 529, 544 n.7 (2018) (citing *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986)). In other words, so long as a plaintiff pleads that the restraint had an actual detrimental effect on competition, the plaintiff has sufficiently pleaded a rule of reason claim. *See Procaps, S.A.*, 845 F.3d at 1084; *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996). Here, Plaintiffs have done just that. *See* Am. Compl. ¶¶ 106, 113-14.

### IV.     NO DEFENDANTS SHOULD BE DISMISSED.

Three Defendants—in particular, Burger King Worldwide, Inc. ("BKW"), Restaurant Brands International, Inc. ("RBI"), and Restaurant Brands International Limited Partnership ("RBI LP")—contend that they should be dismissed, because the wrongful conduct alleged in the Complaint is attributable, they claim, only to the fourth Defendant, Burger King Corporation ("BKC"). Mot. at 18-19.  This argument, however, conflicts with the allegations of the Complaint, which must be accepted at this stage. *Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1335 (N.D. Ga. 2015).

Plaintiffs identify the relationships between the various affiliated entities and assert that all four Defendants are engaged in and benefit from maintaining the antitrust conspiracy between Burger King and its franchisees.  Am. Compl. ¶¶ 1, 21-28, 53-54, 59, 105, 107, 110, 116.  Plaintiffs also specifically allege that RBI LP is liable for BKC's wrongful acts because RBI LP's guarantee of BKC's obligations extends to anything "under its franchise registration in each state where the franchise is registered, *and* under its Franchise Agreements." *Id*. ¶ 28 (emphasis added).  Contrary to Burger King's suggestion, the guarantee is not limited to obligations between BKC and franchisees.  Mot. at 19 n.16.  RBI LP thus became responsible for BKC's franchise-related liabilities, and RBI is liable for RBI LP's actions and debts as its sole general partner.

- 13 -

While the Amended Complaint, for the sake of efficiency, refers to "Defendants" where applicable, "use of the term 'Defendants' does not deprive Defendants of fair notice of the conduct attributed to them; instead, it simply signals that Defendants are [all] alleged to have participated in the conduct at issue." *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1227 (S.D. Fla. 2014); *see Garcia v. Clarins USA, Inc.*, No. 14-cv-21249, 2014 WL 11997812, at *10 (S.D. Fla. Sept. 5, 2014) ("[T]hough Plaintiff refers to the Defendants collectively, she alleged sufficient detail to put them on notice of her claims.").   Indeed, the Eleventh Circuit opinion that Burger King cites, *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*, 917 F.3d 1249 (11th Cir. 2019), rejected a "group pleading" attack akin to Defendants' argument here. *Id.* at 1275 (holding that allegations "aimed generally at 'the Defendants'" provided sufficient notice and survived a motion to dismiss).[10]   Moreover, grouping affiliated Defendants together is permissible under Rule 8, because "[w]ithout discovery it would be virtually impossible to know precisely which [Defendant] entity is responsible for what aspect of the [challenged conduct]." *Garcia*, 2014 WL 11997812, at *10; *see Toback v. GNC Holdings, Inc.*, No. 13-80526-CIV, 2013 WL 5206103, at *2 (S.D. Fla. Sept. 13, 2013). Given the Amended Complaint's allegations and the stage of the litigation, all four Defendants should remain in the action.

## V.   PLAINTIFFS SUFFICIENTLY PLEAD FRAUDULENT CONCEALMENT.

Plaintiffs allege that they and Class members "had neither actual nor constructive knowledge of the unlawful conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence . . . have put them on notice of the conspiracy." Am. Compl. ¶ 174. Plaintiffs had "no reason to know of the No-Hire Agreement." *Id.* ¶ 183. To toll claims beyond the Sherman Act's four-year statute of limitations, Plaintiffs must prove that these allegations were true, *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999), which is a question of fact not suitable for resolution on a motion to dismiss. *See Credit Bureau Servs., Inc. v. Experian Info. Solutions, Inc.*, No. 12–61360–CIV , 2012 WL 6102068, at *12 (S.D. Fla. Dec. 7, 2012) (citing *Ballew v. A.H. Robins Co.*, 688 F.2d 1325 (11th Cir. 1982)).

Plaintiffs allege that Burger King concealed its misconduct in many ways, *see* Am. Compl. ¶¶ 55–61, 129–34, 174–89, most importantly by lying to prospective employees, telling them that

---

[10] Defendants cite *Quality Auto* for the proposition that "conclusory allegations of a conspiracy" are inadequate, Mot. at 18, but the allegations of a conspiracy or agreement here are the opposite of conclusory, as the terms of the No-Hire Agreement are alleged in the Amended Complaint.

"employment terms and conditions . . . will vary and are determined *solely* by the Franchisee." *Id.* ¶ 182 (emphasis added). In fact, franchisees' hiring decisions were constrained by the No-Hire Agreement. *Id.* ¶ 78. This affirmative misrepresentation suffices to toll the claims. *See, e.g.*, *Cent. Fla. Sterilization, LLC v. Synergy Health AST, LLC*, No. 6:15–cv–2120, 2016 WL 8944643, at *4 (M.D. Fla. June 27, 2016) (holding that "deception constitutes an affirmative act" for tolling).

Burger King does not address this allegation. Instead, it asserts, impermissibly beyond the four corners of Plaintiffs' Amended Complaint, that its franchise agreement "has been publicly available for years," Mot. at 20, n.18, and was inherently "self-revealing," *id.* at 20. For that to matter, however, Plaintiffs had to be put on inquiry notice, but they had no reason to be. *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 803–04 (N.D. Ohio 2011) (due diligence is adequately pled when a plaintiff alleges they had no reason to know of an unlawful conspiracy). And the purportedly "public" franchise agreements are hundreds of pages long, with no reference to the No-Hire Agreement until page 260. Moreover, Burger King does not establish that these materials were reasonably accessible when the class period began, that historical versions were ever accessible, or how one would link any agreement with any particular franchisee-employer. *See* ECF No. 51 (explaining why information is not "self-revealing").

Finally, Burger King and franchisees' conspiracy is not "self-revealing." That argument is premised on the flawed assumption that each franchisee told its employees and prospective employees of its existence, which again impermissibly contradicts Plaintiffs' allegations. Regardless, it would not apply to class members who did not attempt to switch employers.[11]

## VI.   ALTERNATIVELY, PLAINTIFFS REQUEST LEAVE TO AMEND.

Burger King's motion should be denied because Plaintiffs plausibly plead a claim whether judged by the *per se*, quick look, or rule of reason standards. But if the Court concludes otherwise, or that BKW, RBI, and RBI LP's involvement or fraudulent concealment are insufficiently pled, Plaintiffs respectfully request leave to amend to cure any deficiencies.

## VII.   CONCLUSION

For the foregoing reasons, Burger King's Motion should be denied.

---

[11] Finally, fast-food workers should not be held to the standards of experienced antitrust enforcers, expected to recognize subtle indicia of illegal conspiracies. *See* Am. Compl. ¶¶ 18–20, 47–54; *cf. In re Managed Care Litig.*, No. 00-1334-MD, 2009 WL 855963, at *5 n.8 (S.D. Fla. Mar. 30, 2009) ("Recognizing that Plaintiffs here are sophisticated parties, [and] they will not be held to a lower standard than unsophisticated parties.").

Dated: March 14, 2025                    Respectfully submitted,

                                         */s/ Peter Prieto*
                                         Peter Prieto (FBN 501492)
                                         Matthew P. Weinshall (FBN 84783)
                                         **PODHURST ORSECK, P.A.**
                                         SunTrust International Center
                                         2525 Ponce de Leon Blvd, Suite 500
                                         Coral Gables, Florida 33134
                                         Tel: (305) 358-2800/Fax: (305) 358-2382
                                         pprieto@podhurst.com
                                         mweinshall@podhurst.com

                                         *Interim Liaison Counsel and Plaintiffs' Steering
                                         Committee*

                                         Joseph H. Meltzer
                                         **KESSLER TOPAZ
                                         MELTZER & CHECK LLP**
                                         280 King of Prussia Road
                                         Radnor, PA 19087
                                         Tel: (610) 667-7706
                                         Fax: (610) 667-7056
                                         jmeltzer@ktmc.com

                                         *Interim Co-Lead Counsel*

                                         Richard D. Mccune
                                         Michele M. Vercoski
                                         **McCUNE WRIGHT AREVALO, LLP**
                                         3281 East Guasti Road, Suite 100
                                         Ontario, CA  91761
                                         Tel: (909) 557-1250
                                         rdm@mccunewright.com
                                         mmv@mccunewright.com

                                         *Interim Co-Lead Counsel*

                                         Paul J. Geller (FBN 984795)
                                         Stuart A. Davidson (FBN 0084824)
                                         Jason H. Alperstein (FBN 64205)
                                         **ROBBINS GELLER RUDMAN
                                         & DOWD LLP**
                                         120 East Palmetto Park Road, Suite 500
                                         Boca Raton, FL  33432
                                         Tel: (561) 750-3000

Fax: (561) 750-3364
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
jalperstein@rgrdlaw.com

David W. Mitchell
Carmen A. Medici
**ROBBINS GELLER RUDMAN
& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel: (619) 231-1058
Fax: (619) 231-7423
davem@rgrdlaw.com
cmedici@rgrdlaw.com

*Plaintiffs' Steering Committee*

John Radice
Daniel Rubenstein
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
jradice@radicelawfirm.com
drubenstein@radicelawfirm.com

Walter W. Noss
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA  92101
Tel: (619) 233-4565
Email: wnoss@scott-scott.com

Dean M. Harvey
Anne B. Shaver
Yaman Salahi
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111
Tel: (415) 956-1000
dharvey@lchb.com
ashaver@lchb.com
ysalahi@lchb.com

- 17 -

Michael L. Schrag
Eric H. Gibbs
Joshua J. Bloomfield
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
mls@classlawgroup.com
ehg@classlawgroup.com
jjb@classlawgroup.com

George W. Sampson
**SAMPSON DUNLAP LLP**
1001 4th Ave., Suite 3200
Seattle, WA 98154
Tel: (206) 369-3962
george@sampsondunlap.com

Derek Y. Brandt
**BRANDT LAW LLC**
132 N. Kansas St., P.O. Box 66
Edwardsville, IL 62025
Tel: (312) 543-9198
derek@brandtlawllc.com

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2025, I caused a copy of the foregoing Plaintiffs'
Memorandum of Law in Opposition to Defendants' Motion to Dismiss to be filed electronically
via the Court's CM/ECF system. Those attorneys who are registered CM/ECF users may access
these filings, and notice of these filings will be sent to those parties by operation of the CM/ECF
system.

By: /s/ Peter Prieto
Peter Prieto